1
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
2
3300 Hillview Avenue
Palo Alto, California 94304
3
Tel: (650) 849-6600; Fax: (650) 849-6666
Robert F. McCauley III (Bar No. 162056)
4
robert.mccauley@finnegan.com

5
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
6
901 New York Avenue, NW
Washington, DC 20001
7
Tel: (202) 408-4000; Fax: (202) 408-4400
Gerald F. Ivey (pro hac vice)
8
gerald.ivey@finnegan.com
Michael A. Morin (pro hac vice)
9
michael.morin@finnegan.com
James R. Barney (pro hac vice)
10
james.barney@finnegan.com

11
Attorneys for Defendants
Abbott Cardiovascular Systems Inc.,
12
Abbott Laboratories, and Abbott Vascular, Inc.

FISH & RICHARDSON PC
225 Franklin Street
Boston, Massachusetts 02110-2804
Tel: (617) 542-5070; Fax: (617) 542-8906
Frank E. Scherkenbach (Bar No. 142549)
scherkenbach@fr.com

Attorneys for Counterclaim-Plaintiff
Boston Scientific Corporation

13

14
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

15

16
MEDTRONIC VASCULAR, INC.
MEDTRONIC USA, INC., MEDTRONIC, INC.,
MEDTRONIC VASCULAR GALWAY, LTD.,
17
and EVYSIO MEDICAL DEVICES, ULC

18
             Plaintiffs/Counterclaim-
             Defendants
19

20
             v.

21
ABBOTT CARDIOVASCULAR SYSTEMS
INC., ABBOTT LABORATORIES, and
ABBOTT VASCULAR, INC.
22

23
             Defendants/Counterclaim-
             Plaintiffs
24
             and

25
BOSTON SCIENTIFIC CORPORATION

26
             Counterclaim-Plaintiff

CASE NO. 06-01066-PJH

**ABBOTT AND BSC'S NOTICE OF
MOTION AND MOTION FOR
SUMMARY JUDGMENT OF
INVALIDITY**

[REDACTED VERSION FOR PUBLIC
VIEWING]

**Date:    September 24, 2008
Time:    9:00 a.m.
Place:   Courtroom 3
Judge:  Honorable Phyllis J. Hamilton**

27

28

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     BACKGROUND ............................................................................................2

        A.      By 1996, the "Ring-and-Link" Concept Was Well Known...................2

        B.      By 1996, It Was Known That a Ring-and-Link Design Could Be Either "Out-of-Phase" or "In-Phase" ...........................................................3

        C.      By 1996, Curved Connectors Were Well Known for Both In-Phase and Out-of-Phase, Ring-and-Link Designs.......................................................4

        D.      During Prosecution of the Patents-in-Suit, Drs. Penn and Ricci Withheld Key Information About What Those Skilled in the Art Knew in 1996.........7

III.    ARGUMENT ..................................................................................................9

        A.      Wijay '940 Anticipates Many of the Asserted Claims of the '037 and '255 Patents .........................................................................................................9

                1.      Legal Standard for Anticipation..................................................9

                2.      Wijay Anticipates Independent Claim 11 of the '255 Patent and Several Dependent Claims ..........................................................9

                        a.      Wijay Discloses a Flexure Member "Interposed" Between Two Straight, Parallel Portions According to the Ordinary Meaning of That Term ...............................................12

                        b.      Wijay Has a Flexure Member That "Comprises" (i.e., Contains) an "Arcuate U-Shape"........................................14

                        c.      Wijay Anticipates Dependent Claims 13, 15 and 16 of the '255 Patent.............................................................................16

                3.      Wijay Anticipates Independent Claim 1 of the '037 Patent and Several Dependent Claims ..........................................................16

                        a.      Wijay Discloses a Single-Bend Flexure Member, Which Is "Non-Sinusoidal" and "Arcuate"........................................17

                        b.      Alternatively, Wijay Figures 2 and 2A, as Drawn, Include a Non-Sinusoidal "*Part* of a Longitudinal Portion That Provides Flexibility" ......................................................18

                        c.      Wijay Anticipates Dependent Claims 8, 9, 12, 13, 17, 20 and 55 of the '037 Patent ...............................................20

                4.      Wijay Anticipates Independent Claim 22 of the '037 Patent and Several Dependent Claims ..........................................................21

        B.      All of the Asserted Claims are Obvious in View of Wijay '940 Alone or in Combination with Fischell '442 or Israel '303.....................................21

1          1.     Legal Standard for Obviousness ...............................................21

2          2.     To the Extent Not Anticipated by Wijay, All the Asserted Claims Are Obvious in View of Wijay Alone or in Combination With Fischell '442 or Israel '303 .....................................................................22

4                 a.     It Would Have Been Obvious to Substitute a Non-Sinusoidal Flexure Member for a Sinusoidal One.............................................22

                 b.     It Would Have Been Obvious to Modify the Flexure Member of Wijay to Include a "U-Shape" ................................................23

7                 c.     It Would Have Been Obvious to Modify Wijay so That the Flexure Member Was "Interposed Between" a Pair of Straight, Parallel Struts .................................................................................24

9                 d.     It Would Have Been Obvious to Thin the Flexure Member in Wijay to Improve Flexibility .........................................................25

                 e.     It Would Have Been Obvious to Modify Wijay to Include an "Orthogonal" U-Shape ..................................................................26

12          3.     Secondary Considerations Cannot Overcome the Overwhelming Evidence of Obviousness in This Case .........................................26

                 a.     Plaintiffs Cannot Attribute Commercial Success to Any Allegedly Novel Feature of the Claimed Stent Designs ................27

                 b.     Plaintiffs Cannot Prove There Was a "Long Felt Need" for the Claimed Designs Since Every Element Was Already Known in the Prior Art .................................................................................27

17                 c.     Plaintiffs Cannot Show the Claimed Designs Produced "Unexpected Results" ...................................................................28

                 d.     Near-Simultaneous Invention by Others Further Supports Obviousness .........................................................................30

20    C.     The Asserted Claims Are Invalid for Indefiniteness................................31

21          1.     Legal Standard for Indefiniteness ..............................................31

22          2.     As Asserted by Plaintiffs, "U-Shaped" Is Indefinite ................................31

23                 a.     Plaintiffs Have Interpreted "U-Shaped" Inconsistently................32

24                 b.     Plaintiffs' Own Experts Cannot Agree on the Meaning of "U-Shaped" ............................................................................33

IV.     CONCLUSION................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Advanced Cardiovascular System, Inc. v. Medtronic Vascular, Inc.*,
    485 F. Supp. 2d 519 (D. Del. 2007)................................................................................3

*Apple Computer, Inc. v. Articulate System, Inc.*,
    234 F.3d 14 (Fed. Cir. 2000)........................................................................................9

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
    406 F.3d 1365 (Fed. Cir. 2005)..................................................................................18

*Board of Trustees v. Roche Molecular System, Inc., Number C 05-04158 MPH*,
    2008 WL 2241468 (N.D. Cal. May 29, 2008) ..........................................................21

*In re Corkill*,
    771 F.2d 1496 (Fed. Cir. 1985)..................................................................................29

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)..................................................................................33

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
    227 F.3d 1361 (Fed. Cir. 2000)..................................................................................30

*Halliburton Energy Services, Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)..................................................................................31

*Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc.*,
    397 F.3d 1217 (9th Cir. 2005) ...................................................................................19

*IXPL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005)....................................................................................9

*KSR International Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007).................................................................................................1

*Karsten Manufacturing Corp. v. Cleveland Golf Co.*,
    242 F.3d 1376 (Fed. Cir. 2001)....................................................................................9

*Muniauction, Inc. v. Thomson Corp.*,
    No. 2007-1485, 2008 WL 2717689 (Fed. Cir. July 14, 2008).................................21

*Ormco Corp. v. Align Technology, Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)..................................................................................27

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir. 2007)..................................................................................29

*Rocep Lusol Holdings Ltd. v. Permatex, Inc.*,
    470 F. Supp. 2d 448 (D. Del. 2007), *appeal dismissed*, 226 Fed. Appx. 998 (Fed. Cir.
    2007) ....................................................................................................................................18

*Seachange International, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)........................................................................................18

*The International Glass Co. v. United States*,
    408 F.2d 395 (1969)...........................................................................................................30

*Union Pac. Resource Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (Fed. Cir. 2001)...........................................................................................31

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942)...........................................................................................................32

## STATUTES

35 U.S.C. § 102(a) ...........................................................................................................................9

35 U.S.C. § 103(a) .........................................................................................................................21

## PUBLICATIONS

American Heritage College Dictionary 711 (3d ed. 1993) ...........................................................12

C.S. Forester, The Sky and the Forest .........................................................................................12

Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent
    Law and Policy*, Ch. 5 at 4 (Oct. 2003) ............................................................................1

John R. Allison & Mark A. Lemley, *Empirical Evidence on the Validity of Litigated Patents*,
    26 AIPLA Q.J. 185, 205 (1998)..........................................................................................1

Merriam-Webster Dictionary of English Usage 559 (1994).........................................................12

Random House Webster's College Dictionary 692 (2000) ...........................................................12

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on September 24, 2008, at 9:00 AM or soon thereafter as counsel may be heard by The Honorable Phyllis J. Hamilton of above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Abbott Cardiovascular Systems, Inc., Abbott Laboratories, Abbott Vascular, Inc., and Boston Scientific Corporation. will and hereby do move for summary judgment (or in the alternative, summary adjudication) that, as provided in the tables below, the following claims of the following patents are invalid under 35 U.S.C. §§ 102, 102, and/or 112:  claims 1, 8, 9, 12, 13, 16, 17, 20, 22, 29, 30, 33, 34, 40, 41, 43, 45-48, 53, and 55-57 of U.S. Patent No. 6,858,037 (the "'037" patent); and claims 11-13, 15, and 16 of U.S. Patent No. 7,094,255 (the "'255" patent).

| '255 Asserted Claims | Grounds for Invalidity |
|---|---|
| 11, 13, 15, and 16 | Each of these claims is anticipated by Wijay '940.<br>Alternatively, each is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442.<br>In addition, each of these claims is invalid as indefinite. |
| 12 | This claim is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442.<br>In addition, this claim is invalid as indefinite. |

| '037 Asserted Claims | Grounds for Invalidity |
|---|---|
| 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41, 55 and 56 | Each of these claims is anticipated by Wijay '940.<br>Alternatively, each is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442.<br>Claim 17 is invalid as indefinite. |
| 16, 40, 43, 45-48, 53 and 57 | Each of these claims is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442. |

This motion is based on this Notice of Motion and Motion, the supporting Declaration of Robert F. McCauley, all pleadings in the case, and such other arguments and evidence as may properly come before the Court.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        The U.S. Patent & Trademark Office ("PTO") is responsible for examining approximately

4   300,000 patent applications each year and determining their patentability.[1]  While the corps of some

5   3,000 examiners certainly does their best to perform this task and weed out unpatentable inventions,

6   no system is perfect.[2]  Indeed, despite the examination process, many invalid patents still issue from

7   the PTO on a routine basis.[3]  This occurs particularly often when applicants withhold important

8   information about the prior art from the Examiner.

9        Here, the asserted claims of the '037 and '255 patents are invalid as anticipated by Wijay or

10  obvious over Wijay in view of Israel or Fischell.  These claims should never have been issued by the

11  PTO, and certainly not in light of the U.S. Supreme Court's recent decision in *KSR International Co.*

12  *v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007), which established that "the predictable use of prior art

13  elements according to their established functions" is not patentable.  As will be explained below, it is

14  undisputed that *every* feature recited in the asserted claims was well known in the prior art.

15  Likewise, the particular combinations recited in the asserted claims were either expressly disclosed

16  in the art or admittedly obvious to those skilled in the art at the time.  Accordingly, no reasonable

17  juror could find the asserted claims valid under the current law.  In addition, many of the asserted

18  claims are invalid because they employ indefinite terminology.

19

20
_____

21      [1] *See* Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and*

22  *Patent Law and Policy*, Ch. 5 at 4  (Oct. 2003) (McCauley Decl., Ex. 1 (hereinafter "Ex. __"))
(documenting "a surge in patent applications, described by PTO Director James Rogan as an

23  'unprecedented explosion.'  Applications have doubled in the last twelve years, and increasing about
10% per year.").)

24      [2] *See id.*, Executive Summary at 9-10 ("Once an application is filed, the claimed invention is

25  effectively presumed to warrant a patent unless the PTO can prove otherwise.  The PTO's
procedures to evaluate patent applications seem inadequate to handle this burden."  "The PTO's

26  resources also appear inadequate to allow efficient and accurate screening of questionable patent
applications.").

27      [3] *See, e.g.,* John R. Allison & Mark A. Lemley, *Empirical Evidence on the Validity of*

28  *Litigated Patents*, 26 AIPLA Q.J. 185, 205 (1998) (reporting that 45-46% of all patents litigated to
final results were held invalid).  (Ex. 7.)

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

## II.      BACKGROUND

To understand why the Penn and Ricci patents consist merely of the obvious combination of prior-art elements, it is helpful to survey the state of the art as of March 1996, the earliest date to which the patents-in-suit claim priority.

### A.      By 1996, the "Ring-and-Link" Concept Was Well Known

All the stents at issue in this case are of the "ring-and-link" design.  To understand the import of that concept, it is first necessary to understand what came before it.

The evolution of modern stent design began in approximately 1985 (more than a decade before Drs. Penn and Ricci's alleged invention) when Drs. Palmaz and Gianturco introduced two design concepts for a balloon-expandable stent.  Dr. Palmaz's design consisted of a slotted, metal tube that could be delivered via a balloon catheter and expanded to hold open a diseased portion of a blood vessel.  (Ex. 9.)  Later, he and Dr. Schatz developed an "articulated" version of that structure.  (Ex. 10 at 21-32.)  Dr. Gianturco's design consisted of a single, metal wire coiled into an alternating clamshell configuration.  (Ex. 11.)  These two designs are shown below:



**Palmaz-Schatz design (left); Gianturco design (right)**

Throughout the late 1980s and early 1990s, as these "first-generation" designs were carefully studied, it became apparent they had certain limitations.  Namely, the slotted-tube structure of the Palmaz-Schatz stent, while radially strong upon expansion, was quite inflexible and difficult to deliver through small, curvy blood vessels.  (Ex. 10 at 21; Ex. 16 at 38; Ex. 17.)  Meanwhile, the coil structure of the Gianturco design, while very flexible along its length, was perceived as lacking sufficient radial strength to reduce "restenosis," i.e., the tendency of diseased vessels to re-narrow over time.  (Ex. 12 at 442-43.)

What was needed, therefore, was a stent that combined the radial strength of a slotted-tube design with the longitudinal flexibility of a coil design.  In 1989-91, the engineers at Advanced

Cardiovascular Systems ("ACS," now part of Abbott) developed just such a design, which became the first of the "second generation" stents.

The 1991 ACS design—later commercialized as the Multi-Link stent—consisted of short, undulating rings connected by straight connectors. Although the Multi-Link design was cut from a metal tube, its unique, ring-and-link structure and "open-cell" configuration made it extremely flexible along its length, akin to a coil stent. (Ex. 41 at 118, Ex. 14 at 53.) ACS filed a patent application on the ring-and-link design in October 1991 (Ex. 15), and publicly unveiled the Multi-Link stent approximately two years later (Ex. 54 at 805-07 ("Bronco stent")).



**Figs. 4 and 5 from ACS's U.S. Patent No. 5,421,955 (priority: 10/28/91), showing the connected ring design rolled and unrolled. (rings highlighted yellow, connectors blue)**

The Multi-Link stent received worldwide praise from physicians, who heralded its combination of flexibility and radial strength as a new era in stent design. (*See, e.g.,* Ex. 41 at 118 (Dr. Penn: "[I]t was an incredible advance for us.  It was a very good stent."); *see also* Exs. 16, 17.)  Indeed, the Multi-Link and its later iterations have remained the best selling bare-metal (i.e., non-drug-eluting) stents in the U.S. (with the exception of a single quarter in 1998) for the eleven years since it was launched.  (Ex. 2 at 113-14.)  Today, virtually



**Multi-Link stent: open cell design with straight connectors**

every stent on the market employs some variation of ACS's patented, ring-and-link design, including *all* of Medtronic's coronary stents, which have been found to infringe Abbott's patents on that design.  *See Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519 (D. Del. 2007).

**B.    By 1996, It Was Known That a Ring-and-Link Design Could Be Either "Out-of-Phase" or "In-Phase"**

ACS's 1991 patent application taught both an "out-of-phase" design (*see* Fig. 11) and an "in-phase" design (*see* Fig. 5), which differ with respect to the relative orientation of the peaks in adjacent rings.  (Ex. 15.)  As can be seen, an "out-of-phase" design like Figure 11 has peaks that



point towards each other (i.e., "peak-to-peak"), whereas an "in-phase" (or "peak-to-valley") design like Figure 5 has peaks that are all aligned in the same direction. By 1996, both orientations were well known to stent designers, as evidenced, for instance, by the 1994 Israel and 1995 Wijay designs shown here:



**Left**: 1995 Wijay design with peak-to-valley connectors. (Ex. 20); **Right**: 1994 Israel design with peak-to-peak connectors (Ex. 19)

### C.   By 1996, Curved Connectors Were Well Known for Both In-Phase and Out-of-Phase, Ring-and-Link Designs

Drs. Penn and Ricci did not invent the idea of using curved connectors in a ring-and-link design. (*See* Ex. 13 at 134-35; Ex. 23 at 161-62.) Rather, it is undisputed that many others before them had already recognized and disclosed the benefits of using curved connectors.

As just one example, U.S. Patent No. 6,053,940 to Wijay (priority date: October 20, 1995) (Ex. 20) discloses a peak-to-valley, ring-and-link design with curved "crossties" or connectors between rings (*see* Fig. 2 at right), which it explains as follows:



> The flexible crossties allow greater accommodation of the stent shown in FIG. 2 when advanced into a vascular cavity that contains bends in one or more planes. To accommodate a bend, some of the crossties 3 on the inside of the bend are placed in compression and can easily compress, due to the flexibility revealed in the design of FIG. 2, while on the opposite side of the bend, the crossties 3 are in tension and elongate to accommodate the total stent structure in being positioned in a turn that exists in one or more planes.

(*Id.*, col. 5:43-51.) Thus, Wijay explains that the expected function of curved connectors is to extend and compress, which provides flexibility as the stent rounds a curve.

Similarly, Israel '303 (priority date: March 17, 1994) (Ex. 19) discloses U-shaped connectors



1  or "loops" between adjacent undulating rings in a ring-and-link design,

2  which are highlighted in blue in the portion of Figure 3 reproduced

3  here.  Israel specifically explains how these U-shaped connectors

4  operate to provide flexibility during delivery of the stent through

5  curved vessels:

> During bending, the loops 14-20 to the right of point A
> change shape in order to compensate for the differences
> in length between the inside and outside curves.  For example, loops
> 18*i* and 20*i* near the inside of the curve are closer together than loops
> 18*o* and 20*o* on the outside of the curve, which expand.

9  (*Id.*, col. 3:37-41.)  Thus, Israel explains the expected function of U-shaped connectors in a ring-and-

10  link design; namely, they extend and compress as the stent rounds a curve to provide flexibility.

11  By December 1995, Dr. Penn was *personally* familiar with the curved connectors of the NIR

12  stent (a commercial embodiment of Israel '303) because he was the lead investigator of a human

13  clinical trial in which NIR stents were implanted in 255 patients from December 1995 through

14  March 1996.  (Ex. 24 at 847; Ex. 13 at 618-22.)  At the end of that study, Dr. Penn co-authored a

15  paper in which he explained that "[t]he cellular structure of the NIR stent was designed to provide

16  differential elongation of the struts" and that this "unique feature . . . facilitates delivery of the

17  unexpanded stent to the lesion site."  (Ex. 24 at 851.)  Dr. Penn and his co-authors included the

18  following photograph and caption, explaining in detail how the U-shaped connectors in the NIR

19  ("vertical loops" 1 and 2) extend and compress to provide flexibility:



**Figure 2. A,** Crimped stent is flexible by virtue of differential elongation of vertical loops (note the difference in opening of the vertical loop inside [1] and outside [2] the curve). **B,** Stent expanded in a curve shows conformity to curvature by the same differential elongation (note the difference in length of the loop inside [1] and outside [2] the curve).

26  This same feature was also described in U.S. Patent No. 5,607,442 to Fischell et al. (priority

27  date: November 13, 1995) (Ex. 21), which incorporates U.S. Patent No. 5,643,312 (Ex. 25) by

1   reference.  (Ex. 21, col. 2:44-47.)  Fischell '442 and Fischell '312 collectively disclose a ring-and-

2   link design with curved connectors.  For example, Figure 8 of

3   Fischell '312 depicts "a side view of

4   a post-deployment stent structure which utilizes two undulating

5   longitudinals on opposite sides of the stent for improved

6   placement in curved vessels."  (Ex. 25, col. 2:31-33; *see also* Ex.

7   13 at 149.)  Fischell '312 explains that a stent with such curved

8   connectors "would bend more easily during insertion into a vessel

9   and would be more readily adaptable for placement in curved

10  vessels such as some coronary arteries."  (Ex. 25, col. 3:45-49.)



**Figs. 8 and 9 from Fischell '312, showing both curved and straight "peak to valley" connectors**

11      Similarly, U.S. Patent No. 5,776,161 to Globerman

12  (priority date: October 16, 1995) (Ex. 26) discloses a ring-and-

13  link design with curved "longitudinal connectors" between rings.

14  (*Id.*, col. 7:16-17.)  These curved connectors are shown as item

15  35 in the partial reproduction of Figure 16 at right.  The

16  undulating rings "can either be in phase, with its 'peaks' and

17  'valleys' or offset up to about 180 degrees."  (*Id.*, col. 8:2-4.)

18      Thus, *without question*, curved connectors—including "peak-to-valley" connectors—were

19  well known in the art by 1995.  Accordingly, Drs. Penn and Ricci cannot claim to have invented

20  them by virtue of their March 1996 patent application.  (*Cf.* Ex. 27, '037 patent, col. 3:33-37 ("[W]e

21  have now *discovered* that the use of flexure means in the series of longitudinal struts leads to a very

22  desirable balance of lateral flexibility . . . and radial rigidity . . .") (emphasis added).)  (*See also* Ex.

23  23 at 161-62; Ex. 13 at 135; Ex. 49 at 301-02.)  Nor can they lay claim to the "non-sinusoidal"

24  connector, the "U-shaped" connector, the "arcuate" connector, or the "interposed" connector.  (*Id.*;

25  *see also* Ex. 23 at 164.)  Those concepts were all well known in the art by March 1996, as the

26  following sampling of pre-1996 designs illustrates:

27

28



**Top row:** Israel '303 (7/28/94) (Figs. 7&3); Fischell '312 (2/25/94); Fischell '442 (11/13/95)

**Bottom row:** Globerman '161 (10/16/95); Wijay '940 (10/20/95); Pinchasik '373 (3/17/94); NIR stent (Dec. 1995)

### D.   During Prosecution of the Patents-in-Suit, Drs. Penn and Ricci Withheld Key Information About What Those Skilled in the Art Knew in 1996

Drs. Penn and Ricci and their company, Evysio, were sued in 2002 for misappropriating trade secrets from IsoStent, a company owned by the Fischell family.  The alleged trade secrets included the idea of connecting undulating rings with curved connectors in an in-phase (i.e., "peak-to-valley") orientation, as shown here in a 1995 IsoStent schematic.  (Ex. 22.)  In order to win that lawsuit, Evysio presented evidence that an in-phase design with curved connectors—*the very design Drs. Penn and Ricci now claim to have invented in 1996*—was publicly known before 1995.



**July 1995 IsoStent design**

In the *IsoStent* litigation, Drs. Penn and Ricci submitted signed pleadings stating that "the undulating longitudinal and peak to valley combination stent design was not a trade secret of IsoStent and *similar designs were being created by several stent designers as early as 1994*."  (Ex. 28 at 11, Ex. 29 at 11, emphasis added; *see also* Ex. 13 at 256-57.)  Moreover, they retained an expert, Dr. Gary Roubin—a well-known interventional cardiologist and stent designer—to testify under oath that these ideas were all well known before 1995:

> It was well known at the time throughout the world that the introduction of curvilinear segments into any stent improved the flexibility.  And it was an obvious thing to have done with any laser cut stent at that time.
>
> \* \* \* \*
>
> The use of curvilinear segments in a laser cut stent design was -- was information that was widely appreciated throughout the stent business at the time.

1    (Ex. 30 at 70-71; *see also id.* at 147-48 ("[A]nyone designing, trying to achieve the same objectives

2    of flexibility and compressibility and radial strength would come up with these types of designs.");

3    *id.* at 60-61, 69-71, 82-83, 107, 144, 195.)

4              At the same time they were making these factual assertions in the *IsoStent* litigation, Drs.

5    Penn and Ricci were prosecuting the '037 patent before the PTO.  *Yet, incredibly, they never*

6    *mentioned a single word about the IsoStent litigation to the PTO during prosecution of the '037*

7    *patent.[4]*  (Ex. 49 at 275.)  Thus, the PTO never knew that Drs. Penn and Ricci had sworn under oath

8    that peak-to-valley designs with curved connectors "were being created by several stent designers as

9    early as 1994."  And the PTO never knew that the inventors' own expert, Dr. Roubin, testified under

10   oath that "it was an *obvious* thing to have done with any laser cut stent at that time."  (Ex. 30 at 70.)

11   Clearly, these admissions would have precluded patentability of the claims-in-suit; hence Plaintiffs'

12   furious efforts now to disown and downplay these comments.  (Ex. 39 at 24, 53; *see also* Ex. 23 at

13   380-88.)  Indeed, it should come as no surprise that Dr. Roubin—whom Evysio replied upon in the

14   *IsoStent* case—is nowhere to be found in *this* case.  Instead, Evysio has chosen a new expert, who,

15   conveniently, disagrees with virtually everything Dr. Roubin said in the *IsoStent* case.

16            Drs. Penn and Ricci's abuse of the patent system did not stop there, however.  While the

17   *IsoStent* decision was on appeal, they instructed their patent attorney, Mr. Bauer, to file a

18   Reexamination Request at the PTO to try to invalidate the Fischells' '817 patent.  (Ex. 23 at 412.)

19   Mr. Bauer filed that Request on December 22, 2004, asserting that Wijay '940 anticipates and/or

20   renders obvious the Fischell '817 claims.  (Ex. 31.)  This is *critically important* because—at that

21   very moment—Wijay '940 was also a highly material reference to the prosecution of Drs. Penn and

22   Ricci's '037 application, which Mr. Bauer was simultaneously prosecuting on behalf of Evysio

23   before a different PTO Examiner.

24            In the Fischell '817 Reexamination Request, Mr. Bauer (at Evysio's instruction) asserted that

25   Wijay '940 discloses two "U-shaped turn-back portions" with at least one "straight," "substantially

26

27            [4] Later, during prosecution of the '255 patent, they submitted some *IsoStent* materials, but

28   not Dr. Roubin's testimony, and not Penn and Ricci's sworn pleadings referring to the state of the art
     in 1995.  (Ex. 42.)

1  parallel" portion connecting one of the U-shapes to an adjacent ring.  (Ex. 31 at 32 (claim 6).)  Mr.

2  Bauer also represented, on Evysio's behalf, that it would have been an obvious "design choice" to

3  put straight, parallel portions on both sides of the curved portion.  (*Id.* at 32-33 (claim 7).)  Yet he

4  failed to disclose those highly relevant admissions to the Examiner handling Evysio's '037 and '255

5  patent applications.  Instead, he told *that* Examiner that the claims-at-issue—reciting nearly the

6  identical requirements of a U-shaped member disposed between two straight, parallel struts—were

7  fully patentable over Wijay '940.  (Ex. 32 at AB0732165, AB0732125-26.)

8      Needless to say, if Drs. Penn and Ricci had played fair with the PTO and had submitted all of

9  this information to the Examiner, the PTO never would have allowed the asserted claims to issue.  In

10  short, Drs. Penn and Ricci pulled a fast one at the PTO.  They should not be allowed to get away

11  with it here.

12  **III.   ARGUMENT**

13      **A.    Wijay '940 Anticipates Many of the Asserted Claims of the '037 and '255 Patents**

14          **1.    Legal Standard for Anticipation**

15      A patent claim is invalid as "anticipated" if it recites a structure that "was patented or

16  described in a printed publication in this or a foreign country, before the invention thereof by the

17  applicant for patent."  35 U.S.C. § 102(a).  Anticipation requires that a single prior-art reference

18  disclose, either expressly or inherently, "each and every limitation of a claimed invention."  *Apple

19  Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000) (affirming summary

20  judgment of invalidity based on anticipation); *see also Karsten Mfg. Corp. v. Cleveland Golf Co.*,

21  242 F.3d 1376, 1383-84 (Fed. Cir. 2001) (same).  Moreover, a patent "may be found to be

22  anticipated on the basis of a reference that had properly been before the patent examiner in the

23  United States Patent and Trademark Office ('PTO') at the time of issuance," even if that reference

24  was specifically cited and discussed by the Examiner.  *IXPL Holdings, L.L.C. v. Amazon.com, Inc.*,

25  430 F.3d 1377, 1381 (Fed. Cir. 2005).

26          **2.    Wijay Anticipates Independent Claim 11 of the '255 Patent and Several
                Dependent Claims**

27      As the claim chart below demonstrates, every limitation of independent claim 11 of the '255

28

patent (Ex. 50) is expressly or inherently disclosed in Wijay '940 (Ex. 20):

| Claim Language (Ex. 50) | Construction[5] | Wijay '940 (Ex. 20) |
|---|---|---|
| 11. An unexpanded stent comprising: | not construed (therefore, ordinary meaning) | *See* Ex. 20, col. 1:7-10 ("The field of this invention relates to vascular stents that can be delivered to a predetermined position and allowed to spring outwardly or, in the alternative, which can be expanded in place."); *see also* col. 9:17-21. |
| a tubular wall having a series of undulating circumferential portions, each circumferential portion comprising alternating peaks and valleys; | tubular wall: having the form of a tube<br><br>undulating: rising and falling in waves, wave like<br><br>peaks and valleys: the surface outside the point at which two slopes or curves meet is the peak, and the surface inside the point at which two slopes or curves meet is the valley | *See id.,* col. 5:37-41 ("The stent depicted in FIG. 1 can be . . . cut from a solid tube using known laser cutting techniques."); *see also* col. 4:57-63.<br><br>*See also* Fig. 2 below.<br><br><br><br>*FIG. 2* |
| the tubular wall also having a plurality of longitudinal portions connecting said series of undulating circumferential portions to form a porous, cylindrical surface; | longitudinal portion: parts placed or running in a generally lengthwise direction. | *See* Fig. 2 above. Crossties run generally lengthwise (along axis labeled x-y) and connect undulating rings.<br><br>*see also* Ex. 20, col. 5:19-31 (discussing "crossties 3" between rings); *id.,* col. 5:35-51. |
| a longitudinal portion of said plurality of longitudinal portions connecting a peak in a first circumferential portion with a valley in a second circumferential portion adjacent to the | not construed (therefore, ordinary meaning) | As shown in Fig. 2 below, the longitudinal portion (purple) connects a peak (red) to a valley (green) |

---

[5] Constructions are from the Court's Order Construing Claims (Dkt. No. 283) and the parties' stipulated constructions (Dkt. No. 163).

| Claim Language (Ex. 50) | Construction[5] | Wijay '940 (Ex. 20) |
|---|---|---|
| first circumferential portion; and | | <br>FIG. 2 |
| each of said plurality of longitudinal portions having a single flexure member interposed between a pair of straight strut portions which are disposed parallel to a longitudinal axis of the stent, | flexure member: part of a longitudinal portion that provides flexibility<br><br>interposed between…: ordinary meaning (discussed below) | Referring to Fig. 2 below, Plaintiffs have admitted that Wijay has a flexure member (shown in blue). (Ex. 23 at 500; Ex. 39 at 100.) Plaintiffs have also admitted that each longitudinal member in Wijay has a straight, parallel portion (shown in pink). (Ex. 23 at 501, Ex. 31, Ex. 43.) As can be seen, the flexure member is interposed between two of these straight, parallel portions.<br><br> |
| the flexure member comprising an arcuate U-shape curving in a non-radial direction of the stent. | arcuate: comprising a shape bent in the form of a bow or curved in the form of a bow<br><br>curving in a non-radial direction: curved or curving such that the [arcuate U-shape] does not extend substantially outside the outer surface or inside the inner surface of the tubular wall | Evysio represented to the PTO that Wijay comprises (i.e., contains) a "U-shaped" portion. (Ex. 31 at 32.) Plaintiffs have also admitted that the U-shaped portion highlighted below is shaped like a bow, i.e., arcuate. (Ex. 35 at 8-9.) Because Wijay can be cut from a tube, the U-shape will inherently curve in a non-radial direction. |

| Claim Language (Ex. 50) | Construction[5] | Wijay '940 (Ex. 20) |
|---|---|---|
| | |  Arcuate U-shape |

Plaintiffs' expert, Dr. Rothman, has identified only two limitations of claim 11 that are allegedly missing from Wijay: (1) the "interposed" requirement, and (2) the "U-shape" requirement.[6]  Each will be addressed in turn below.

  **a.** **Wijay Discloses a Flexure Member "Interposed" Between Two Straight, Parallel Portions According to the Ordinary Meaning of That Term**

With respect to the "interposed" requirement of claim 11, this Court has instructed that "[t]he ordinary meaning of the phrase shall control."  (Dkt. No. 283 at 19.)  The word "interpose" is ordinarily defined as "[t]o insert or introduce between parts," (AMERICAN HERITAGE COLLEGE DICTIONARY 711 (3d ed. 1993)) (Ex. 36) or "to place between; cause to intervene" (RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 692 (2000)) (Ex. 37).  Thus, applying the ordinary meaning per the Court's instruction, the "interposed" limitation requires a "flexure member" that has been introduced or placed between a pair of straight, parallel strut portions.

Notably, this "interposed" requirement differs from the limitation of claim 1 of the '037 patent, which requires that the flexure member be "*connected* to" a straight, parallel strut portion. (Ex. 27, claim 1.)  The phrase "interposed between" identifies only the position of one object relative to other objects; it does not require a physical connection, nor does it preclude intervening objects.[7]

 Plaintiffs' expert, Dr. Rothman, however, has opined that "interposed" has a much different meaning within the "context" of the patents-in-suit.  (Ex. 39 at 74-75.)  Namely, he asserts "the term

---

[6] Plaintiffs have adopted Dr. Rothman's Rebuttal Report as their corporate position on what elements are allegedly missing from the prior art.  (Ex. 55.)

[7] *See, e.g.,* C.S. Forester, *The Sky and the Forest* (". . . the tops of the trees behind him interposed between him and the sun.") in MERRIAM-WEBSTER'S DICTIONARY OF ENGLISH USAGE 559 (1994) (Ex. 38).  *See also* Ex. 34 at 255 ("Q. So the ordinary meaning of interpose doesn't require things to be connected, agreed?  A. Not necessarily.").

1  requires that the flexure member be actually *connected to* (inserted between) two straight strut

2  portions which are parallel to the longitudinal axis of the stent." (*Id.*, emphasis added.) Thus,

3  Plaintiffs are now attempting to equate "interposed" with "connected," contrary to the ordinary

4  meaning of "interposed."

5        Plaintiffs should be precluded from arguing anything other than the ordinary meaning of

6  "interposed." Not only has the Court ordered that the ordinary meaning shall apply, but Plaintiffs

7  specifically argued during claim construction that "[t]he phrase means what it says and does not

8  require further construction." (Dkt. No. 171 at 20.) They cannot now argue that "interposed" has a

9  nuanced meaning that depends on the "context" of the patents-in-suit.

10       In any event, the correct construction of "interposed" is evident from claim 22 of the '037

11  patent, which requires a non-sinusoidal flexure member that is "interposed between

12  a pair of straight strut portions which are disposed parallel to a

13  longitudinal axis of the stent." *All parties* agree this limitation is supported by

14  Figure 6. (Ex. 39 at 75.) As seen in Figure 6 at right, a U-shaped or "non-

15  sinusoidal" flexure member (blue) is indeed "interposed between" two straight,

16  parallel strut portions (pink) under the *ordinary* meaning of that term. (Ex. 34 at

17  259.) It does not matter that there is an intersecting circumferential member

18  because the *ordinary* meaning of "interposed" does not preclude intervening or

19  intersecting items.[8] Indeed, Dr. Rothman readily admitted that Figure 6 satisfies the ordinary

20  meaning of "interposed" without any need to modify the figure:

21            Q.   There are several things interposed between A and B;
                   correct?

22            A.   Yes.

23            Q.   And C is one of the things that's interposed between A
                   and B; correct?

24            A.   Yes.

25

26



**Excerpt from
Fig. 6**

---

27       [8] Moreover, even under Dr. Rothman's incorrect interpretation, the blue flexure member is
28  still interposed between the straight portions because it is "connected" to the lower pink portion
    through the ring.

1    (*Id.* at 259.)

2        In contrast, Plaintiffs contend Figure 6 only supports the "interposed"

3    limitation under their "contextual" definition if the figure is modified so that an

4    *entire circumferential ring* is removed from the stent, leaving elongated,

5    double-length connectors, some having regions of different thicknesses.  (Dkt.

6    No. 171 at 22.)  Yet this drastic "modification" is nowhere taught or suggested

7    in the patent.  Moreover, Dr. Penn admitted this would be a bad design, which

8    he would not want to put in his patients' arteries.  (Ex. 41 at 289-90 ("I would

9    be concerned about that as a stent designer.").)



From Pls'
Opening Claim
Contr. Br. at 22

10        Thus, since all parties agree that Figure 6 supports the "interposed" claims, and since

11    Plaintiffs' unorthodox definition would require Figure 6 to be modified in an absurd way that even

12    Dr. Penn admits would be unworkable, the only logical conclusion is that the *ordinary* meaning of

13    "interposed" should apply, precisely as this Court has already ordered.

14        Turning to Wijay, it is undisputed that Wijay discloses flexure members, each connected to a

15    straight, parallel strut portion on at least one side.  (Ex. 23

16    at 500-06; Ex. 43; Ex. 31 at 32.)  Dr. Ricci labeled these

17    items on Wijay Figure 2A at right.  (Ex. 43.)  Thus, if

18    "interposed" is given its ordinary meaning, it is

19    *undisputable* that Wijay discloses a flexure member

20    "interposed" between two straight, parallel strut portions,

21    precisely as depicted in Figure 6 of the patent.



Dr. Ricci labeled
this portion of
Wijay, showing a
flexure member
(yellow) connected
to a straight portion
(purple).  (Ex. 43;
Ex. 23 at 500-02)
Of course, another
staight portion is
located just below
point B.

22            **b.    Wijay Has a Flexure Member That "Comprises" (i.e., Contains)
                    an "Arcuate U-Shape"**

23

24        Plaintiffs admit Wijay has a flexure member that contains an "arcuate" shape, as highlighted

25    at right.  (Ex. 35 at 10.)  Dr. Rothman, however, contends this arcuate portion

26    of Wijay is not "U-shaped" because, according to him, those skilled in the art

27    would only recognize a U-shape if it has "substantially full 180 degree semi-

28    circular shape or a substantial arc of 180 degrees or less that connects two



Plaintiffs admit the
yellow shape is
arcuate but deny it is
U-shaped.

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

1  substantially straight and substantially parallel strut portions." (Ex. 39 at 86.) That assertion,

2  however, contradicts the ordinary meaning of "U-shaped" and many of Plaintiffs' representations

3  and admissions.[9]

4  For example, Dr. Penn testified in no uncertain terms that a "U-shape" need only have the

5  general shape of the letter "U," which can vary significantly depending on

6  the font and style used. (Ex. 41 at 295-96, 302-07.) When given a variety

7  of U shapes and asked to rank each on a scale from 1 to 5 (with 5 being

8  the "perfect U"), Dr. Penn gave Wijay a score of 3 out of 5 (*id.* at 306-07),

9  a higher score than he gave to Dr. Rothman's "substantially full 180

10  degree semi-circular shape" (*Id.* at 331-32.) In other words, he considered the Wijay curve to be

11  *more* U-shaped that Dr. Rothman's semi-circular arc.



The "u" in this word is from Wijay Fig. 2. Penn gave it a score of 3/5. (Ex. 41 at 285-87.)

12  Likewise, in the Fischell Reexamination Request, Evysio represented

13  to the PTO that Wijay has "U-shaped turn back portions," which Mr. Bauer

14  personally labeled in the drawing at right on behalf of Evysio. (Ex. 31 at 32.)

15  Dr. Rothman's litigation-induced definition of "U-shaped" thus stands in

16  stark contrast to what Evysio earlier represented to the PTO.



Assertion by Evysio's patent attorney.

17  What Plaintiffs are apparently trying to do is draw a razor-thin line between curves that are

18  "U-shaped" and others that are not. If they insist on doing so, however, then "U-shaped" is simply

19  indefinite. *See* Section III.C.2, *infra.* Moreover, it is clear from their own admissions that no

20  reasonable juror could conclude that Wijay does *not* contain a "U-shape":

21
22              **VS.**      
23
24
25  Plaintiffs admit these yellow shapes are "U-shaped." (Ex. 35 at 46, 60-61, 131, 148)

Accordingly, Wijay must also have a U-shape.

26

27  [9] Indeed, when asked for support for this highly nuanced definition, Dr. Rothman could not

28  identify a single document to support it (Ex. 34 at 59-60), and he admitted that this definition is contrary to how other stent designers have used "U-shaped" in the art (Ex. 39 at 55, 72).

1

2

   **c. Wijay Anticipates Dependent Claims 13, 15 and 16 of the '255 Patent**

3

   Claim 13 requires that "the porous, cylindrical surface comprises a

4

repeating pattern comprised of a polygon having a pair of side walls

5

substantially parallel to a stent longitudinal axis, and wherein the flexure

6

member is disposed in each of the side walls."  (Ex. 50, col. 15:39-43.)  As

7

shown in Figure 2 of Wijay at right, that requirement is clearly met.  Claim 15

8

requires "a medicinal coating" on the stent, which Wijay expressly discloses.



**FIG. 2**

9

(*See* Ex. 20, col. 7:1-7 (stent can be "coated with heparin …").)  Claim 16 requires "a balloon

10

catheter having an expandable portion," which Wijay also discloses.  (*See id.*, col. 9:16-20 (the

11

"various stents illustrated in the figures can be delivered by a balloon . . . .").)  Neither Dr. Rothman

12

nor Plaintiffs (who adopted his report) have disputed that Wijay discloses these limitations.

13

   **3. Wijay Anticipates Independent Claim 1 of the '037 Patent and Several Dependent Claims**

14

   As the claim chart below demonstrates, every element of independent claim 1 of the '037

15

patent (Ex. 27) is expressly or inherently disclosed in Wijay '940 (Ex. 20):

16

| Claim Language (Ex. 27) | Construction | Wijay '940 (Ex. 20) |
|---|---|---|
| 1.  An unexpanded stent comprising: | *See* '255 claim 11 (above) | *See* '255 claim 11 (above) |
| a tubular wall having a series of undulating circumferential portions, each circumferential portion comprising alternating peaks and valleys; | *See* '255 claim 11 (above) | *See* '255 claim 11 (above) |
| the tubular wall also having a plurality of longitudinal portions connecting said series of undulating circumferential portions to form a porous, cylindrical surface; | *See* '255 claim 11 (above) | *See* '255 claim 11 (above) |
| a longitudinal portion connecting a peak in a first circumferential portion with a valley in a second circumferential portion adjacent to the first circumferential portion; and | *See* '255 claim 11 (above) | *See* '255 claim 11 (above) |
| each longitudinal portion having a flexure member, | <u>flexure member</u>: part of a longitudinal portion that provides flexibility | *See* Ex. 20, Figs. 2 & 2A;<br><br>*see also id.*, col. 8:53-55 ("The crossties can be . . . a more flexible design incorporating one or more |

17

18

19

20

21

22

23

24

25

26

27

28

| Claim Language (Ex. 27) | Construction | Wijay '940 (Ex. 20) |
|---|---|---|
| | | bends."). |
| said flexure member, in two dimensions, being non-sinusoidal and arcuate, | non-sinusoidal: not S-shaped<br><br>arcuate: comprising a shape bent in the form of a bow or curved in the form of a bow | Wijay meets these requirements in two ways:<br><br>First, Wijay discloses that "[t]he crossties can be . . . a more flexible design incorporating **one or more bends**." (Ex. 20, col. 8:53-55.) Thus, the flexure member can consist of just "one" of the bends shown in Fig. 2, which is inherently "non-sinusoidal" and "arcuate."<br><br>Second, as shown in Fig. 2 below, *part* of the longitudinal portion that provides flexibility is "non-sinusoidal," even though it is part of a larger portion that is S-shaped.<br><br> |
| each flexure member being connected to an adjacent circumferential portion with a straight strut portion which is disposed parallel to a longitudinal axis of the stent. | Not construed (therefore, ordinary meaning) | Plaintiffs have admitted that the pink section shown above in Fig. 2 is straight and parallel. (*See, e.g.,* Ex. 23 at 500-06, Ex. 31 at 32.) |

The only limitation in claim 1 of the '037 patent that Dr. Rothman and Plaintiffs contend is missing from Wijay is the "non-sinusoidal" requirement. Wijay satisfies that limitation for at least two separate reasons.

           **a.**      **Wijay Discloses a Single-Bend Flexure Member, Which Is "Non-Sinusoidal" and "Arcuate"**

Although Wijay illustrates a two-bend (i.e., S-shaped) flexure member in Figures 2 and 2A, it makes absolutely clear that the shape of the "crossties" is not limited to an S shape. Specifically, in discussing "several salient advantages of the various embodiments previously described," Wijay

1   explains that, "[t]he crossties can be a more rigid, straight design or a more flexible design

2   incorporating **one or more bends**." (Ex. 20, col. 8:55-57.)[10]  Thus, Wijay expressly teaches that the

3   "crossties" in Figures 2 and 2A can have one bend, two bends (as illustrated), or more than two

4   bends.  Choosing either of the bends illustrated in Figures 2 and 2A for the "one-bend" embodiment

5   necessarily results in a non-sinusoidal and arcuate flexure member.

6          It makes no difference that Wijay describes the "one-bend" embodiment only in text, without

7   a corresponding illustration.  The law is clear that alternative embodiments—even non-preferred and

8   unillustrated embodiments—can anticipate.  *See Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d

9   1361, 1380 (Fed. Cir. 2005) ("To be anticipating, Gardner need not disclose a separate figure

10  depicting [the anticipating embodiment]; disclosing the embodiment in textual form is enough.");

11  *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1372 (Fed. Cir. 2005) ("[I]t was error for

12  the district court to limit the disclosure of the prior art reference to a preferred embodiment.");

13  *accord Rocep Lusol Holdings Ltd. v. Permatex, Inc.*, 470 F. Supp. 2d 448, 456 n.6 (D. Del. 2007)

14  ("Disclosing a tilt valve as an alternative embodiment rather than as the primary embodiment of the

15  claim does not make the reference non-anticipatory.") (granting summary judgment of anticipation),

16  *appeal dismissed*, 226 Fed. Appx. 998 (Fed. Cir. 2007).

17              **b.    Alternatively, Wijay Figures 2 and 2A, as Drawn, Include a Non-
                        Sinusoidal "*Part* of a Longitudinal Portion That Provides
18                      Flexibility"**

19          This Court has defined "flexure member" to mean "part of a

20  longitudinal portion that provides flexibility."  (Dkt. No. 283 at 14.)

21  Because different parts of a longitudinal portion can provide

22  flexibility, it is possible, of course, for a longitudinal portion to have

23  more than one flexure member.  Indeed, claims 2 and 23 of the '037

24  patent *require* "multiple flexure members within the same

25  longitudinal portion."  (*See* Ex. 27.)  Thus, for instance, the two



**Fig. 12f (left) and a portion of
Fig. 9 (right), showing two
different portions that provide
flexibility**

26

27          [10] Dr. Rothman contends this passage only pertains to Figure 19.  That is clearly incorrect.
28  The passage refers to "the *various* embodiments previously described" and specifically refers to
    stents that are "cut from a tube," which would not apply to the helically-wound stent of Figure 19.

1  omega-shaped portions in Figure 12f of the specification can each be described as a separate

2  "flexure member," i.e., "*part of a longitudinal portion that provides flexibility*," as can each of the

3  joined omega-shaped sections in Figure 9.  (*See id.*, col. 10:51-53 ("another way to conceptualize

4  this is a pair of link[ed] omega-shaped sections . . .").)

5        Although Plaintiffs now dispute that an S-shaped connector can be described as two curved

6  flexure members joined together, the evidence to the contrary is overwhelming.  To begin with, the

7  patents-in-suit expressly refer to the S-shaped connectors in Figures 8-10 as a "pair of joined curved

8  sections." (*See id.,* col. 4:39, 4:46, 4:49, 10:50, 10:67.)  Moreover, during prosecution of the '037

9  patent, Drs. Penn and Ricci told the PTO that the "non-sinusoidal" claims of the '037 patent "may be

10  read on Figure 8, which appears in the CA 2,175,722 priority document."  (Ex. 32 at AB0732816.)

11  In other words, *in order to secure an earlier priority date for their claims*, they represented to the

12  PTO that the "non-sinusoidal" claims of the '037 patent are supported by Figure 8, which means

13  each "curved section" in Figure 8 can be considered a non-sinusoidal flexure member by itself.

14        Likewise, *in this case*, Dr. Ricci testified unequivocally that Figure 8 discloses a non-

15  sinusoidal flexure member, just as he told the PTO during prosecution three years earlier:

16      Q.  [T]he jury will see Exhibit Ricci 029, and you've taken a
           part of the curved element of the Penta and characterized a

17         piece of it as an S-shaped flexure member.  You did that for
           me earlier.

18      A.  Hmm-hmm.

19      Q.  And I'm asking, by that same logic, for the jury if we take
           that piece of the connector in Figure 8, wouldn't that be a

20         non-sinusoidal flexure member?

21      A.  One could say that the red part that you've identified is a
           "C" or "U" shaped flexure member.

22  (Ex. 23 at 261.)[11]



**Excerpt from Fig. 8 of the patents-in-suit. Dr. Ricci identified the red highlighted portion as a non-sinusoidal flexure member**

23

24



25        [11] Incredibly, more than nine months later, Dr. Ricci submitted an "errata sheet" in which he

26  attempted to change the above sworn testimony to the opposite of what he originally testified.  (Ex.
    44.)  Putting aside the obvious impropriety of a witness trying to change his testimony *nine months*

26  after his deposition, *see Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225
    (9th Cir. 2005) ("A deposition is not a take home examination."), the fact remains that Dr. Ricci

27  originally testified under oath that Figure 8 includes a "C" or "U" shaped flexure member, which is
    precisely what he told the PTO in 2004.  It is doubtful he made a mistake both times.

28



Plaintiffs' own experts agree that a flexure member need only be part of a longitudinal portion that provides flexibility, not necessarily the entire part.  For instance, Dr. Rothman, has identified a *portion* of a larger curved connector in the accused Vision stent as being a "flexure member."  (Ex. 52 at 22-23.)

**Dr. Rothman identified only the green portion as a "flexure member," ignoring the curved corners**

Likewise, Dr. Eberhart, testified unequivocally that a two-turn connector can be described as including a non-sinusoidal flexure member:



> Q.   Is what I've marked in blue and marked (A), is that a flexure member?
>
> A.   Based on what I've looked at in the patents at issue, it certainly appears to be a flexure member.
>
> Q.   . . . Is what I've marked as (B) a flexure member?
>
> A.   Yes, for the same reasons.

(Ex. 46 at 255.)

In view of Drs. Penn and Ricci's explicit and unmistakable admission to the PTO that Figure 8 contains "non-sinusoidal" flexure members, and given the admissions of plaintiffs' own experts, the connector in Wijay Figure 2 can be described as two non-sinusoidal flexure members joined together.  For this *additional* reason, Wijay satisfies the "non-sinusoidal" requirement of claim 1.

      c.    **Wijay Anticipates Dependent Claims 8, 9, 12, 13, 17, 20 and 55 of the '037 Patent**

Wijay anticipates claims 8, 9, 12, and 17 of the '037 patent for the reasons explained above for claims 15, 16, 13, and 11, respectively, of the '255 patent.  Claim 13 of the '037 patent additionally requires that "the longitudinal portions are aligned in a spaced relationship parallel to a stent longitudinal axis," which Wijay clearly depicts in Figure 9 and indicates can apply to all embodiments.  (Ex. 20, col. 5:24-28.)  Claim 20 requires that "adjacent undulating circumferential portions have substantially the same profile," which is seen in Wijay Figure 2 and 2A.  And claim 55 requires that the stent be constructed of a balloon expandable metal, which Wijay also discloses.  (*See id.*, col. 8:47-49 (stent can be "made of a metal, such as stainless steel . . .").)  Neither Dr. Rothman nor Plaintiffs (who adopted his report) have disputed that Wijay discloses these limitations.

1

2

### 4.    Wijay Anticipates Independent Claim 22 of the '037 Patent and Several Dependent Claims

3

Claim 22 of the '037 patent is identical to claim 1, except it requires a non-sinusoidal flexure

4

member that is "interposed between a pair of straight strut portions which are disposed parallel to a

5

longitudinal axis of the stent."  (Ex. 27, col. 15:55-col. 16:6.)  For the reasons already explained

6

above for claim 11 of the '255 patent, Wijay clearly satisfies the "interposed" requirement, both for

7

the one-bend embodiment described in column 8, lines 55-57 of Wijay, and the two-bend

8

embodiment illustrated in Figures 2 and 2A.

9

Dependent claims 29, 30, 33, 34, 41, and 56 are anticipated by Wijay for the same reasons as

10

explained above for claims 8, 9, 12, 13, 20, and 55, respectively.

### B.    All of the Asserted Claims are Obvious in View of Wijay '940 Alone or in Combination with Fischell '442 or Israel '303

11

### 1.    Legal Standard for Obviousness

12

13

A claim is obvious if "the differences between the subject matter sought to be patented and

14

the prior art are such that the subject matter as a whole would have been obvious at the time the

15

invention was made to a person having ordinary skill in the art to which said subject matter

16

pertains."  35 U.S.C. § 103(a).  "A central principle in this inquiry is that a 'court must ask whether

17

the improvement is more than the predictable use of prior art elements according to their established

18

functions.'"  *Muniauction, Inc. v. Thomson Corp.,* No. 2007-1485, 2008 WL 2717689, at *5 (Fed.

19

Cir. July 14, 2008) (quoting *KSR*, 127 S. Ct. at 1740); *accord Board of Trustees v. Roche Molecular*

20

*Sys., Inc.*, No. C 05-04158 MPH, 2008 WL 2241468, at *28 (N.D. Cal. May 29, 2008) (granting

21

summary judgment of obviousness).  The Supreme Court has made clear that obviousness may be

22

decided on summary judgment.  *KSR*, 127 S. Ct. at 1745-46.

23

The Supreme Court's *KSR* decision substantially clarified the law on obviousness in a way

24

that directly affects this case.  *See Roche*, 2008 WL 2241468, at *3-4, *16-17 (discussing the impact

25

of *KSR*).  First, *KSR* made clear that defendants need not show any teaching, suggestion or

26

motivation in the art to combine elements in order to prove obviousness.  *KSR*, 127 S. Ct. at 1741-

27

42.  Instead, a proper inquiry is whether it would have been *obvious to try* a combination of

28

elements, each of which was known in the prior art.  *Id.*  Second, *KSR* has prompted the PTO to

issue entirely new guidelines for determining obviousness.  *Id.* at \*16-17.  Those new guidelines—which were implemented *after* the patents-in-suit issued—include the following grounds for finding obviousness under *KSR*:

> (A) Combining prior art elements according to known methods to yield predictable results;
>
> (B) Simple substitution of one known element for another to obtain predictable results;
>
> (C) Use of known technique to improve similar devices (methods, or products) in the same way;
>
> (D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
>
> (E) "Obvious to try"-choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

*Id.* at \*16-17.  As explained below, *each* of these grounds is applicable here and would certainly have precluded patentability of the patents-in-suit had they been considered by the PTO.

### 2.    To the Extent Not Anticipated by Wijay, All the Asserted Claims Are Obvious in View of Wijay Alone or in Combination With Fischell '442 or Israel '303

As explained above, independent claim 11 of the '255 patent, independent claims 1 and 22 of the '037 patent, and most of the related dependent claims, are clearly anticipated by Wijay.  To the extent any limitations are deemed missing, however, they certainly would have been obvious to a person of ordinary skill in the art in 1996.[12]  For brevity's sake, the discussion below will focus only on those limitations identified by Plaintiffs and Dr. Rothman as allegedly missing from Wijay.

#### a.    It Would Have Been Obvious to Substitute a Non-Sinusoidal Flexure Member for a Sinusoidal One

Independent claims 1, 22, and 43 of the '037 require a "non-sinusoidal" flexure member.  As explained above, Wijay expressly discloses a "one-turn" flexure member, which is necessarily non-sinusoidal.  (*See* Section III.A.3, *supra*.)  However, to the extent this disclosure is deemed insufficient for anticipation, a "non-sinusoidal" flexure member would also have been obvious from either Wijay itself or Israel '303.

---

[12] For purposes of this motion only, Defendants adopt Plaintiffs' definition of a person of ordinary skill in the art, i.e., "an interventional cardiologist assisted, as necessary, by an engineer." (Ex. 52 at 10.)

1    At the outset, the patents-in-suit assign *no practical significance* to a "non-sinusoidal"

2  connector versus a sinusoidal connector.  (*See also* Ex. 13 at 320-21; Ex. 23 at 280-82.)  Indeed, the

3  *preferred* embodiment is a sinusoidal connector.  (Ex. 27 at col. 4:17-20.)  And the patents make

4  clear that "[t]he specific shape of the flexure means disposed in the longitudinal strut *is not*

5  *particularly restricted* provided that it confers lateral flexibility to the unexpanded stent by allowing

6  diametrically opposed pairs of the longitudinal struts to undergo substantially complementary

7  extension and compression."  (*Id.* at col. 3:57-62, emphasis added.)

8    By 1996, various curved connector shapes were known in the art to accomplish the basic

9  function of extending and compressing as a stent rounds a bend.  Among these were the non-

10  sinusoidal shapes disclosed in Israel '303 and the NIR stent.  (Ex. 19, Ex. 10 at 137-44.)  Israel '303

11  specifically explains how these non-sinusoidal connectors operate to enhance flexibility.  (Ex. 19 at

12  col. 3:31-49.)  Indeed, Dr. Penn *personally observed* this phenomenon in the NIR stent before March

13  1996.  (Ex. 24 at 851.)  Thus, by 1996, it certainly would have been obvious to modify the two-turn

14  Wijay connector in Figures 2 and 2A to be "non-sinusoidal."  Indeed, Wijay itself teaches that a

15  connector with "*one* or more bends" can be used in place of the two-bend connector shown in

16  Figures 2 and 2A.  (Ex. 20, col. 8:57-58.)  Likewise, Israel '303 teaches non-sinusoidal connectors

17  and expressly describes their expected function, i.e., extension and compression as the stent rounds a

18  bend.  (Ex. 19, col. 3:40-43.)  Thus, substituting non-sinusoidal connectors would have involved

19  nothing more than the "predictable use of prior art elements according to their established

20  functions."  *KSR*, 127 S. Ct. at 1740.

21    **b.    It Would Have Been Obvious to Modify the Flexure Member of**
     **Wijay to Include a "U-Shape"**

22

23    To the extent Plaintiffs contend the flexure member disclosed in Figure 2 of Wijay does not

24  contain a U-shape as required by claim 11 of the '255 patent and claim 17 of the '037 patent, a U-

25  shape would have been obvious in 1996 in light of Fischell '442 or Israel '303, which disclose

26  flexure members that Plaintiffs have admitted include "U-shapes."  (Ex. 35 at 30-31, 131.)

27    By 1996, the use of curved connectors—including "U-shaped" connectors—in a ring-and-

28  link design was well known.  As Evysio's own expert in the *IsoStent* trial testified, "It was well

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

1  known at the time throughout the world that the introduction of curvilinear segments into any stent

2  improved the flexibility.  And it was an obvious thing to have done with any laser cut stent at that

3  time."  (Ex. 30 at 70; *see also* Ex. 46 at 56.)  Moreover, Dr. Eberhart—Plaintiffs' engineering expert

4  in this case—conceded in his expert report that "[t]he U-shaped flexure member is one of the

5  simplest structures that can be used to introduce flexibility into a beam."  (Ex. 48 at ¶ 22.)  He

6  admitted this was well known in 1996:

7      Q.  In 1996, would a person of skill in the art have understood that a
        U-shaped flexure member is one of the simplest structures that can

8        be used to introduce flexibility into a beam?

9      A.  Yes.

10  (Ex. 46 at 236.)

11      Accordingly, in 1996, it would have been obvious to

12  tweak the Wijay connector to include a curve that looked even

13  more "U-shaped," as expressly taught in Fischell '442 and

14  Israel '303.  This would have been nothing more than the

15  "predictable use of prior art elements according to their

16  established functions."  *KSR*, 127 S. Ct. at 1740.



**Israel '303 (left).  Fischell '442 (right).**

17      c.   **It Would Have Been Obvious to Modify Wijay so That the Flexure**
             **Member Was "Interposed Between" a Pair of Straight, Parallel**

18           **Struts**

19      Claim 11 of the '255 patent and claim 22 of the '037 patent require a flexure member

20  "interposed" between a pair of straight, parallel strut portions.  As explained above, Wijay satisfies

21  this requirement under the ordinary meaning of "interposed," as ordered by the Court.  But even if

22  Plaintiffs' unorthodox definition of "interposed" is applied, i.e., requiring the flexure member to be

23  directly connected to a pair of straight, parallel struts without any intersecting or intervening

24  members, this limitation would have been obvious in 1996 in light of Wijay itself, Israel '303, or

25  Fischell '442.

26      On this point, the Court need look no further than Evysio's own representation to the PTO in

27  the Fischell Reexamination Request, where Mr. Bauer asserted that including straight strut portions

28  on either side of the curved connector in Wijay '940 was merely a "design choice."  (Ex. 31at 32-

33.)  As Mr. Bauer acknowledged at his deposition, the term "design choice" in patent parlance
typically means "obvious:"

> I would say "design choice" is where an examiner believes that there's
> an element of a claim that he cannot put his finger on in any reference
> but nevertheless finds that the person of skill in the art at the time of
> the invention would have found to be obvious, and in view of some
> teaching that he sometimes then provides, sometimes they don't.

(Ex. 49 at 130.)  Thus Mr. Bauer (on behalf of Evsyio) told to the PTO that it would have been
*obvious* from Wijay to interpose a flexure member between two straight, parallel strut sections.  (*See
also* Ex. 23 at 418-21.)

Moreover, Dr. Rothman conceded that Drs. Penn and Ricci did not invent the concept of
interposing a flexure member between two straight, parallel sections.  (Ex. 34 at 309-11.)  Instead,
this was known in the art before 1996.  (*Id.*)  For instance, this simple concept would have been
apparent from Israel '303 or Fischell '442, both of which disclose
a flexure member (yellow) directly attached to two straight,
parallel strut portions (red).  For this reason, modifying Wijay to
include the "interposed" feature would have been obvious to a person of ordinary skill in the art in
1996.

### d.    It Would Have Been Obvious to Thin the Flexure Member in Wijay to Improve Flexibility

Dependent claims 16, 40, and 52 of the '037 patent and dependent claim 12 of the '255
patent require a flexure member that "has a width less than a width of said undulating
circumferential portions when measured on an outer surface of the tubular wall."  Drs. Penn and
Ricci have admitted they were not the first to conceive of this simple concept, i.e., thinning
connectors to improve flexibility.  (*See, e.g.,* Ex. 23 at 162; *see also* Ex. 46 at 81.)  Indeed, this
technique is disclosed in numerous references, including Israel '303 (Ex. 19, col. 6:4-12) and
Fischell '312 (Ex. 25, col. 4:20-26.)  Accordingly, modifying Wijay to include this limitation would
have been obvious to a person of ordinary skill in the art in 1996 in view of Wijay alone, or in
combination with Fischell '312 or Israel '303.  Neither Dr. Rothman nor Plaintiffs have disputed that
this limitation was obvious in 1996.

1

2

### e.   It Would Have Been Obvious to Modify Wijay to Include an "Orthogonal" U-Shape

3

Independent claim 43 of the '037 patent requires a non-sinusoidal flexure member

4

"comprising a pair of substantially straight strut portions disposed substantially orthogonal to a

5

longitudinal axis of the stent, the pair of substantially straight strut portions being interconnected by

6

a curved portion."  (Ex. 27 at col. 17:4-25.)  This "orthogonal U" limitation would have been an

7

obvious modification to Wijay in 1996.

8

Again, the patents-in-suit ascribe *no significance* to flexure members having an "orthogonal"

9

U-shape.  Indeed, other than a single "orthogonal" U-shape serendipitously included in the bottom

10

half of Figure 12g (one of numerous shapes hastily disclosed in the final application on March 5,

11

1997), the specification is utterly silent about orthogonal U-shapes, and certainly does not ascribe

12

any significance to them.  This is not surprising given Dr. Penn's explanation of how those shapes

13

came to be in the patents-in-suit:

14

15

> [W]e took all these ideas to our patent agent and said, look, these
> ideas, we ain't, we ain't got the time to do all of this, but we think that
> some of them are going to work, we can't do that now, so put them in,
> protect them.

16

(Ex. 13 at 421.)

17

As with the other limitations, however, the prior art is replete with

18

"orthogonal" U-shapes.  Fischell '442, for example, includes two straight strut

19

portions in red that run orthogonal (i.e., perpendicular) to the longitudinal axis



20

of the stent, and a curved yellow portion connecting the two.  Moreover, as Dr.

21

Eberhart conceded, it was known in 1996 that a U-shape "is one of the simplest structures that can

22

be used to introduce flexibility into a beam."  Accordingly, it would have been obvious to a person

23

of ordinary skill in the art at that time to tweak Wijay to have a more orthogonal "U."

24

Dependent claims 45-48, 53, and 57 are obvious for the same reasons stated above for claims

25

15, 16, and 13 of the '255 patent and claims 13, 20, and 55 of the '037 patent, respectively.

26

### 3.   Secondary Considerations Cannot Overcome the Overwhelming Evidence of Obviousness in This Case

27

28

Dr. Rothman discusses only three "secondary considerations" in his attempt to rebut the

1   evidence of obviousness in this case: (1) commercial success, (2) long felt need, and (3) unexpected

2   results.  None of these factors, however, weighs in Plaintiffs' favor.

3            **a.**      **Plaintiffs Cannot Attribute Commercial Success to Any Allegedly**
    **Novel Feature of the Claimed Stent Designs**

4

5          Plaintiffs do not currently sell a stent covered by any of the asserted claims of the patents-in-

6   suit.  (*See* Ex. 51 at 4.)  So, instead, they point to *Abbott's* stent sales as proof that Penn and Ricci's

    designs have somehow achieved "commercial success."  That, however, is a false comparison.

7

8          To begin with, Abbott's stents do not infringe the asserted claims and, therefore, are not

9   relevant to the question of obviousness.  Moreover, there is no *nexus* between the success of the

10  Vision stent and any alleged, novel feature in the patents-in-suit.[13]  *See Ormco Corp. v. Align Tech.,*

    *Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) ("Evidence of commercial success, or other secondary

11  considerations, is only significant if there is a nexus between the claimed invention and the

12  commercial success.").  The Multi-Link family of stents has *always* been commercially successful,

13  whether they had curved or straight connectors, and whether they had U-shaped connectors or multi-

14  turn connectors.  (Ex. 2 at 113-14.)  Thus, it is difficult to see how Plaintiffs can claim that

15  something in the patents-in-suit suddenly made the Vision stent commercially successful.  (*See* Ex. 2

16  at 104, 113-14; Ex. 47 at 101.)

17           **b.**      **Plaintiffs Cannot Prove There Was a "Long Felt Need" for the**
    **Claimed Designs Since Every Element Was Already Known in the**
18  **Prior Art**

19         As explained above, the idea of curved connectors in a ring-and-link design was publicly

20  known by 1996, and, indeed, "obvious" in the words of Evysio's own expert, Dr. Roubin.  (Ex. 30 at

21  70.)  The same is true for each and every feature claimed in the patents-in-suit, including peak-to-

22  valley connectors, "non-sinusoidal" flexure members, and straight, parallel portions on either side of

23  a flexure member.  (*See* Ex. 34 at 308-11; Ex. 23 at 20-21, 161-68)  Thus, it simply cannot be said

24  that there was a "long felt need" in 1996 for any of these features.

25

26  _____

27     [13] When asked, specifically, what was "novel" about the claimed designs, Dr. Ricci was
    incapable of articulating even a single, novel feature at his deposition.  (Ex. 23 at 21 ("I can't
28  identify at this point as I'm sitting here, without a review of the documents, a single, particular
    feature that is, that wasn't already known.").)

1

2

3

4

5

6

###### c.     Plaintiffs Cannot Show the Claimed Designs Produced "Unexpected Results"

7

8

      Plaintiffs are apparently mindful of the Supreme Court's admonition in *KSR* that "the

predictable use of prior art elements according to their established functions" is not patentable.  *KSR*,

9

127 S. Ct. at 1740.  Accordingly, they have tried mightily in discovery to develop a story that stent

10

design in 1996 was utterly unpredictable, and that even skilled engineers could not predict with any

11

accuracy what would happen if a particular mechanical change were made to a stent design, e.g.,

12

insertion of curved connectors.  But, in the end, it is just that—a *story*.  Because, after all, the year in

13

question is 1996—not *1896* when the wireless telegraph was invented, or 1903 when the airplane

14

was invented, or 1942 when the nuclear reactor was invented, or even 1985 when the first coronary

15

stents were invented.  In 1996, stent designers knew much more than Drs. Penn and Ricci seem

16

willing to give them credit for.  (Ex. 41 at 67-71.)

17

      Indeed, some of Plaintiffs' assertions must be taken with a grain of salt.  For instance, Dr.

18

Rothman opines in his expert report that stents are "astonishingly complex" devices.  Yet, he

19

testified quite differently before the U.K. High Court of Justice (which ultimately held all three

20

asserted British counterparts to the patents-in-suit invalid and/or not infringed):

21

22

23

24

25

26

> We are talking as if they are very complex engineering devices.
> Cardiologists didn't look at them that way. A cardiologist, Richard
> Schatz, for example, drew his stent on a piece of paper. Dominic
> Wiktor drew his stent on a piece of paper.  That was the level of
> engineering input that was required.  I think there is a big difference
> between a Bentley engine, with all the stresses and fatigue issues
> related to it, compared to a stent.  A stent is **one of our simplest
> technologies** compared to many other technologies we use in the
> human circulation.  In those days they were considered to be fairly
> simple.  They were designed on the back of an envelope quite often.

27

(Ex. 33 at 229-30 (emphasis added).)

28

      Notwithstanding this prior testimony, Dr. Rothman now points to the testimony of two

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

1   Abbott stent designers, Diem Ta and Andreina Gomez, who were both involved in the Vision stent

2   project.  Both testified that, given a hypothetical stent design, they could not predict *in the abstract*,

3   i.e., without routine testing, whether adding an unspecified "shaped connector" to the design would

4   necessarily improve flexibility.  (Ex. 53 at 94-96, Ex. 18 at 57-58.)  That is true, of course, because it

5   is entirely possible that a particular "shaped connector" might adversely affect other aspects of the

6   design, for instance if the shaped connector is too big, too thick, too brittle, etc.  That does not

7   change the fact, however, that curved connectors were generally known in the art as a way to

8   improve flexibility, albeit subject to routine design choices and tradeoffs.  (*See* Ex. 13 at 135; Ex. 23

9   at 161-62; Ex. 34 at 309-10.)

10          The need for routine testing does not render a design unpredictable or non-obvious.  *See KSR*,

11   127 S. Ct. at 1732 ("When there is a design need or market pressure to solve a problem and there are

12   a finite number of identified, predictable solutions, a person of ordinary skill in the art has good

13   reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated

14   success, it is likely the product not of innovation but of ordinary skill and common sense.").  Indeed,

15   the Federal Circuit recently addressed this exact issue:

16          [O]bviousness cannot be avoided simply by a showing of some degree
             of unpredictability in the art so long as there was a reasonable
17          probability of success.  Indeed, a rule of law equating unpredictability
             to patentability, applied in this case, would mean that any new salt—
18          including those specifically listed in the [prior art] itself—would be
             separately patentable, simply because the formation and properties of
19          each salt must be verified through testing. This cannot be the proper
             standard since the expectation of success need only be reasonable, not
20          absolute.

21   *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (citations omitted); *accord In re*

22   *Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although [the inventor] declared that it cannot be

23   predicted how any candidate will work in a detergent composition, but that it must be tested, this

24   does not overcome [the prior art's] teaching that hydrated zeolites will work.").

25          Here, the art in 1996 was replete with teachings that curved connectors—both sinusoidal and

26   "non-sinusoidal"—could be used to improve flexibility in a ring-and-link design.  (*See* Section II.C,

27   *supra*.)  Evysio's *own expert* in the *IsoStent* case testified that curved connectors were "well known

28   at the time throughout the world" and were "an obvious thing to have done with any laser cut stent

at the time." (Ex. 30 at 70.) He also testified that "there are a limited number of choices and the potential pathway for improving the design is obvious in terms of curvilinear segments." (*Id.* at 107.) Dr. Eberhart, Plaintiffs' engineering expert in this case, testified similarly:

> A. [W]hen you put flex members into straight beams, you increase flexibility.
>
> Q. Is that elementary mechanical engineering?
>
> A. Well, it goes back to what you learn in, you know, in engineering school.
>
> Q. Undergraduate school?
>
> A. Yes.

(Ex. 46 at 56.)

Thus, Plaintiffs' attempt to make a "well known," "elementary," and "obvious" concept seem hopelessly "unpredictable" in 1996 must be rejected as both self-serving and facially false.

### d.   Near-Simultaneous Invention by Others Further Supports Obviousness

"[N]ear-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000) (quoting *The Int'l Glass Co. v. United States*, 408 F.2d 395, 405 (1969).) Here, there is clear evidence that others in the field in 1995-96 were simultaneously developing designs nearly identical to those claimed in the patents-in-suit. Indeed, contemporaneous literature referred to this period as "stent mania" due to the volume of stent designs emerging. (*See, e.g.,* Ex. 45; *see also* Ex. 5 at 886; Ex. 6; Ex. 8 at 296.) Plaintiffs' experts have agreed with that description. (Ex. 39 at 115.)

As an example of near-simultaneous invention by others, IsoStent was developing many designs with curved connectors in the 1994-95 timeframe, including the July 1995 design shown here, which has curved connectors oriented peak-to-valley. (Ex. 22.)



**July 1995 IsoStent design**

Likewise, Brian Brown—a stent designer for SciMed (now part of BSC)—sketched various designs in his notebook in late 1995 and early 1996, including the design shown here, dated November 3, 1995. (Ex. 3.) This

**November 1995 Brown design**

1   design includes a series of rings connected peak-to-valley by connectors with "orthogonal" U-shaped

2   elements interposed between straight segments.  In a January 1996 notebook entry,  Mr. Brown also

3   sketched a number of other nonlinear shapes that could have been used instead of what Brown

4   himself called the "U-shaped" connector.  (Ex. 3.)

5          Regardless of whether these designs were manufactured or publicly disclosed before March

6   1996, they provide strong evidence that the combination of elements recited in the asserted claims

7   was obvious to those of ordinary skill in the art at the time.

8          **C.     The Asserted Claims Are Invalid for Indefiniteness**

9                  **1.     Legal Standard for Indefiniteness**

10          Patent claims must be "sufficiently definite to inform the public of the bounds of the

11   protected invention."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir.

12   2008).  A claim is indefinite if a person of ordinary skill in the art would not understand its scope

13   when reading the claim in light of the specification.  *Union Pac. Res. Co. v. Chesapeake Energy

14   Corp.* 236 F.3d 684, 692 (Fed. Cir. 2001); *accord Halliburton*, 514 F.3d at 1251, 1254 (finding

15   "fragile gel" indefinite because a person of ordinary skill could not determine how "fragile" the gel

16   must be to be covered by the claim).  Indefiniteness is a question of law to be determined by the

17   Court.  *Union Pac.,* 236 F.3d at 692.

18                  **2.     As Asserted by Plaintiffs, "U-Shaped" Is Indefinite**

19          When asked to determine whether a particular shape was "U-shaped" at his deposition, Dr.

20   Rothman balked at the task, calling it a game of "semantics":

21          It's a matter of parlance, and it's a matter of what I expect when I see
            it.  If I look at that as a letter on the page, it's a "V."  But I think this
22          whole argument about letters is playing with semantics, but we'll
            continue the game.

23   (Ex. 34 at 67.)  He also referred to the term "U-shape" as a "Sesame Street identification."  (*Id.* at

24   219.)  What Dr. Rothman dismisses as a "semantic" or childish game, however, is in fact a *serious

25   concern* to Plaintiffs' competitors, for they are the ones left to wonder (at their peril) about the exact

26   meaning of "U-shape" and what it covers.  Perhaps this is what Plaintiffs intended all along, as Dr.

27   Rothman candidly suggested:

28

> [I]n my experience with patents, they don't always say exactly what
> you want because you sometimes *want* to obfuscate and make it
> unclear as to what you really want and mean, so that we can have this
> conversation 10 or 15 years later about what patents mean.

(*Id.* at 104, emphasis added.)  With all due respect to Dr. Rothman, the purpose of a patent is *not* to "obfuscate" the meaning of claim terms so that you can argue about their meanings "10 or 15 years later."  Indeed, the definiteness requirement was specifically designed to prevent that sort of abuse. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232 (1942) ("The [definiteness] statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights.").

In this case, claims 11-13, 15, and 16 of the '255 patent and claim 17 of the '037 patent are indefinite, as asserted by Plaintiffs, because a person of ordinary skill in the art cannot determine what is, or is not, "U-shaped" given Plaintiffs' inconsistent positions and the inability of their own experts to agree on the meaning of "U-shaped."

### a.  Plaintiffs Have Interpreted "U-Shaped" Inconsistently

Plaintiffs now deny that the highlighted portion of Wijay Figure 2 (at right) is "U-shaped." (Ex. 35 at 9.)  Yet, when Evysio described this *same* figure to the PTO in the Fischell Reexamination Request, they called it an example of a "generally U-shaped segment" and labeled each curve as a "U-shaped turnback portion."  (Ex. 31 at 36.)



Similarly, in this case, Plaintiffs' interpretation of "U-shaped" has been wildly unpredictable. For example, Plaintiffs admit that the following highlighted portions on the left are "U-shaped" yet, inexplicably, deny that the ones on the right are "U-shaped":

| **Plaintiffs: "U-shaped"** | **Plaintiffs: "Not U-shaped"** |
| --- | --- |
|  |  |

(Ex. 35 at 60-61, 104, 148, 160.)  There is no logical way to differentiate between what Plaintiffs call "U-shaped" and what they call "non-U-shaped."  This sort of "I-know-it-when-I-see-it" analysis is totally unfair to competitors and renders the "U-shaped" claims indefinite as a matter of law.  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("The scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.")  (affirming summary judgment of indefiniteness).

Moreover, Plaintiffs' attempt to distinguish Wijay as not containing a "U-shape" flatly contradicts their priority claims in this case. For instance, Plaintiffs have asserted that claim 17 of the '037 patent, which recites a "U-shaped" flexure member, is entitled to the filing date of Canadian Application CA 2,171,047, filed March 5, 1996.  (Ex. 4 at 13.) Yet, as shown here, the only flexure members illustrated in that application (Figures 5 and 6) consist of gentle curves.  Plaintiffs are relying on these gentle curves to support the "U-shaped" limitation of claim 17, while simultaneously attempting to distinguish prior-art curves, like Wijay, as *not* being U-shaped. [14]  Once again, this type of self-serving line drawing is exactly what the indefiniteness requirement is designed to prevent.

**Plaintiffs contend Fig. 6 (top) is "U-shaped" yet deny that Wijay (bottom) is "U-shaped."**

### b.   Plaintiffs' Own Experts Cannot Agree on the Meaning of "U-Shaped"

The strongest evidence of indefiniteness comes from Plaintiffs' own experts, who simply cannot agree as to what is, and is not, "U-shaped."  For example, whereas Dr. Rothman contends the gentle curve of Figure 6 (also illustrated in Figure 5) is not "U-shaped" (Ex. 34 at 81), Dr. Penn testified that Figure 6 *satisfies* the "U-shape" limitation of claim 11 of the '255 patent.  (Ex. 41 at 283-84.)



**Dr. Rothman:** Not U-Shaped.
**Dr. Penn:** U-Shaped

---

[14] In his expert report, Dr. Rothman asserts that a U-shape would result from Figures 5 and 6 if one applied the specification's teaching that flexure members can have up to 35% excess curvature.  (Ex. 39 at 79.)  He admitted at his deposition, however, that such a modification would not necessarily result in a "U shape."  (Ex. 34 at 84-88.)

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

1   Likewise, whereas Dr. Rothman contends the green portion that he

2   identified as a "flexure member" in the accused Vision stent is "U-shaped" (Ex.

3   52 at 28), Dr. Eberhart testified that it is not (Ex. 46 at 285).  Indeed, Dr.

4   Eberhart testified that there *is* no "U-shaped" flexure member in the accused

5   stents.  (*Id.* at 288.)



**Dr. Eberhart:** Not U-Shaped.
**Dr. Rothman:** U-Shaped

6   Similarly, Dr. Rothman testified that Wijay Figure 2 does not contain a U-shape (contrary to

7   Evyisio's representation to the PTO).  Dr. Penn, on the other hand, immediately recognized the

8   Wijay "turnback portion" as a "U-shape" and awarded it a score of 3 out of 5—a higher score than

9   he gave to Dr. Rothman's *definition* of a "U."  (Ex. 41 at 306-07, 331-32.)  Dr. Eberhart took a

10  middle road on Wijay, conceding that people skilled in the art could differ on this issue:



11  Q. . . . My question is: Could someone of ordinary skill in the
    art look at Wijay and conclude that the longitudinal portion
12     includes something in the shape of a U?

13  A. Yeah.  That would not meet my definition of a U, but I
    suppose there are – I wouldn't call it a U but some people might.

14  Q. Reasonable people skilled in the art could differ on their
    interpretation of a U; right?

15  A. See, to me it looks more like a V than a U, but there are may be
    people skilled in the art who see it looks more like a U than a V.
16    So there's a spectrum, I suppose, of interpretations here.

17  (Ex. 46 at 276-77; *see also* Ex. 13 at 186 (Referring to the NIR stent: "Q. You just don't know?  A. I

18  don't -- you know, it could be a 'C,' it could be a 'U.'  One of those.  Somewhere -- I don't know the

19  answer to that.  I, I, I -- multiple choice, I'd fail.  I'd probably -- you know what, I probably

20  wouldn't answer it."); *accord* Ex. 23, Ricci Dep. at 106-08.)

21  Plaintiffs' experts cannot even agree with Plaintiffs'

22  own *admissions* as to what is U-shaped. For example,

23  whereas Plaintiffs admitted that Figure 2 of Israel '303 has a



24  U-shape (image at right) (Ex. 35 at 131), Dr. Eberhart and Dr. Rothman both testified that this

25  structure is *not* U-shaped, in part because it is squared off.  (Ex. 46 at 294-95; Ex. 34 at 169.)

26  All of this begs a simple question: If Plaintiffs and their *own* experts can't agree on what a

27  "U-shape" is—after years of preparing for this case—how can competitors reasonably be expected

28

DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY
Case No. C-06-01066 (PJH)

to know the precise metes and bounds of the asserted "U-shape" claims?  The answer is clear; the "U-shape" claims are indefinite and should be declared invalid as a matter of law.  *Datamize,* 417 F.3d at 1350.

## IV.    CONCLUSION

For the reasons explained above, Abbott and BSC respectfully request that the Court grant summary judgment that the following claims are invalid for the following reasons:

| '255 Asserted Claims | Grounds for Invalidity |
|---|---|
| 11, 13, 15, and 16 | Each of these claims is anticipated by Wijay '940. |
| | Alternatively, each is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442. |
| | In addition, each of these claims is invalid as indefinite. |
| 12 | This claim is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442. |
| | In addition, this claim is invalid as indefinite. |

| '037 Asserted Claims | Grounds for Invalidity |
|---|---|
| 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41, 55 and 56 | Each of these claims is anticipated by Wijay '940. |
| | Alternatively, each is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442. |
| | Claim 17 is invalid as indefinite. |
| 16, 40, 43, 45-48, 53 and 57 | Each of these claims is obvious in view of Wijay alone or in combination with Israel '303 or Fischell '442. |

Dated: July 31, 2008

FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.

FISH & RICHARDSON PC

By:          /s/          
      James R. Barney

By:          /s/          
      Frank E. Scherkenbach