1    FINNEGAN, HENDERSON, FARABOW,
       GARRETT & DUNNER, L.L.P.
2    3300 Hillview Avenue
     Palo Alto, California 94304
3    Tel: (650) 849-6600; Fax: (650) 849-6666
     Robert F. McCauley III (Bar No. 162056)
4    robert.mccauley@finnegan.com

5    FINNEGAN, HENDERSON, FARABOW,
       GARRETT & DUNNER, L.L.P.
6    901 New York Avenue, NW
     Washington, DC 20001
7    Tel: (202) 408-4000; Fax: (202) 408-4400
     Gerald F. Ivey (pro hac vice)
8    gerald.ivey@finnegan.com
     Michael A. Morin (pro hac vice)
9    michael.morin@finnegan.com
     James R. Barney (pro hac vice)
10   james.barney@finnegan.com

11   Attorneys for Defendants
     Abbott Cardiovascular Systems Inc.,
12   Abbott Laboratories, and Abbott Vascular, Inc.

FISH & RICHARDSON PC
225 Franklin Street
Boston, Massachusetts 02110-2804
Tel: (617) 542-5070; Fax: (617) 542-8906
Frank E. Scherkenbach (Bar No. 142549)
scherkenbach@fr.com
Kurt L. Glitzenstein (pro hac vice)
kurt.glitzenstein@fr.com
Elizabeth A. Brown (#193540)
Elizabeth.brown@fr.com
Adam J. Kessel (pro hac vice)
Kessel@fr.com

Attorneys for Counterclaim-Plaintiff
Boston Scientific Corporation

13

14                        UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF CALIFORNIA
                           SAN FRANCISCO DIVISION
15

16   MEDTRONIC VASCULAR, INC.
     MEDTRONIC USA, INC., MEDTRONIC, INC.,
     MEDTRONIC VASCULAR GALWAY, LTD.,
17   and EVYSIO MEDICAL DEVICES, ULC

18                        Plaintiffs/Counterclaim-
                          Defendants
19
          v.
20
     ABBOTT CARDIOVASCULAR SYSTEMS
21   INC., ABBOTT LABORATORIES, and
     ABBOTT VASCULAR, INC.
22
                          Defendants/Counterclaim-
23                        Plaintiffs

24        and

25   BOSTON SCIENTIFIC CORPORATION

26                        Counterclaim-Plaintiff

27

28

CASE NO. 06-01066-PJH (EMC)

**ABBOTT AND BSC'S BRIEF IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT**

[REDACTED VERSION FOR PUBLIC
VIEWING]

Date:     **September 24, 2008**
Time:     **9:00 a.m.**
Place:    **Courtroom 3**
Judge:    **Honorable Phyllis J. Hamilton**

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

II.   FACTS ...................................................................................................................2

III.  ARGUMENT ..........................................................................................................2

      A.   Plaintiffs Are Not Entitled to Summary Judgment on Anticipation by Wijay
           '940 and Fischell '442; Summary Judgment Is Appropriate in Abbott and
           BSC's Favor for Most Asserted Claims, and Disputed Issues of Material Fact
           Preclude Summary Judgment on the Rest ...............................................................2

           1.   The Fact That Wijay '940 and Fischell '442 Are Listed on the Faces of
                the Patents-In-Suit Is Irrelevant To This Motion...........................................2

           2.   Wijay '940 Anticipates Most of the Asserted Claims ...................................4

                a.   Wijay Discloses a "One-Bend" Flexure Member, Which Is
                     Necessarily Non-Sinusoidal...................................................................4

                b.   Wijay Also Discloses a Connector in Figures 2 and 2A That
                     *Comprises* (i.e., Includes) a Non-Sinusoidal Flexure Member........7

                c.   Wijay Discloses a Flexure Member That Includes a "U-Shape"
                     With "Substantially Orthogonal" Sides .........................................12

                d.   Wijay Discloses a Flexure Member "Interposed Between" Two
                     Straight Strut Portions According to the Ordinary Meaning of
                     "Interposed" ..................................................................................12

           3.   Fischell '442 Anticipates Many of the Asserted Claims ...........................14

                a.   The '255 Claims Do Not Require a "Non-Sinusoidal" Flexure
                     Member, and Fischell '442 Discloses a Connector That
                     *Comprises* (i.e., Includes) a Non-Sinusoidal Flexure Member
                     as Required by the '037 Claims ....................................................14

                b.   Fischell '442 Properly Incorporates Fischell '312 by Reference
                     and Therefore Discloses an Unexpanded Stent With Peak-to-
                     Valley Connectors...........................................................................14

      B.   Plaintiffs Are Not Entitled to Summary Judgment That Contemporaneous
           Internal Work Is Inadmissible *Per Se* .................................................................16

      C.   Disputed Issues of Material Fact Preclude Summary Judgment on Abbott and
           BSC's Derivation Defense .......................................................................................19

           1.   Plaintiffs Ignore Direct Evidence Showing Prior Conception by the
                Fischells ...........................................................................................................19

           2.   Plaintiffs Ignore Substantial Circumstantial Evidence Showing
                Communication of the Fischells' Conception to Drs. Penn and Ricci ......20

|  |  | a. | Substantial Circumstantial Evidence Shows That George Shukov Conveyed the Fischells' Designs to Drs. Penn and Ricci | 21 |

|  |  | b. | The Fischell Drawings Reflected the Complete Conception of the Invention and Were Enabling | 24 |

|  | 3. | The *IsoStent* Court's Ruling Is Irrelevant | 25 |

D. | Summary Judgment Is Inappropriate on the Written Description Defense | 27 |

| 1. | There Is No Written Description Support for a Single Flexure Member that Has An Orthogonal U Shape | 27 |

| 2. | Plaintiffs' Written Description Argument Contradicts Their Obviousness Argument | 29 |

| 3. | There Is No Written Description of a Flexure Member Without Substantially Complementary Extension and Compression | 30 |

E. | Plaintiffs' Motion for Summary Judgment on BSC's License Defense Should Be Denied | 31 |

| 1. | BSC's 1995 Agreement Provides a License to Mr. Shukov's Inventions and Improvements Relating to BSC's Stents | 31 |

| 2. | A Reasonable Jury Could Conclude that Mr. Shukov Contributed to the Patents in Suit | 33 |

F. | Plaintiffs Are Not Entitled to Summary Judgment on Indefiniteness | 34 |

G. | There Is No Dispute That Claims 1, 8-9, 12-13, 16, 20, and 55 of the '037 Patent Are Entitled to a Priority Date of March 5, 1996 | 35 |

IV. | CONCLUSION | 35 |

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Advanced Display System, Inc. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000)...................................................................................15

4

5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)...................................................................................25

6

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
    No. C-92-20643, 1995 WL 848951 (N.D. Cal. Nov. 1, 1995) ...............................17

7

8

*Atlas Powder Co. v. Ireco Inc.*,
    190 F.3d 1342 (Fed. Cir. 1999)................................................................................3, 4

9

10

*Brown v. 3M*,
    265 F.3d 1349 (Fed. Cir. 2001)......................................................................................3

11

12

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*,
    150 F.3d 1354 (Fed. Cir. 1998)................................................................................3, 4

13

14

*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
    412 F.3d 1331 (Fed. Cir. 2005)...................................................................................33

15

16

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004)...................................................................................25

17

*Chore-Time Equip., Inc. v. Cumberland Corp.*,
    713 F.2d 774 (Fed. Cir. 1983).......................................................................................2

18

19

*Concrete Appliances Co. v. Gomery*,
    269 U.S. 177 (1925)......................................................................................................17

20

21

*Cook Biotech Inc. v. Acell, Inc.*,
    460 F.3d 1365 ........................................................................................................15, 16

22

23

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)...................................................................................11

24

*Ethicon, Inc. v. U.S. Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998)...................................................................................33

25

26

*Fina Oil & Chem. Co. v. Ewen*,
    123 F.3d 1466 (Fed. Cir. 1997)...................................................................................34

27

28

*Grinnell Corp. v. Va. Elec. & Power Co.*,
    277 F. Supp. 507 (E.D. Va. 1967) ..............................................................................18

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
   222 F.3d 951 (Fed. Cir. 2000)..................................................................7

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003)........................................................10, 13

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)..................................................................3

*KSR Int'l Co. v. Teleflex Inc.*,
   127 S. Ct. 1727 (2007)............................................................................29

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   481 F.3d 1371 (Fed. Cir. 2007)..................................................................3

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
   424 F.3d 1336 (Fed. Cir. 2005)................................................................30

*Maxwell v. K Mart Corp.*,
   880 F. Supp. 1323 (D. Minn. 1995)..........................................................24

*Michalic v. Cleveland Tankers, Inc.*,
   364 U.S. 325 (1960).............................................................................20-21

*Monarch Knitting Mach, Corp. v. Sulzer Morat GmbH*,
   139 F.3d 877 (Fed. Cir. 1998)..........................................................17, 18

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
   864 F.2d 757 (Fed. Cir. 1988)..................................................................17

*OddzOn Prods., Inc. v. Just Toys, Inc.*,
   122 F.3d 1396 (Fed. Cir. 1997)........................................................25, 26

*Omega Eng'g, Inc., v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..................................................................9

*Pannu v. Iolab Corp.*,
   155 F.3d 1344 (Fed. Cir. 1998)................................................................25

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004)................................................................10

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008)........................................................27, 29

*Pratt & Whitney Canada Inc. v. U.S.*,
   12 U.S.P.Q.2d 1497 (Ct. Cl. 1989), *aff'd*, 897 F.2d 539 (Fed. Cir. 1990) ...............17

*Price v. Symsek,*
    988 F.2d 1187 (Fed. Cir. 1993).........................................................................19

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,*
    412 F.3d 1284 (Fed. Cir. 2005).........................................................................3

*PureChoice, Inc. v. Honeywell Int'l, Inc.,*
    No. 2:06-CV-244, 2008 WL 190317 (E.D. Tex. Jan. 22, 2008).......................10, 11

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001).........................................................................12

*Rockwell Int'l Corp. v. U.S.,*
    37 Fed. Cl. 478 (Ct. Cl. 1997), *vacated-in-part on other grounds,* 147 F.3d 1358 (Fed. Cir. 1998)......................................................................................................18

*Springs Window Fashions LP v. Novo Indus., L.P.,*
    323 F.3d 989 (Fed. Cir. 2003).........................................................................7, 8

*Stewart-Warner Corp. v. Pontiac,*
    767 F.2d 1563 (Fed. Cir. 1985).........................................................................17

*Taylor v. Sturgell,*
    128 S. Ct. 2161 (2008).........................................................................26

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998).........................................................................30-31

*Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc.,*
    127 F.3d 1065 (Fed. Cir. 1997).........................................................................15, 16

*Vandenberg v. Dairy Equip. Co., Div. of DEC Int'l, Inc.,*
    740 F.2d 1560 (Fed. Cir. 1984).........................................................................17

*Vas-Cath Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991).........................................................................31

## STATUTES

35 U.S.C. § 102.........................................................................18, 19, 25, 26, 27

35 U.S.C. § 103.........................................................................18, 25

35 U.S.C. § 112, ¶ 1.........................................................................25, 30

37 C.F.R. § 1.14(a)(1)(vi).........................................................................16

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.      INTRODUCTION**

3      Abbott and BSC's Motion for Summary Judgment explained how the prior art Wijay patent

4  anticipates the majority of the asserted claims by disclosing each and every claimed element, and

5  renders the remaining claims obvious.  The only correct and reasonable reading of Wijay, and the

6  only correct and reasonable application of the asserted claims, not only disposes of Plaintiffs' motion

7  for summary judgment of no anticipation, it disposes entirely of their case against Abbott and BSC.

8      Plaintiffs' request to exclude the extensive real-world evidence of simultaneous invention by

9  others should likewise be denied.  If the case does proceed to trial, one question the jury will

10  confront is whether the claimed designs would have been obvious to a person of ordinary skill in the

11  art in 1996.  In this regard, the evidence shows that numerous stent designers in 1995 and 1996 had

12  conceived of these very designs.  This contemporaneous evidence is relevant and admissible to the

13  obviousness inquiry *regardless* of whether it qualifies as prior art, because it shows that these

14  designs were not the product of true innovation, but rather were obvious combinations of known

15  elements to others in this field, directly refuting the opinions of Plaintiffs' paid experts in this case,

16  offered twelve years after the fact.  This contemporaneous evidence also confirms exactly what

17  Plaintiff Evysio and its experts testified to under oath in the prior *IsoStent* litigation—in which

18  Evysio was accused of misappropriating the Fischells' stent designs—to try to convince *that* judge

19  and jury that the remarkable similarity between the designs was a matter of mere coincidental

20  development, i.e., obviousness, rather than chicanery.

21      While the claimed designs were obvious, the evidence further shows that Drs. Penn and Ricci

22  did not conceive of them independently, precluding summary judgment on the derivation claim.  The

23  evidence shows, *inter alia*, that George Shukov, Drs. Penn and Ricci's partner: (1) had unfettered

24  access to the Fischells' designs; (2) collaborated with Drs. Penn and Ricci to correct fundamental

25  flaws in their early designs, which then rapidly morphed to the Fischell designs; *and* (3) ██████

26  ████████████████████  On this record, a reasonable jury could and should conclude that there

27  was derivation.  Abbott and BSC's right to have a jury consider this issue is in no way foreclosed by

28  any finding in the *IsoStent* case.  Neither Abbott nor BSC was a party to that case.  Moreover, that

court's decision turned on a different claim (unjust enrichment) than Abbott and BSC's derivation defense, and has no collateral estoppel effect in these proceedings.  To the extent of any overlap in the facts and issues presented here, it is Plaintiffs, not Abbott and BSC, that are bound by the prior case—an important consideration given that Plaintiffs now seek to *disavow* the same factual testimony they once proffered and relied upon.

Plaintiffs' motions for summary judgment on the written description, indefiniteness, and license defenses should likewise be denied.  Written description is an issue of fact for the jury, and the evidence shows that Plaintiffs, in an attempt to ensnare Abbott's products a decade after Drs. Penn and Ricci had filed their patent applications presenting a very different set of claims, wrote entirely new claims that were not fairly or properly based on the earlier applications.  As for indefiniteness, Plaintiffs' application of the terms is so arbitrary and tortured that Plaintiffs and their experts cannot even keep their *own* stories straight as to what the terms mean.  Finally, Plaintiffs' motion regarding BSC's license defense rings particularly hollow given the evidence that Evysio's own attorney, in independently reviewing the license agreement, contemporaneously arrived at the same conclusion BSC advocates here.

Accordingly, with the exception of one discrete issue regarding priority dates that Abbott and BSC do not contest, Plaintiffs' motion for summary judgment should be denied in full.

## II.   FACTS

A discussion of the pertinent facts can be found in the Background section of Abbott and BSC's Motion for Summary Judgment of Invalidity.  (Dkt. No. 408.)

## III.   ARGUMENT

**A.   Plaintiffs Are Not Entitled to Summary Judgment on Anticipation by Wijay '940 and Fischell '442; Summary Judgment Is Appropriate in Abbott and BSC's Favor for Most Asserted Claims, and Disputed Issues of Material Fact Preclude Summary Judgment on the Rest**

**1.   The Fact That Wijay '940 and Fischell '442 Are Listed on the Faces of the Patents-In-Suit Is Irrelevant To This Motion**

While an issued patent is presumed valid, the presumption is, of course, rebuttable.  *See Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 780 (Fed. Cir. 1983) ("To treat the presumption as irrebuttable would be to oust the courts of their jurisdiction to consider a challenge to

1   the validity of patents before them.") (affirming summary judgment of invalidity).  Nor should the

2   Court accept Plaintiffs' invitation to defer to the fact that these two prior art references were cited on

3   the faces of the patents-in-suit (Plaintiffs' Motion ("Mot.") at 11), since a patent may be held invalid

4   "on the basis of a reference that had properly been before the patent examiner."  *IPXL Holdings,*

5   *L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383 (Fed. Cir. 2005) (affirming summary judgment of

6   anticipation); *accord Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1381 (Fed. Cir. 2007)

7   (same); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1287 (Fed. Cir. 2005) ("Under the

8   appropriate standard, the Charrin prior art reference, which was before the examiner during

9   prosecution of the '532 patent, clearly anticipates the asserted claims of the patents in suit."); *Brown*

10  *v. 3M*, 265 F.3d 1349, 1352-53 (Fed. Cir. 2001) (affirming summary judgment of anticipation).

11        That is especially true where the PTO did not have all the facts regarding these references in

12  particular, and the state of the art in 1996 in general.  In assessing the validity of issued claims, it is

13  relevant whether certain information was mischaracterized or withheld from the PTO during

14  prosecution.  *See, e.g., Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1345-46, 1349 (Fed. Cir.

15  1999) (affirming finding that claims were anticipated by a reference considered by the PTO, where,

16  at trial, there was "testimonial and documentary evidence on inherent disclosures of the prior art that

17  was not before the PTO"); *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360-61

18  (Fed. Cir. 1998) (finding claims anticipated by a reference considered by the PTO and noting that the

19  patentee had mischaracterized that reference during prosecution).

20        Here, the applicants withheld critical information from the *IsoStent* litigation, including Drs.

21  Penn and Ricci's sworn admissions that peak-to-valley designs with curved connectors "were being

22  created by several stent designers as early as 1994" (Ex. 1 at 11, Ex. 2 at 11).  They also withheld the

23  sworn testimony of Evysio's own stent-design expert, Dr. Gary Roubin, that ▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*id. at*

27  148)—a design that the applicants told the PTO was covered by *all* of the independent claims of the

28  '037 patent and which Plaintiffs still contend is covered by the '255 patent.  (*See also id.* at 94-95,

1    103-10, 194-96, 219-21.)  They likewise withheld the Fischell Reexamination Request, in which

2    Evysio represented to a *different* PTO Examiner that Wijay includes "U-shaped turn back portions"

3    and that it would have been a mere "design choice" to put straight, parallel portions on both sides of

4    the U-shaped connector.  (Ex. 4 at 32-33.)  While the teachings of Wijay '940 and Fischell '442 are

5    sufficient on their own to overcome the statutory presumption of validity, this additional evidence, as

6    in *Celeritas* and *Atlas Powder*, provides further reason to find the asserted claims invalid over the

7    cited prior art.

8              **2.       Wijay '940 Anticipates Most of the Asserted Claims**

9             Abbott and BSC have jointly moved for summary judgment that Wijay '940 anticipates most

10   of the asserted claims of the patent-in-suit.  (*See* Dkt. No. 408.)  Plaintiffs, however, contend Wijay

11   is missing four limitations: (1) "non-sinusoidal;" (2) "U-shaped;" (3) "substantially orthogonal;" and

12   (4) "interposed."  Plaintiffs are wrong on each point.

13             **a.       Wijay Discloses a "One-Bend" Flexure Member, Which Is**
                          **Necessarily Non-Sinusoidal**
14

15            Plaintiffs assert that Wijay does not disclose a non-sinusoidal flexure member, calling this a

16   "simple" and "indisputable" fact that allegedly "dooms the Defendants' anticipation defense as to the

17   '037 patent."  (Mot. at 11.)  Plaintiffs' rhetoric is no substitute for evidence.  Abbott and BSC

18   absolutely dispute Plaintiffs' core premise that Wijay lacks a non-sinusoidal flexure member.  To the

19   contrary, it is beyond genuine dispute that it does have this feature.

20            Figures 2 and 2A of Wijay illustrate S-shaped (i.e., two-bend) "crossties."  But the disclosure

21   does not stop there.  As is typical, the figures illustrate only some embodiments.  The text of Wijay

22   contemplates a range of variants, including that crossties can have only one bend:  "The crossties can

23   be a more rigid, straight design or a more flexible design incorporating **one or more bends**."  (Ex. 5,

24   col. 8:55-57.)  A "one-bend" flexure member is not S-shaped and, therefore, non-sinusoidal.

25            Plaintiffs' only response to this is to ask this Court to conclude, as a matter of law and

26   undisputed fact, that the above passage from Wijay applies to "completely different figures (Figure

27   19 and 20)," which "bear virtually no resemblance to the structure claimed in the claims of the '037

28

ABBOTT AND BSC'S BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. C-06-01066 PJH (EMC)

1   patent." (Mot. at 17-28.)  The reference itself, however, clearly shows that the one-bend variant is

2   applicable to Figures 2 and 2A of Wijay.

3        The discussion of Figures 19 and 20 in Wijay begins at column 8, line 23.  (Ex. 5, col. 8:23.)

4   As explained there, "FIGS. 19 and 20 illustrate a helical winding for a stent."  (*Id.*, col. 8:23.)  The

5   helical stents illustrated in Figures 19 and 20 include "crossties 102" (*id.*, col. 8:25-27), which can

6   optionally have "a bend or more in them" to provide additional flexibility:

7            While straight crossties have been shown in FIGS. 19 and 20, it is
             within the purview of the invention to use crossties that have additional
8            flexibility of a bend or more in them to accommodate the needs of
             bending for the stent.

9   (*Id.*, col. 8:30-34.)  *This* passage refers specifically to Figures 19 and 20.  In contrast, the remainder

10  of column 8 does not.

11       At column 8, lines 35-44, the discussion in Wijay switches to a different topic, namely the

12  "advantages of the use of the second bend, such as bent-up ends 42 and 44 in FIG. 19."[1]  This second

13  bend" feature is also illustrated in other figures such as Figure 3.  (*See, e.g.,* col. 6:4-19 (discussing

14  "second bend 34" in Fig. 3); *see also* col. 5:62-63 ("The design in FIG. 2A can have the second bend

15  feature").)  Thus, the discussion at column 8, lines 35-44, is not limited to Figures 19 and 20.

16  Indeed, the discussion expressly refers to several other figures, *viz.* Figures 13, 15, 16, and 17.

17       Continuing at column 8, line 45, Wijay again switches topics, this time to a general

18  discussion regarding "several salient advantages of the various embodiments previously described."

19  (Ex. 5, col. 8:45-46.)  The next paragraph is a general discussion of a wide range of variants of the

20  disclosed stents, including what they can be made of, how they can be made, and—relevant here—

21  the fact that the crossties can have one bend, or multiple bends:

22           The stents as above described can be made of a metal, such as stainless
23           steel, platinum, nickel titanium, copper-tin alloy, or other suitable
             biocompatible metals.  The stents as illustrated can be cut from a tube
24           whose wall thickness is between about 0.003"-0.10", using known laser
             techniques, so that the wire crosssection is rounded, such as illustrated in
25           FIGS. 18 or 1A.  The stents illustrated can also be made from wire by

26

27

28   ——————————————
     [1] This "second bend" feature refers to a projecting portion of the ring or spiral structure, not
     the crossties.  (Ex. 5, col. 8:35-44.)

bending the wire, as illustrated, to form the sharp angles as described.  The crossties can be a more rigid, straight design or **a more flexible design incorporating one or more bends**.  In lieu of a multi-ring design, a helix turned on a mandrel, using crossties, such as shown in FIG. 19, can also be employed.

(Ex. 5, col. 8:47-59) (emphasis added.)  Thus, this paragraph expressly discloses that the "various embodiments" in Wijay can have crossties "incorporating **one or more bends**."

Plaintiffs' assertion that the above paragraph pertains *only* to Figures 19 and 20 is incorrect.  That would mean, for example, that the laundry list of alternative materials in the first sentence is for some unexplained reason limited to only these two embodiments.  Moreover, the final sentence of the paragraph states that, "[i]n lieu of a multi-ring design, a helix turned on a mandrel, using crossties, *such as shown in FIG. 19*, can also be employed."  There would be no need to single out Figure 19 on Plaintiffs' fanciful interpretation.  Clearly Figure 19 is merely *one* of the "various embodiments" referred to in this paragraph, and the "multi-ring" designs—such as shown in Figures 2 and 2A—are also expressly included.

As a fallback, Plaintiffs assert that "the 'one or more bends' language does not *expressly* teach that the bends should be 'non-sinusoidal'" and also that this arrangement will not necessarily have the other features recited in the claims.  (Mot. at 18.)  Plaintiffs do not explain how a one-bend crosstie could be anything but "non-sinusoidal," given that an S-shape has two bends.  Wijay does not have to expressly use the claim term "non-sinusoidal" in order to anticipate.  The issue is what is the *substance* of Wijay's disclosure, and Wijay expressly discloses a one-bend crosstie, which is squarely within the Court's construction of "non-sinusoidal" (i.e., "not S-shaped"), since an S at minimum requires two bends.  As for the other limitations in the asserted claims (e.g., "arcuate" and "connected" to a straight strut portion), those limitations are expressly disclosed in Figures 2 and 2A, and would remain in the variant where one of the two bends in those figures is eliminated to create a "one-bend" embodiment, as expressly taught at column 8, lines 55-57.

Thus, as explained in Abbott and BSC's Motion, no reasonable juror could find that Wijay does *not* disclose a non-sinusoidal flexure member.

b.     **Wijay Also Discloses a Connector in Figures 2 and 2A That**
***Comprises* (i.e., Includes) a Non-Sinusoidal Flexure Member**

As explained in Abbott and BSC's Motion, an S-shaped connector comprises two non-sinusoidal flexure members joined together.  (Dkt. No. 408 at 18-20.)  Although Plaintiffs now ridicule this position as "absurd" (Mot. at 14), this has repeatedly been their own position—when it suited their objectives.



For example, during prosecution of the patents-in-suit, Drs. Penn and Ricci told the PTO that the "non-sinusoidal" claims of the '037 patent "may be read on Figure 8, which appears in the CA 2,175,722 priority document."[2] (Ex. 6 at AB0732816.)  They made this representation in a successful attempt to secure an earlier priority date for those claims.  *Plaintiffs have no answer to this*, except to claim that the statement was a "mistake" by Evysio's patent attorney.  Abbott and BSC dispute that this assertion was anything but calculated, deliberate, and intentional, and Plaintiffs cannot seriously contend that the Court must accept its version of the mental state behind this assertion

**Excerpt from Fig. 8 of the patent.  Drs. Penn and Ricci represented to the PTO that this figure discloses "non-sinusoidal" flexure members.**

on its *own* motion for summary judgment.  Moreover, even assuming, *arguendo* and contrary to the contemporaneous evidence, that this express statement to the PTO was a "mistake," that still would not erase it from the PTO file, which the public is fully entitled to rely upon.  *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent."); *see also Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("The prosecution history constitutes a public record of the patentee's representations concerning the scope and the meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct.").

---

[2]  Dr. Penn and Ricci's representation to the PTO was entirely consistent with the specification of their patents, which makes clear that, while the flexure means in Figures 8-10 can be described as being sinusoidal or S-shaped, they can also be described as comprising "a pair of joined curved sections." (Ex. 7, col. 4:35-52.)

1    It is also telling that Drs. Penn and Ricci have never sought to retract or correct their

2    allegedly "mistaken" statement that the "non-sinusoidal" claims in the '037 patent are satisfied by

3    the S-shaped connectors of Figure 8, despite having ample opportunity to do so.  In similar

4    circumstances, the Federal Circuit has refused to give credence to *post facto* claims of alleged

5    "mistakes" during prosecution.  *See, e.g., Springs*, 323 F.3d at 995 ("If the applicant mistakenly

6    disclaimed coverage of the claimed invention, then the applicant should have amended the file to

7    reflect the error, as the applicant is the party in the best position to do so.").

8    The idea of an S-shape connector containing two non-sinusoidal flexure members was also

9    not "absurd" to Dr. Ricci when he testified under oath *in this litigation*

10

11

12

13

14

15

16

17   (Ex. 8 at 261.)

18   Likewise, the idea was not "absurd" to Plaintiffs' own expert, Dr. Eberhart, who testified

19   under oath that

20

21

22

23

24   (Ex. 9 at 255.)

25   Indeed, it is also apparently not "absurd" for *Plaintiffs* in this very motion to dissect a non-S-

26   shaped flexure member into smaller pieces to find a "sinusoidal" flexure member when it suits their

27   needs, i.e., when they wish to distinguish prior art.  They do this, for instance, on page 13 of their

28

1   brief, where they identify the IsoStent design shown here as having

2   "sinusoidal" flexure members, even though the curved connectors clearly

3   have *four* bends and are therefore not "S-shaped" when viewed as a whole.



**July 1995 IsoStent**

4   The only way Plaintiffs can find an S-shape in this design is to subdivide the connectors into smaller

5   flexure members.  Abbott and BSC agree that this is proper.  When this same methodology is applied

6   to Wijay '940, the reference plainly discloses non-sinusoidal flexure members.

7          Likewise, it is also apparently not

8   "absurd" for Plaintiffs to represent to another

9   Court that a curved "flexure member" can be

10   dissected into smaller curved "flexure

28. The stent defined in claim 24, wherein the **flexure member** is isolated from two circumferential struts,



**Plaintiffs' Infringement Contentions Against J&J**

11   members."  Specifically, in an ongoing case against Johnson & Johnson in Texas involving closely-

12   related patents with identical specifications, Plaintiffs assert that a fully-curved connecting element

13   can be arbitrarily dissected into three portions, wherein the middle (blue) portion is a "flexure

14   member" that is "isolated" from the circumferential struts (rings) by the other two (pink and brown)

15   portions.[3]   (Ex. 10 at 24.) According to Plaintiffs, the blue "flexure member" is "for illustrative

16   purposes only" and "may comprise more or less of the overall longitudinal strut." (*Id.* at 8 n.5.)  In

17   other words, when it suits Plaintiffs' purposes, they assert that *any* curved portion of a curved

18   longitudinal can be a flexure member, even if that means dissecting a flexure member that would not

19   otherwise be "isolated" from the circumferential struts (i.e., the entire connector) into pieces in order

20   to create an "isolated" flexure member (the blue portion).  If a portion of a "non-isolated" flexure

21   member can be considered an "isolated" flexure member, certainly a portion of a "sinusoidal" flexure

22   member can be considered a "non-sinusoidal" flexure member.

23          Despite the overwhelming evidence in which they have repeatedly taken the contrary

24

25   _____

26          [3]  Because they share the same specification, the term "flexure member" is presumed to have
the same meaning in the patent being asserted against Johnson & Johnson as in the patents in suit
27   here.  *See, e.g., Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e
presume, unless otherwise compelled, that the same claim term in the same patent or related patents
28   carries the same construed meaning.").

1   position, Plaintiffs nevertheless argue it would be "absurd" to break an S-shape into smaller, non-

2   sinusoidal flexure members because that would allegedly "read the 'non-sinusoidal' limitation

3   entirely out of the claim because the limitation would read on <u>any</u> flexure member."  (Mot. at 14.)

4   But there is no absolute prohibition on interpretations that render terms superfluous.  *See Power*

5   *Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[W]hile interpretations

6   that render some portion of the claim language superfluous are disfavored, where neither the plain

7   meaning nor the patent itself commands a difference in scope between two terms, they may be

8   construed identically.").  Plaintiffs must live with the claims as they were written, and cannot now

9   rewrite them to avoid the invalidating effects of the prior art.  *See Honeywell Int'l, Inc. v. Int'l Trade*

10  *Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003).

11          As a fallback, Plaintiffs contend the applicants "expressly distinguished the claims [from

12  Wijay and Fischell] <u>precisely because</u> the prior art did not disclose a <u>non-sinusoidal</u> flexure

13  member."  (Mot. at 14.)  If this argument had any basis in the record, Plaintiffs should have made it

14  during claim construction, rather than advocating for—and getting—a broad construction.  For

15  alleged support, Plaintiffs point to a one-sentence summary of an otherwise undocumented interview

16  between the applicants and the Examiner, which states that "the Applicants' attorney contended that

17  the prior art of reference does not disclose a flexure member being non-sinusoidal, arcuate and

18  isolated to a least one adjacent circumferential portion."  (*See* Mot. at 14.)  Plaintiffs cannot now rely

19  on largely undocumented oral interviews with the Examiner,[4] which was likely Evysio's strategy for

20  avoiding a fully developed written record.

21          In any event, this argument should be rejected because the applicants clearly argued that a

22  *combination* of characteristics was missing from the prior art, not that each characteristic was

23

24  _____

25  [4] *See, e.g., PureChoice, Inc. v. Honeywell Int'l, Inc.*, No. 2:06-CV-244, 2008 WL 190317, *7 (E.D.
    Tex. Jan. 22, 2008) (refusing to entertain arguments as to what transpired during undocumented
26  examiner interviews.) ("The patent owner did not reduce either of the last two phone interviews with
    the examiner to a written statement. The failure to comply with 37 C.F.R. 1.560(b) does not render a
27  claim invalid. The lack of written record, however, does not provide this court or the public with any
    information in the prosecution history to determine the scope of these claim terms.").

28

missing individually.  Indeed, Drs. Penn and Ricci used this same tactic in distinguishing virtually

every reference during prosecution, including references that clearly included non-sinusoidal

connectors.  For example, in attempting to distinguish the non-sinusoidal and arcuate connectors of

Israel '303, they argued:

> As discussed at the interview, <u>Israel</u> fails to disclose or suggest flexure members which are **non-sinusoidal**, **arcuate**, and connected to an adjacent circumferential portion with a straight strut portion which is disposed parallel to the longitudinal axis of the stent.

(Ex. 6 at AB0732787.)  As can be seen, Israel discloses non-sinusoidal and

arcuate flexure members.  (*See* Ex. 11, Fig. 7.)  In short, Drs. Penn and

Ricci would distinguish a prior art reference on the basis that it lacked a

combination of three limitations, even when a reference clearly met one or

two of them (again no doubt to muddy the waters to avoid the potential



estoppel implications of simply and forthrightly saying "reference X fails to disclose claim feature

Y").  Thus, their alleged oral argument to the Examiner that Wijay and Fischell lack the *combination*

of three limitations does not warrant the conclusion that those references lack the individual "non-

sinusoidal" limitation.  Because the interview was only superficially documented, and because

Evysio sought to cover its tracks and cloud the record whenever possible, the public simply has no

way of knowing.  *See PureChoice*, 2008 WL 190317 at *7.

In the end, Plaintiffs contend this is all "merely an argument about

claim construction" and that "Defendants could (and should) have raised" this

issue during the *Markman* proceedings.  (Mot. at 14.)  Abbott and BSC agree

this is a claim-construction issue.  But claim construction *has already been*

*decided.*  The '037 claims require a "longitudinal portion <u>having</u> a <u>flexure</u>

<u>member</u>, said flexure member, in two dimensions being <u>non-sinusoidal</u> . . ."



**Wijay Fig. 2 shows a longitudinal portion that *includes* a non-S-shaped *part* (blue) that provides flexibility**

The term "flexure member" has been construed to mean "part of a longitudinal portion that provides

flexibility."  (Dkt. No. 283 at 14.)  "Non-sinusoidal" has been construed to mean "not S-shaped."

(*Id.* at 17.)  The term "having" in this context indisputably means "including."  *See Crystal*

*Semiconductor Corp. v. TriTech Microelectronics Int'l., Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001).

1    With these three constructions, no reasonable jury could conclude otherwise than that Figures 2 and

2    2A of Wijay satisfy the requirement of "a longitudinal portion having [i.e., *including*] a flexure

3    member [i.e., *part* of a longitudinal portion that provides flexibility], said flexure member, in two

4    dimensions, being non-sinusoidal [i.e., not S-shaped]."

**c.      Wijay Discloses a Flexure Member That Includes a "U-Shape"
With "Substantially Orthogonal" Sides**

6           Plaintiffs argue in a single footnote that Wijay does not contain a "U-shape," as required by

7    the asserted '255 claims and claim 17 of the '037 patent.  (Mot. at 17 n.6.)  That is not only incorrect,

8    but inconsistent with Plaintiffs' own prior statements and admissions.  (Dkt. No. 408 at 15.)

9           Plaintiffs also summarily allege that the sides of the "U-shaped turn back portions" in Wijay

10   are not "substantially orthogonal" to the stent's longitudinal axis, as required by claim 43 of the '037

11   patent.  (Mot. at 17 n.6.)  Yet Dr. Ricci testified (as Evysio's corporate representative) that

12   "substantially orthogonal" in the asserted patents can simply mean ████████████████████████

13   ██████████████████████████████████████████████████████  (Ex. 13 at 307-10.)[5]   Under

14   that definition, Wijay satisfies this limitation.  (Ex. 14 at 64-65.)  Thus, there is a triable issue of fact

15   on this question, which precludes summary judgment in Plaintiffs' favor.

**d.      Wijay Discloses a Flexure Member "Interposed Between" Two
Straight Strut Portions According to the Ordinary Meaning of
"Interposed"**

18          This Court has ordered that "interposed between" shall have its ordinary meaning in this case.

19   (Dkt. No. 283 at 19.)  Under that ordinary meaning, Wijay clearly satisfies the requirement of claim

20   11 of the '255 patent and claim 22 of the '037 patent of a flexure member "interposed between" two

21   straight, parallel strut portions.  (*See* Dkt. No. 408 at 12-14, 21.)

22          Plaintiffs, however, wish to give "interposed" an unorthodox, "contextual" definition that

23   differs from its ordinary meaning, and really amounts to a prohibited rewriting of the claims to avoid

24   the invalidating effect of the prior art.  According to Plaintiffs, "[w]hen the language is viewed in

---

27          [5] While Dr. Ricci ████████████████████████████████████████████  (Ex. 13
28   at 307-10), as a general rule, the same words should be given the same meaning throughout a patent.
     *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

context, it is clear the straight strut portions must be part of the <u>same longitudinal</u> as the flexure

member." (Mot. at 20.) That requirement is nowhere found in the claims. Indeed, Plaintiffs should

not even be permitted to raise this new "contextual" claim construction argument because claim

construction concluded many months ago, and it was Plaintiffs themselves who advocated for the

"ordinary meaning" of this term. (*See* Dkt. No. 171 at 20 ("The phrase means what it says and does

not require further construction.").)

In any event, Plaintiffs are simply wrong that the "context" of the claims somehow dictates

that "the straight strut portions must be part of the <u>same longitudinal</u> as the flexure member." Claim

22 of the '037 patent, for instance, requires only that:

> each of said plurality of longitudinal portions hav[e] a flexure member
> that provides flexibility to said stent and is disposed within each of said
> plurality of longitudinal portions, each said flexure member, in two
> dimensions, being (i) non-sinusoidal, (ii) interposed between a pair of
> straight strut portions which are disposed parallel to a longitudinal axis
> of the stent, and (iii) arcuate.

(Ex. 7, col. 15:66-col. 16:6.) Nothing in that claim language indicates that the "pair of straight strut

portions" must be part of the same longitudinal portion as the flexure member. The United States

has a land mass that is "interposed between" Canada and Mexico. Yet, neither of those countries is

"part of" the United States. Thus, Plaintiffs are simply trying to revise their claims to add this

additional requirement in order to avoid the prior art. That is improper in any circumstance, *see*

*Honeywell*, 341 F.3d at 1341, and is particularly egregious here because this Court has already

ordered that the ordinary meaning of "interposed" shall apply.

As explained in Abbott and BSC's Motion for Summary Judgment of

Invalidity, no reasonable jury could conclude that Wijay lacks the "interposed"

requirement under the ordinary meaning. Indeed, Wijay meets this requirement

for the same reason as Figure 6 of the patents-in-suit, which *all parties* agree

supports the priority date of the "interposed" claims. (Ex. 15 at 75.) Dr. Rothman

readily conceded that Figure 6



**Excerpt from Fig. 6 of the patent. All parties agree this figure supports the "interposed" limitation**

(Ex. 16. at 259.)

### 3.      Fischell '442 Anticipates Many of the Asserted Claims

Plaintiffs allege that Fischell '442 cannot anticipate any of the asserted claims for two

reasons: (1) it discloses only a sinusoidal flexure member; and (2) it does not properly incorporate

the Fischell '312 patent by reference and, therefore, does not disclose an unexpanded stent with

peak-to-valley connectors.  (Mot. at 15.)  Plaintiffs are wrong on both points.

### a.      The '255 Claims Do Not Require a "Non-Sinusoidal" Flexure Member, and Fischell '442 Discloses a Connector That *Comprises* (i.e., Includes) a Non-Sinusoidal Flexure Member as Required by the '037 Claims

None of the asserted '255 claims requires a "non-sinusoidal" flexure member.  Thus, the

curved connectors disclosed in Fischell '442 clearly satisfy the

"flexure member" requirements of the asserted '255 claims:



> each of said plurality of longitudinal portions having a single flexure member interposed between a pair of straight strut portions which are disposed parallel to a longitudinal axis of the stent, the flexure member, comprises [i.e., includes] an arcuate U-shape curving in a non-radial direction of the stent.

**Fig. 1 of Fischell '442.  "Single flexure member" shown in yellow.**

(Ex. 17, col. 15:29-34, as modified by Certificate of Correction.)

As for the "non-sinusoidal" requirement of the '037 claims, Fischell '442 satisfies this

limitation for the same reasons explained above in Section III.A.2.b; namely, the Fischell '442

connector can be considered two non-sinusoidal flexure members joined together.  Beyond this, there

is a factual dispute as to whether the *entirety* of the curved portion in Fischell '442 (shown above in

yellow) is S-shaped and therefore sinusoidal.  (Ex. 14 at 69.)  Plaintiffs are therefore not entitled to

summary judgment that Fischell '442 discloses *only* "S-shaped" flexure members.

### b.      Fischell '442 Properly Incorporates Fischell '312 by Reference and Therefore Discloses an Unexpanded Stent With Peak-to-Valley Connectors

Plaintiffs do not dispute that Fischell '312 discloses an unexpanded stent having undulating

rings and peak-to-valley connectors.  Nor do they dispute that Fischell '312 corresponds to

1  "application Ser. No. 08/202,128," which is expressly recited as being "included herein by reference"

2  in Fischell '442.  Thus, the only question here is whether the '442 patent's incorporation by reference

3  of the '312 patent is legally effective.

4        The legal standard for incorporation by reference is not in dispute.  "To incorporate material

5  by reference, the host document must identify with detailed particularity what specific material it

6  incorporates and clearly indicate where that material is found in the various documents."  *Advanced*

7  *Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000).  Plaintiffs' brief,

8  however, suggests a much more draconian application of this standard than is the practice of the PTO

9  and the Federal Circuit.

10        For instance, in *Cook Biotech Inc. v. Acell, Inc.,* 460 F.3d 1365 (Fed. Cir. 2006), the Federal

11  Circuit held that U.S. Patent No. 5,554,389 ("the '389 patent") properly incorporated U.S. Patent No.

12  4,902,508 ("the '508 patent") by reference for a certain procedure.  *See id.* at 1376 ("[T]he '389 patent

13  specification expressly incorporates by reference the procedure for preparing intestinal submucosa

14  from the '508 patent.").  The following is the language of incorporation in the '389 patent:

15            The preparation of UBS from a segment of urinary bladder is similar to the
16            procedure for preparing intestinal submucosa detailed in U.S. Pat. No.
             4,902,508, the disclosure of which is expressly incorporated herein by
17            reference.

18  (Ex. 18 at col. 2:17-20.)

19        Similarly, in *Ultradent Products, Inc. v. Life-Like Cosmetics, Inc.,* 127 F.3d 1065 (Fed. Cir.

20  1997), the Federal Circuit reversed a denial of summary judgment of anticipation because the district

21  court failed to recognize that the asserted prior-art patent (U.S. Patent No. 4,990,089 to Munro)

22  incorporated another patent by reference (U.S. Patent No. 3,657,413 to Rosenthal).  The Federal

23  Circuit held that "[t]he Munro patent incorporates by reference the *entire contents* of the Rosenthal

24  disclosure" and that the patentee's "assertion that Munro 'says nothing' about the Rosenthal

25  compositions . . . is contrary to the rules of practice, which permit incorporation of prior art by

26  reference."  *Ultradent*, 127 F.3d at 1069 (emphasis added).  Munro incorporates by reference the

27  *entire* Rosenthal patent as follows:

28            The commercial product PROXIGEL, described in U.S. Pat. No. 3,657,413
             issued on Apr. 18, 1972 to M. W. Rosenthal, which patent is hereby

incorporated herein by reference, is one attempt to overcome the problems of hydrogen peroxide by using urea peroxide in a slowly dispersable glycerol based solvent.   This combination, according to the above-mentioned patent, improves sustained nascent oxygen release.   It is the nascent oxygen release which is believed to cause the antiseptic and/or cleansing effect of the peroxide.   PROXIGEL, whch is manufactured by Reed & Carnrick, is a 10% solution of carbamide peroxide in a water free gel base.

(Ex. 19, col. 2:10-22.)

Turning now to Fischell '442, the inventors of that patent very clearly incorporated their co-pending '128 application (now the '312 patent) with at least the same level of detail and precision as in *Cook* and *Ultradent*:

FIG. 1 illustrates a stent 10 laid out into a flat, two-dimensional form.   In fact, the stent 10 is in the form of a thin-walled, cylindrical mesh having a plurality of rings 11, two or more longitudinals 12 having undulating structures 12A to enhance the longitudinal flexibility of the stent 10.   The design advantages of this type of stent structure is described in U.S. patent application Ser. No. 08/202,128 entitled "Stent Having A Multiplicity of Closed Circular Structures" which application is included herein by reference.

(Ex. 20, col. 2:38-47.)   As in *Cook* and *Ultradent*, Fischell '442 identifies what specific material it incorporates (i.e., the stent structure described in U.S. patent application Ser. No. 08/202,128)[6] and where that material can be found (i.e., in the discussion of the design advantages of that stent structure).   Hence, incorporation by reference of the '312 patent into the '442 patent is proper, and it would be legal error to hold otherwise.   *See Ultradent*, 127 F.3d at 1069 ("Because the Rosenthal disclosure is not as limited as the district court found, and because the court's conclusion as to the scope of the Rosenthal disclosure was critical to the court's summary judgment ruling, we reverse the court's ruling on the issue of anticipation . . . .")

**B.      Plaintiffs Are Not Entitled to Summary Judgment That Contemporaneous Internal Work Is Inadmissible *Per Se***

In the 1995-96 timeframe, several stent designers simultaneously conceived of the same

---

[6] The PTO rules expressly allow incorporation of a "pending U.S. application" by reference.   *See* MPEP § 608.01(p).   Even if unpublished, pending applications become available to the public upon being incorporated by reference into an issued U.S. patent.   37 C.F.R. § 1.14(a)(1)(vi).

1    designs that are claimed in the patents-in-suit.  As just one example, in

2    1995, Brian Brown at BSC conceived of an in-phase, ring-and-link design

3    with U-shaped, "interposed" connectors, as shown here.  Because Mr.

4    Brown did not publish or patent this design, however, Plaintiffs contend

5    his internal work (and similar work by others) cannot be "admitted for any

6    purpose" at trial.  (Mot. at 21-22.)  That is wrong as a matter of law.



Nov. 1995 Brown design

7         As the Court explained in *Applied Materials, Inc. v. Advanced Semiconductor Materials*

8    *America, Inc.*, No. C-92-20643, 1995 WL 848951 (N.D. Cal. Nov. 1, 1995), evidence of

9    contemporaneous conception by others is relevant and admissible for at least two reasons.  First, it is

10   relevant to the level of ordinary skill in the art at the time of the invention.  *See id.* at *12 ("In

11   assessing the level of knowledge that one of ordinary skill would have at the time the invention was

12   made, contemporaneous conception of the invention by others should also be considered.") (citing

13   *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 767 (Fed. Cir. 1988); *Vandenberg v. Dairy*

14   *Equip. Co., Div. of DEC Int'l, Inc.* 740 F.2d 1560, 1566 (Fed. Cir. 1984)).  Second, "[i]ndependent

15   conception is evidence weighing against patentability." *Applied Materials*, 1995 WL 848951, at *13

16   (citing *Pratt & Whitney Canada Inc. v. U.S.,* 12 U.S.P.Q.2d 1497, 1504 (Ct. Cl. 1989), *aff'd*, 897

17   F.2d 539 (Fed. Cir. 1990); *Concrete Appliances Co. v. Gomery,* 269 U.S. 177, 185 (1925); *Stewart-*

18   *Warner Corp. v. Pontiac,* 767 F.2d 1563, 1570 (Fed. Cir. 1985) ("Development by others may also

19   be pertinent to a determination of the obviousness of an invention.")).

20        Non-prior art work can also be used as secondary evidence of obviousness.  *See, e.g.,*

21   *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 883-84 (Fed. Cir. 1998).

22   Indeed, a leading treatise makes this abundantly clear, collecting numerous cases on the topic:

23              Evidence that a number of other persons, working under the same state
             of the prior art, arrived at the same or similar solutions to that
24           embodied in a patent claim has been relied upon in a number of
             decisions as tending to show that the claimed solution was obvious.
25           The other solutions may not be "prior art" in the strict sense; they may
             have occurred after the patent claimant's date of invention or in another
26           country.  However, such solutions are still "secondary considerations"
             from which the obviousness of the claim may be inferred.

27
28   2 CHISUM ON PATENTS § 5.05[7] (2007) (Ex. 21) (collecting cases).  Indeed, contrary to Plaintiffs'

1    assertion (Mot. at 21-22), the Federal Circuit has specifically held that simultaneous conception by

2    others—*even if not prior art*—is relevant and admissible, both as evidence of the ordinary level of

3    skill in the art and as a secondary consideration relating to obviousness. *See, e.g., Monarch Knitting*,

4    139 F.3d at 883 ("Although this court has noted the relevance of contemporaneous independent

5    invention to the level of ordinary skill in the art, it has also acknowledged the view that this evidence

6    is relevant as a secondary consideration.") (citations omitted).

7        In *Monarch Knitting*, the defendants submitted evidence that the claimed knitting needle

8    design had been conceived by two earlier designers.  They produced proprietary blueprints for those

9    two designs, both dated after the May 1976 priority date of the claimed invention.  *Id.* at 883-84.

10   Although those secret designs were never patented or published and did not qualify as prior art, the

11   Federal Circuit nevertheless held they were "relevant" to the obviousness analysis.  *Id.* at 884

12   ("These needles do not qualify as 'prior art' under 35 U.S.C. § 102 or § 103(a), but are relevant to

13   obviousness as a secondary consideration.").  Thus, Plaintiffs are simply wrong that a proprietary

14   design that was never published or patented is inadmissible *per se*.

15        Ignoring the Federal Circuit's ruling in *Monarch Knitting*, Plaintiffs claim that the "only

16   case" that squarely addresses this issue is a 1967 case from the Eastern District of Virginia, *Grinnell

17   Corp. v. Va. Elec. & Power Co.*, 277 F. Supp. 507 (E.D. Va. 1967).  *Grinnell*, however, addressed

18   only the question of whether an abandoned or concealed design could be asserted as "prior art" under

19   35 U.S.C. § 103.  That is a different question than whether such a design can be used to show

20   contemporaneous conception for purposes of determining the level of ordinary skill in the art or as a

21   secondary consideration bearing on obviousness.  The Federal Circuit has made very clear that such

22   designs can, in fact, be used for both purposes, even if they do not qualify as prior art.  *See Monarch

23   Knitting*, 139 F.3d at 883-84; *see also Rockwell Int'l Corp. v. U.S.*, 37 Fed. Cl. 478, 500 (Ct. Cl.

24   1997) ("Evidence that several persons working in the same art each independently arrive at the same

25   solution to the operative problems at roughly the same time mitigates strongly toward a finding that

26   the solution was obvious.  An independent conception need not be prior art.") (citations omitted),

27   *vacated-in-part on other grounds,* 147 F.3d 1358 (Fed. Cir. 1998).

28        In view of the foregoing, Plaintiffs' request for summary judgment—which is really a

18

premature motion *in limine*—that the work of Brian Brown, Dan Cox, Tim Limon, Matthew Birdsall, and the Fischells are inadmissible "for any purpose" should be denied as contrary to established law.

**C.    Disputed Issues of Material Fact Preclude Summary Judgment on Abbott and BSC's Derivation Defense**

Under 35 U.S.C. § 102(f), a person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented."  To prove derivation under section 102(f), the party asserting invalidity must demonstrate two elements by clear and convincing evidence: (1) prior conception of the invention by another, and (2) communication of the conception to the patentee.  *Price v. Symsek,* 988 F.2d 1187, 1190 (Fed. Cir. 1993).  Whether there was a prior conception is a question of law based on underlying facts; the ultimate question of whether a patentee derived an invention from another is one of fact.  *Id.*  In this case, there are genuine issues of material fact as to both elements of the derivation determination, which preclude summary judgment.

**1.    Plaintiffs Ignore Direct Evidence Showing Prior Conception by the Fischells**

Plaintiffs assert that "there is no evidence establishing prior conception by the Fischells of each of the asserted claims of the patents in suit." (Mot. at 33.)  The record shows otherwise. A peak-to-valley stent design with curved longitudinal connectors was first conceived by the Fischells in 1993, shortly before they formed their company IsoStent.  (Ex. 22 at 32-33; 115; Ex. 23 at 119.)  On February 25, 1994, more than two years before Drs. Penn and Ricci filed their first Canadian patent application that led to the patents-in-suit, the Fischells filed U.S. Appl. No. 08/202,128 (issued as the Fischell '312 patent), disclosing a ring-and-link stent design with curved connectors that "would bend more easily during insertion into a vessel and would be more readily adaptable for placement in curved vessels such as some coronary arteries."  (Ex. 24 at 3:45-49 & Fig. 8 (post-deployment view).)  In the same application, the Fischells also disclosed an expandable stent structure with straight "peak-to-valley" connectors.  (*Id.* at 4:36-47 & Fig. 9 (pre-deployment view).)

Subsequently, between March 1994 and November 1995, the Fischells created additional peak-to-valley, curved connector designs, including the following (*see* Ex. 25; *see also* Ex. 23 at 84):

    

| March 1994 (ISO000111.11) | June 1994 (ISO000111.13; L000269) | Sept. 1994 (ISO000111.20; *see also* L000271) | Sept. 1995 (ISO00095; *see also* ISO00093) | Nov. 1995 (ISO000111.10) |

On November 13, 1995, the Fischells filed U.S. Appl. No. 08/557,355 (issued as the Fischell '442 patent). The Fischell '442 patent incorporated the '312 patent by reference, and disclosed another ring-and-link design with curved connectors "to enhance the longitudinal flexibility of the stent[.]"  (Ex. 20 at 2:38-42 & Fig. 1; *see also* Dkt. No. 408 at 5-6.)

This evidence leaves no question that the Fischells conceived of an expandable stent design with peak-to-valley, curved connectors long before Drs. Penn and Ricci's alleged invention.  Indeed, Plaintiffs have not denied that the Fischells conceived of peak-to-valley, curved connectors prior to Drs. Penn and Ricci's alleged invention.  Dr. Ricci admitted that ████████████████████████ ████████████████████████████████████  (Ex. 8 at 123.)  To the extent Plaintiffs dispute whether the Fischells created these designs by March 1996, that is an issue of material fact precluding summary judgment.

Plaintiffs also contend there is no evidence that the Fischells ever conceived of a "non-sinusoidal" flexure member.  (Mot. at 33 n.10.)  Yet, as explained above, this position directly contradicts Plaintiffs' repeated position that the "non-sinusoidal" requirement can be satisfied by a non-sinusoidal one-turn *part* of a sinusoidal two-turn connector, as well as their position that a two-turn part of a four-turn connector is "sinusoidal."   In any event, because the asserted claims of the '255 patent do not require a "non-sinusoidal" flexure member, Plaintiffs' "non-sinusoidal" argument is irrelevant to these claims.

### 2.    Plaintiffs Ignore Substantial Circumstantial Evidence Showing Communication of the Fischells' Conception to Drs. Penn and Ricci

Plaintiffs' argument of no derivation is based on their apparent belief that circumstantial evidence is not evidence.  It is.  *See Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) ("[D]irect evidence of a fact is not required.  Circumstantial evidence is not only sufficient, but may

1   also be more certain, satisfying and persuasive than direct evidence.").  In this case, Plaintiffs offer

2   the testimony of three interested parties, Drs. Penn and Ricci and Mr. Shukov, elicited almost a

3   decade after the events in question.  In contrast, Abbott and BSC offer contemporaneous

4   documentary evidence that Drs. Penn and Ricci derived their invention from the Fischells, with Mr.

5   Shukov serving as the conduit of information.  Weighing self-serving testimony on one side against

6   overwhelming circumstantial evidence on the other is a function of the jury.

7           a.      **Substantial Circumstantial Evidence Shows That George Shukov
                    Conveyed the Fischells' Designs to Drs. Penn and Ricci**

8
9           In all relevant respects, what Penn and Ricci "invented" looks almost exactly like the

10   Fischells' design.  Both include peak-to-valley, curved connectors flanked by two straight sections:

11
12      
13
14
15          **The Fischells' "Vacco" design**          **Figure 8 of patents-in-suit**
                **(March 1994)**                          **(submitted May 1996)**

16   The evidence shows that this remarkable similarity was no coincidence.

17          In the summer of 1994, the Fischells engaged Mr. Shukov and his company LPL to laser-cut

18   their stents, on a confidential basis.  (Ex. 22 at 215, 396.)  In June 1994, Mr. Shukov received one of

19   the Fischells' curved connector designs.  (Ex. 26.)  Between 1994 and 1996, the Fischells entrusted

20   Mr. Shukov with numerous peak-to-valley, curved connector designs, including the March 1994

21   design shown above ("the Vacco design").  (*See, e.g.*, Ex. 22 at 121 (Robert Fischell testifying that

22   he handed the Vacco design to Shukov); Ex. 23 at 75, 83 (David Fischell testifying that he sent

23   various drawings to Shukov in 1994); Ex. 27; Ex. 28 at 232, 242; Ex. 29.)[7]

24          In March 1995, Drs. Penn and Ricci sought out Mr. Shukov, who was cutting stents for

25   several companies in addition to IsoStent.  (Ex. 30 at L001035.)  Eight months later, ████████

26

27   _____

28          [7]   Plaintiffs do not appear to dispute that Mr. Shukov had access to the Fischells' designs.  If
        they do, this is a factual issue for the jury.

1   ███████████████████████████████████████████  (Ex. 31 at 270.)

2           Plaintiffs do not deny the relationship between Mr. Shukov and Drs. Penn and Ricci but claim

3   there is no direct evidence that Shukov ever communicated any of the Fischell designs to Drs. Penn

4   and Ricci.  But neither the Evysio partners' self-serving testimony nor the Fischells' lack of direct

5   knowledge of what Mr. Shukov told Drs. Penn and Ricci about the IsoStent designs ends the inquiry.

6   Contemporaneous evidence shows that Drs. Penn and Ricci valued Mr. Shukov specifically *because*

7   of his access to other companies' proprietary information, that he assisted Drs. Penn and Ricci in

8   stent design,███████████████████████  and that Drs. Penn and Ricci's stent development

9   accelerated suspiciously after making Mr. Shukov a partner.

10          Contemporaneous documentary evidence further shows that Mr. Shukov regularly shared

11  other companies' proprietary information and that Drs. Penn and Ricci prized the access that Shukov

12  provided.  Plaintiffs assert, based solely on recent self-serving testimony, that "Dr. Ricci said that

13  Mr. Shukov <u>never</u> communicated proprietary information that he learned from another company and

14  never showed him proprietary stents or designs owned by another company," and that "Mr. Shukov

15  also testified that he never communicated confidential information about one customer's designs to

16  another customer."  (Mot. at 31 (emphasis original).)  Contemporaneous documents show the

17  opposite, however, and demonstrate how valuable Mr. Shukov's access to this confidential

18  information was to Divysio and its investors:[8]

19      •   The April 5, 1995 entry of Dr. Ricci's notes indicated that Mr. Shukov showed him
            "several stents that are either proprietary or no longer in consideration" and that he
20          looked at other companies' stent designs while visiting LPL. (Ex. 30 at L001035.)

21      •   In September 1996, Dr. Ricci wrote to the president and CEO of Biocompatibles (a
            company that was in the process of acquiring Divysio): "We believe that all our
22          interests would be served by allowing LPL to continue to cut prototype stents for
            other vendors--there is no better way to keep [us] on the cutting edge (no pun
23          intended) of new developments."  (Ex. 32.)

24

25  _____

26      [8]  Non-party witness testimony also contradicts Mr. Shukov's testimony.  Ex-Isosent
        employee Todd Turnlund testified that Mr. Shukov showed him a Fischell nitinol stent design in
27      1995, while Mr. Turnlund was still working for Guidant.  (Ex. 36 at 90-92.)  In addition, William
        Hill, Mr. Shukov's former colleague, testified that Mr. Shukov showed IsoStent's proprietary stent
28      design to another company that he was trying to do business with.  (Ex. 37 at 103-106.)

- In October 1996, Mr. Shukov convinced Biocompatibles ███████████████ (Ex. 33 at EVY005407.)

While Plaintiffs now deny any collaboration between Mr. Shukov and Drs. Penn and Ricci in stent design, contemporaneous documents also show that Drs. Penn and Ricci sought Mr. Shukov for help with design.  In an October 1995 letter to Mr. Shukov, Dr. Penn acknowledged that he and Dr. Ricci "do not have the technical know how to produce" the stents, and he expressed a desire for Mr. Shukov's "participation in this project."  (Ex. 34.)  In a February 1996 agreement memorializing Mr. Shukov's arrangement with Drs. Penn and Ricci, Mr. Shukov was recognized as having "substantial expertise, know-how and technical information relating to the *developing* and manufacturing of, endoluminal stents[.]"  (Ex. 35 at L009819 (emphasis added).)  The agreement also stated that "Penn, Ricci and Shukov wish to work together to develop and exploit the Technology" and that "Penn, Ricci and Shukov wish to work through Divysio to conduct stent research and development." (*Id.*)  Schedule A to the agreement described "R & D Services To Be Provided by Shukov," which included "modifying each of the above prototype stents for the purposes of improving the design and functionality of such stents" and "[c]onsulting on the development and modification of the stents[.]" (*Id.* at L009824.)  In a November 1996 press release announcing Biocompatibles' acquisition of Divysio, "Mr. George Shukov" was recognized as one of the "initial developers of the intellectual property, owned by Divysio, relating to the Divysio stents."  (Ex. 38 at 2.)

Likewise, while Plaintiffs now try to minimize Mr. Shukov's role as merely a stent fabricator, Dr. Ricci's contemporaneous notes show that he and Dr. Penn offered to make Mr. Shukov an equal partner "as an enticement to give us some data[.]"  (Ex. 30 at L001036-37.)  ███████████ ███████████████████████████ (Ex. 31 at 270.)  Under this deal, ███████████ ██████████████████████████████ (*Id.* at 271, 276, 279.) According to Plaintiffs, Mr. Shukov was made a partner solely to provide stent cutting services. ██ ██████████████████████████ (*Id.* at 276.)  Clearly a jury presented with the full story could reasonably conclude that the real *quid pro quo*—the real value provided by Mr. Shukov to his new business partners—was the confidential information of other stent designers, including the Fischells with their strikingly similar design.

1       There is also ample evidence that Drs. Penn and Ricci's stent

2   development accelerated exponentially after making Mr. Shukov an

3   equal partner.  Although Drs. Penn and Ricci claimed that they had

4   started working on stent development in 1989-1990, their first

5   prototype, made in 1995, was so poor that they could not even expand

6   it with a hammer and nail.  (Ex. 30 at L001038; Ex. 31 at 234.)





**Penn & Ricci's design before making Shukov a partner (Ex. 39)**

**Four months after making Shukov a partner (Ex. 39.)**

7   Almost immediately after signing up Mr. Shukov, however, Drs. Penn

8   and Ricci came up with what looked like Figure 8 of the patents-in-suit in just four months.

9   (*Compare* Ex. 39 at L011638 (Penn/Ricci design dated 12/15/95), *with id.* at L011679 (Penn/Ricci

10   design dated 4/22/96).)  Dr. Ricci's notes reflect that Shukov provided numerous stent design

11   suggestions to Drs. Penn and Ricci.  (*See* Ex. 30 at L001038 (documenting contributions of "GS,"

12   i.e., George Shukov).)

13       Plaintiffs rely on *Maxwell v. K Mart Corp.*, 880 F. Supp. 1323, 1333 (D. Minn. 1995), for the

14   proposition that lack of testimonial evidence showing communication mandates summary judgment

15   of no derivation.  (Mot. at 32.)  Plaintiffs misstate the district court's holding in *Maxwell*.  To begin,

16   the *Maxwell* court did not *grant* summary judgment in Maxwell's favor—as Plaintiffs assert—but

17   *denied* the accused infringers summary judgment motion relating to the derivation defense.

18   *Maxwell*, 880 F. Supp. at 1342.  Nor did the court find a lack of testimonial evidence of

19   communication of the conception.  The issue that precluded summary judgment was whether the

20   patentee would be able to establish a conception date earlier than the filing date (a disputed fact in

21   that case), in which case there was "absolutely no evidence suggest[ing] that any prior conception

22   was communicated to Maxwell" before that date.  *Id.* at 1333.  This stands in stark contrast with the

23   present case, where overwhelming circumstantial evidence shows that Shukov communicated the

24   Fischells' stent designs to Drs. Penn and Ricci.

25       **b.**   **The Fischell Drawings Reflected the Complete Conception of the Invention and Were Enabling**

26   Contrary to Plaintiffs' assertions, the Fischell drawings reflected the complete invention

27

28

1    claimed by Penn and Ricci and were enabling.[9]   For example, the Vacco design is almost identical to

2    the design shown in Figure 8 of the patents-in-suit.  As noted above, during prosecution, in trying to

3    establish that the pending claims were entitled to a priority date of May 3, 1996—the filing date of

4    the Canadian application, CA 2,175,722—Evysio told the Patent Office that Figure 8 provided the

5    requisite support for—i.e., was covered by—the "non-sinusoidal" claims.  (Ex. 6 at AB0732816

6    (noting that "Applicants pointed out" during the interview that "the independent claims may be read

7    on Figure 8, which appears in the CA 2,175,722 priority document").)  A patent may only claim

8    priority to an earlier application if that earlier application meets both the written description and

9    enablement requirements of section 112.  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253

10   (Fed. Cir. 2004).  If Figure 8 enables and embodies the non-sinusoidal claims, as Evysio told the

11   PTO, the nearly identical Fischell drawings must as well.

12          Moreover, Plaintiffs overlook that § 102(f) art (like the Fischell designs) can be used in an

13   obviousness combination under 35 U.S.C. § 103, even if it discloses and enables *less* than the entire

14   claimed invention.  *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403-04 (Fed. Cir.

15   1997) (§ 102(f) art can be combined with other references in a § 103 analysis); *Amgen Inc. v.

16   Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) ("Under § 103, … a reference

17   need not be enabled; it qualifies as a prior art, regardless, for whatever is disclosed therein.").

18          **3.      The *IsoStent* Court's Ruling Is Irrelevant**

19          Plaintiffs' selective and inaccurate recounting of the *IsoStent* litigation is a red herring.  The

20   *IsoStent* court's ruling on IsoStent's motion for equitable relief based on unjust enrichment—a ruling

21   which issued from a proceeding that Divysio's lawyers had argued was without statutory

22   _____

23          [9]       By asserting that the derivation defense must be dismissed for alleged lack of

24   evidence "establishing that any communication was of the complete, claimed invention" and that
     "any communication was enabling," Plaintiffs apparently seek summary judgment only on Abbott

25   and BSC's derivation claim under section 102(f).  These requirements do not apply to a claim of
     invalidity based on nonjoinder of a co-inventor under section 102(f).  *See Pannu v. Iolab Corp.*, 155

26   F.3d 1344, 1351 (Fed. Cir. 1998) ("All that is required of a joint inventor is that he or she (1)
     contribute in some significant manner to the conception or reduction to practice of the invention, (2)

27   make a contribution to the claimed invention that is not insignificant in quality, when that
     contribution is measured against the dimension of the full invention, and (3) do more than merely

28   explain to the real inventors well-known concepts and/or the current state of the art.") (citations
     omitted).

1    authorization—is plainly not binding on this Court, or on Abbott or BSC.  The *IsoStent* court's ruling

2    has no preclusive effect or relevance here.

3           To begin, neither Abbott nor BSC were parties to the IsoStent litigation and cannot be bound

4    by any of the *IsoStent* court's findings.  *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 (2008).

5           Moreover, Plaintiffs' assertion that Abbott and BSC are relying on the same allegations

6    "already rejected in the IsoStent litigation" is incorrect.  (Mot. at 30.)  The jury in that case never

7    rendered a verdict on the merits; its verdict was instead based on the statute of limitations.  The

8    court, sitting in equity, then denied IsoStent's request for restitution based on findings that are by no

9    means dispositive of the derivation claim in this case.

10          Specifically, in January 2002, IsoStent filed suit against LPL, Divysio, Biocompatibles, Mr.

11   Shukov, Dr. Penn, and Dr. Ricci in Santa Clara Superior Court.  IsoStent asserted several causes of

12   action, including breach of contract and breach of the implied duty of good faith and fair dealing.

13   (Ex. 40.)  The jury found that these claims were barred by the statute of limitations.  (Ex. 41.)  After

14   trial, IsoStent filed a motion for equitable relief, seeking restitution based on unjust enrichment.[10]

15   (Ex. 42.)  The court denied IsoStent's motion, finding that (1) many of the elements IsoStent claimed

16   to be confidential were in the public domain;[11] and (2) IsoStent failed to demonstrate that the

17   "Superman 'S'" design element—not at issue here—was misappropriated.  (Ex. 43 at 13-14; 42-43.)

18          The *IsoStent* court's findings are irrelevant to the derivation inquiry in this case as a matter of

19   law.  Patent invalidity based on derivation is an entirely different legal claim from unjust enrichment

20   based on breach.  Whether the design elements in the Fischells' stent designs were publicly known is

21   immaterial to derivation under section 102(f).  *See OddzOn*, 122 F.3d at 1401-02 (noting that "prior"

22   invention under section 102(f) pertains to both public and private knowledge).  The *IsoStent* court

23

24   ───────────────

25          [10]   In their opposition in the *IsoStent* case, Evysio, Dr. Penn, and Dr. Ricci argued that there
     was no statutory justification for the "post-verdict" relief sought by IsoStent because the issue of

26   unjust enrichment was submitted to the jury.  (Ex. 44 at 1-11; Ex. 43 at 43-44.)

27          [11]   Rather than arguing that a peak-to-valley design with curved connectors was novel and
     not obvious, as Plaintiffs do now, Drs. Penn and Ricci convinced the *IsoStent* court that those design

28   elements were well known – *a 180° turn from their current position*.  (*See* Ex. 43 at 13-14; Dkt. No.
     408 at 7-8, 23-24.)

1    made no finding as to the pertinent questions under section 102(f), i.e.: (1) whether the Fischells

2    conceived of the invention recited in the asserted claims prior to Penn and Ricci's alleged invention;

3    and (2) whether the Fischells' designs embodying the alleged invention were communicated to Drs.

4    Penn and Ricci.  Indeed, neither patent-in-suit had even issued at the time of the *IsoStent* litigation.

5        **D.      Summary Judgment Is Inappropriate on the Written Description Defense**

6            Abbott and BSC are not trying to reargue claim construction, as Plaintiffs charge.  Rather,

7    Abbott and BSC submit that the asserted claims are invalid for lack of adequate written description

8    *based on* the Court's claim construction and Plaintiffs' contentions with respect to the prior art.  The

9    question here is whether a person of ordinary skill in 1996, having read the specification of the

10   patents-in-suit, would have concluded that Drs. Penn and Ricci invented a stent whose longitudinal

11   members each contain only a *single* flexure member that has an "orthogonal" U shape, or flexure

12   members that do not provide complementary extension and compression.

13           Plaintiffs assert that the Court should grant summary judgment because, "as a matter of law,"

14   Abbott and BSC cannot prove their written description defense.  (Mot. at 7.)  But compliance with

15   the written description requirement is a question of *fact*, not a question of law.  *See PowerOasis, Inc.*

16   *v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).  Because there are disputed issues of

17   material fact as to whether a person of ordinary skill in March 1996 would have understood the

18   inventors to have been in possession of a single (i.e., unaccompanied), orthogonal, U-shaped flexure

19   member or flexure members that fail to provide complementary extension and compression, this

20   issue cannot be resolved on summary judgment.[12]

21       **1.      There Is No Written Description Support for a Single Flexure Member
                 that Has An Orthogonal U Shape**

22

23           Properly construed, none of the asserted claims are limited to a longitudinal member having

24   just a *single* U-shaped flexure member.  Although Dr. Rothman alleges that claim 17 of the '037

25   _____

26       [12]      The patents-in-suit claim priority to four parent patent applications, each of which
     added new matter.  Plaintiffs provided contradictory responses through their experts' opinions and
27   interrogatory responses as to which priority applications they contend provide the requisite
     disclosure to support each asserted claim.  None of the applications, however, disclose that the
28   inventors were *ever* in possession of a single flexure member consisting only of a U-shape
     comprising two straight orthogonal struts.

1    patent is so limited, he is wrong.  Claim 17 depends from claim 1, which requires a longitudinal

2    member "having [i.e., *including*] a flexure member."  Claim 1 is thus not limited to a *single* flexure

3    member, as confirmed by dependent claim 2, which expressly requires "*multiple* flexure members

4    within the same longitudinal portion."  Likewise, claim 17 is thus also not limited to a single flexure

5    member because it requires only that "*said* flexure member . . . is U-shaped," referring to the

6    "flexure member" of claim 1, which—as dependent claim 2 makes clear—need not be the only

7    flexure member.  Thus, for instance, the composite structure of Figure 12(g) would satisfy both

8    claims 1 and 17 of the '037 patent because it *includes* "a flexure member" that "is U-shaped."

9           Nevertheless, Plaintiffs apparently intend to argue to the jury. ███████████████

10   ███████████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████

12   █████████████     (*Id.* at 86.)  Yet Drs. Penn and Ricci *did not disclose such an embodiment*.  Thus, if

13   Dr. Rothman were correct, the claims would be invalid, for there is no written-description support for

14   a longitudinal member having just a single, "orthogonal," U-shaped flexure member by itself.  On

15   that issue, there are clearly disputed facts precluding summary judgment.

16          Abbott and BSC's expert, Dr. Taylor, has opined that there is no written description support

17   for a single flexure member that has an orthogonal U-shape because: (1) the *only* disclosure in the

18   patent of an "orthogonal," U-shaped flexure member is in Figure 12g; and (2) there is no teaching in

19   the specification that Figure 12g, which contains both a U and an omega shape, could be cut in half

20   to derive *just* a single orthogonal, U-shaped portion.  (Ex. 14 at 113.)  Plaintiffs have not come

21   forward with any evidence rebutting Dr. Taylor's opinions.[13]   To the extent the parties' experts

22   disagree with each other as to what each of the figures in the patents disclose, it is for the jury to

23   decide which expert is more credible and trustworthy.

24   _____

25          [13] Plaintiffs point to twelve different figures in the specification, asserting these figures
26   provide "ample support for a flexure member consisting only of a U-shape." (Mot. at 11.)  Yet none
     of these figures depicts "only" an orthogonal U-shape.  Instead, they depict "many different shapes"
     including a "single gentle curve…S-shapes…[and a] single Omega shape." (Mot. at 10.)  As
27   discussed in Abbott and BSC's Motion, it is unclear whether Plaintiffs actually contend that the
     "single gentle curve" shown in Figures 5 and 6 is U-shaped. (Dkt. No. 408 at 33.)  Plaintiffs' expert
28   Dr. Rothman contends it is not.  *See, e.g., id.* at 33.  It clearly is not an *orthogonal* U, however.

To the extent Plaintiffs argue that it would have been *obvious* to a person of ordinary skill in the art to use half of the flexure member disclosed in Figure 12g, this argument fails as a matter of law.  To satisfy the written description requirement, Plaintiffs cannot simply assert that the claimed invention was *obvious* over the disclosed embodiments.  Instead they must meet the higher standard of showing that the claimed invention was "actually or inherently" disclosed in the specification.  *PowerOasis*, 522 F.3d at 1306; *cf. KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1741-42 (2007) (proper obviousness inquiry is whether it would have been obvious to try a combination of elements, each of which was known in the prior art).  The written description requirement is "not a question of whether one skilled in the art <u>might</u> be able to construct the patentee's device from the teachings of the disclosure. … Rather, it is a question whether the application *necessarily discloses* that particular device."  *PowerOasis,* 522 F.3d at 1306 (underlining in original, italics added, internal citations omitted).  There is no evidence that the inventors were in possession of the claimed invention.

### 2.    Plaintiffs' Written Description Argument Contradicts Their Obviousness Argument

Plaintiffs' argument that one of ordinary skill would have understood the invented designs to include only half of the Figure 12g flexure members cannot be reconciled with their non-obviousness argument, in which they assert that one of ordinary skill would not have thought it obvious to use half of a *prior art* flexure member to find a single U-shaped flexure member.

Plaintiffs' position that a single orthogonal U-shape flexure member is "necessarily" disclosed by Figure 12g logically leads to the conclusion that a single U-shape flexure member is obvious from the two-bend and four-bend flexure members of the Fischells' stent designs and others – each of which can also be cut into a single orthogonal U-shape flexure member.  Said otherwise, if Figure 12g "necessarily discloses" a single orthogonal U-shape flexure member, then the same U-shaped flexure member would be obvious from the Fischell designs, as illustrated below.



1

Plaintiffs cannot have it both ways:  either a single U-shape flexure member is inherently

2

disclosed in Figure 12g and thus also in the Fischells' and other prior art designs, or a single U-shape

3

flexure member is not obvious from the Fischells' and other prior art designs and thus not even

4

obvious from, let alone "necessarily present in," Fig. 12g.  Either way, the claims are invalid.

5

### 3.   There Is No Written Description of a Flexure Member Without Substantially Complementary Extension and Compression

6

7

Plaintiffs devote at least three pages of their brief to refuting arguments that Abbott and BSC

are not making.  Abbott and BSC are not rearguing claim construction.  Instead, they base their

8

written-description argument on the Court's construction of flexure member, which does *not* require

9

complementary extension and compression.  As Dr. Taylor acknowledged in his report: "the Court's

10

construction of 'flexure member' does not require 'complementary extension and compression.'

11

Thus, for purposes of this report, I understand this limitation is not required by any of the asserted

12

claims."  (Ex. 14 at 111.)

13

Plaintiffs have simply reached too far and drawn the boundaries of their claims beyond what

14

Drs. Penn and Ricci actually invented at the time they filed their patent applications.  The

15

specification of the patents-in-suit makes clear that "complementary extension and compression" is

16

an essential feature of what they believed they invented.  (*See, e.g.,* Ex. 7, col. 3:57-62 ("The specific

17

shape of the flexure means disposed in the longitudinal strut is not particularly restricted *provided*

18

*that* it confers lateral flexibility by . . . undergo[ing] substantially complementary extension and

19

compression.").)  Indeed, in describing the two shapes in Figure 12(g), far from suggesting they

20

should be separated, the specification expressly teaches away from any such dissection by stating

21

that both shapes are needed for complementary extension and compression.  (*See id.*, col. 11:54-56

22

("The flexure means illustrated in FIG. 12*g* may be considered to be an opposed omega (facilitates

23

extension)/U-joint (facilitates compression).").)

24

Accordingly, the claims are invalid under 35 U.S.C. § 112, ¶ 1 because the specification does

25

not support the full scope of the claimed invention. *See*, e.g., *LizardTech, Inc. v. Earth Res. Mapping,*

26

*Inc.,* 424 F.3d 1336, 1344-47 (Fed. Cir. 2005) (holding broader claim invalid for lack of written

27

description where specification was directed at more specific solution); *Tronzo v. Biomet, Inc.,* 156

28

1   F.3d 1154, 1159-60 (Fed. Cir. 1998) (same).  Because the specification only discloses

2   complementary flexible connectors and "substantially complementary extension and compression" is

3   described as an essential feature, the jury could reasonably find that the inventors were not in

4   possession of non-complementary flexible connectors, which nevertheless fall within the scope of

5   the asserted claims given the overbroad construction successfully urged by Plaintiffs.  *Vas-Cath Inc.*

6   *v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed. Cir. 1991).

7        As Dr. Taylor's opinion makes clear, this is primarily a factual dispute:

8           In summary, because the claims-in-suit are drafted so broadly as to

9   cover both complementary and non-complementary flexible
    connectors, because there is no disclosure of non-complementary
    connectors in the specification, and because the specification identifies

10  "substantially complementary extension and compression" as an
    essential feature of the applicants' invention, it is my opinion that the

11  asserted claims are invalid for lack of an adequate written description.

12  (Ex. 14 at 111.)  Plaintiffs cite no evidence to rebut Dr. Taylor's opinion, and their request for

13  summary judgment should be denied.

14      **E.**    **Plaintiffs' Motion for Summary Judgment on BSC's License Defense Should Be Denied**

15

16       Plaintiffs are not entitled to summary judgment on BSC's license defense because there is

    ample evidence—evidence Plaintiffs failed to address in their motion—that establishes a genuine

17  issue of material fact on the defense.  Based on that evidence, a reasonable jury could conclude that

18  BSC has a license to at least some claims of the patents in suit.

19

20      **1.**    **BSC's 1995 Agreement Provides a License to Mr. Shukov's Inventions and Improvements Relating to BSC's Stents**

21       The evidence supporting BSC's license defense includes a consulting agreement (Ex. 45

22  "Agreement") drafted by BSC among BSC, George Shukov, and Richard Press.  During the term of

23  the Agreement, which ran from November 15, 1995 to November 15, 1996, Mr. Shukov was a

24  partner in Divysio, the predecessor company to Plaintiff Evysio.  Paragraph 7, entitled "Patents,

25  Inventions and Copyright," provides in pertinent part that

26          all derivative inventions, improvements, or discoveries conceived or
    made by Consultant, either alone or in cooperation with others, during

27  the term of this Agreement that relate to the manufacture or design of
    BSC's stents shall be made available to BSC on a non-exclusive basis

28  and may only be disclosed to third parties to the extent that no BSC
    Confidential Information is disclosed.

1    (*Id.* at 3.)

2          The Agreement thus provides that any inventions, improvements or discoveries relating to

3    BSC's stent design made by Mr. Shukov must be made available to BSC.  The purpose of such a

4    provision in this and other standard form BSC contracts is to protect BSC from former consultants

5    who, having once worked with BSC on stents, later acquire patent rights and assert them against

6    BSC—exactly what is happening here.  A reasonable jury could conclude, based on the Agreement,

7    that BSC has a license to any stent-related invention to which Mr. Shukov and Mr. Press contributed.

8    As discussed above and in further detail below, there is ample evidence that at least Mr. Shukov

9    contributed to the alleged inventions in the patents in suit.

10         Divysio's own lawyer read the Agreement similarly.  In all copies of the Agreement Plaintiffs

11   have produced, the phrase "that relate to the manufacture or design of BSC's stents" has been

12   underlined.  In the left margin, a handwritten note asks what the jury should be permitted a chance to

13   answer in this case: "why does this not provide that BSC owns the invention?" (*Id.*) (emphasis in

14   original)  Plaintiffs have confirmed that the notes and underlining were made by John Pearson,

15   Divysio's corporate counsel during the company's negotiations with Biocompatibles.  (Ex. 47 at 2-

16   3.)  If Divysio's own attorney read the Agreement to mean that BSC had ownership rights to the

17   "inventions" Mr. Shukov made, "either alone or in cooperation with others," a reasonable jury could

18   and should read the Agreement the same way.

19         Plaintiffs try to dismiss this defense on the grounds that there is no invention related to the

20   "manufacture or design of BSC's stents" in any asserted claim of the patents in suit.  (Mot. at 34.)

21   BSC agrees that no asserted claim of the patents in suit relates to the manufacture or design of the

22   accused Promus stent.  To the extent that Plaintiffs assert that Promus infringes the claims of those

23   patents, however, the Agreement provides BSC with a license to any "inventions" in those claims

24   conceived or made, in whole or in part, by Mr. Shukov and Mr. Press.[14]

25

26   _____

27        [14]    Plaintiffs' related argument that the Agreement must be interpreted to cover only
     "inventions, improvements and discoveries" that are "derivative" of a BSC invention is an incorrect
28   interpretation of the contract.  The term "derivative" applies broadly to the scope of consulting work
     that the Agreement covers.

1

2

          2.      **A Reasonable Jury Could Conclude that Mr. Shukov Contributed to the Patents in Suit**

3

       Plaintiffs' argument that neither Medtronic nor Evysio was a party to the Agreement is beside

4

the point.  There is no question that Mr. Shukov is a party to the Agreement.  If Mr. Shukov is a co-

5

inventor of *any* of the claims of the patents-in-suit, he would have the right to license these patents

6

and is required to offer BSC a license under the Agreement.  *Ethicon, Inc. v. U.S. Surgical Corp.*,

7

135 F.3d 1456, 1466 (Fed. Cir. 1998) (holding that a co-inventor of only one claim had the power to

8

license the rights in the entire patent).

9

       Inventorship is a question of law *with underlying fact issues*.  *Checkpoint Sys., Inc. v. All-Tag*

10

*Sec. S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005).  There is a genuine issue of material fact as to

11

whether Mr. Shukov contributed to the claimed stent designs at issue in this case.  Mr. Shukov's self-

12

serving testimony on his role in the stent design process proves nothing, and does not make this issue

13

appropriate for summary judgment.  In fact, Mr. Shukov's testimony as to his design contributions is

14

far more ambiguous than Plaintiffs allow.  At his deposition, Mr. Shukov testified that



15

16

17

18

(Ex. 31 at 341.)

19

       Mr. Shukov's collaborators also remember his design suggestions, perhaps more clearly than

20

Mr. Shukov does.  Both named inventors have described some of Mr. Shukov's contributions to the

21

stent design process.   Dr. Penn and Dr. Ricci both testified, for example, that

22

(Ex. 8 at 55; Ex.

23

46 at 226-27.)  Mr. Shukov's design contributions are described in more detail *supra* at Section III.C.

24

Plaintiffs' brief does not even mention, let alone rebut, such evidence.  There is, therefore, ample

25

evidence from which a jury could and should conclude that at least Mr. Shukov developed

26

"inventions, improvements or discoveries," "either alone or in cooperation with others," that "relate

27

to the manufacture or design of BSC's stents," and that Mr. Shukov made a contribution to the

28

1   conception of the claimed invention "that is not insignificant in quality, when that contribution is

2   measured against the dimension of the full invention."  *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d

3   1466, 1473 (Fed. Cir. 1997).  Plaintiffs are not entitled to summary judgment on this defense.

4        **F.**    **Plaintiffs Are Not Entitled to Summary Judgment on Indefiniteness**

5        As explained in Abbott and BSC's Motion (at 31-35), the term "U-shaped"—as asserted by

6   Plaintiffs in this case—is indefinite because a person of ordinary skill in the art would not be able to

7   discern its scope, particularly given Plaintiffs' wildly inconsistent admissions and the contradictory

8   testimony of its experts.  Accordingly, while this issue is amenable to summary judgment, it should

9   be granted in *Abbott and BSC's* favor, not Plaintiffs'.

10       As for the terms "flexure member" and "arcuate," Abbott and BSC do not contend these

11  terms are indefinite *as construed by the Court.*  In their application of those terms to the facts of this

12  case, however, Plaintiffs are improperly seeking to modify the Court's construction in a way that

13  renders those terms indefinite.

14       For example, Plaintiffs were asked to admit that the following highlighted portion of Wijay is

15  "part of a longitudinal portion that provides flexibility," i.e., a "flexure member:"

16              <u>**REQUEST FOR ADMISSION NO. 59**</u>:

17                  Admit that the highlighted portion in the image below from Wijay '940 Figure 2 is part of

18          a longitudinal portion that provides flexibility.

19  

20

21  Plaintiffs refused to answer this request, asserting among other things that it is "vague and

22  ambiguous, particularly with regard to Abbott Defendants' use of highlighting as an apparent means

23  of artificially characterizing the highlighted portion as a **distinct stent element**."  (Ex. 12 at 4-5,

24  emphasis added.)  Thus, Plaintiffs apparently intend to argue to the jury that a "flexure member"—in

25  addition to how this Court construed the term—must *also* be a "distinct stent element."  The term

26  "distinct stent element" has no apparent meaning, however, and would thus render the limitation

27  indefinite if actually included.

28

1      Plaintiffs' admissions and denials regarding "arcuate" have been similarly vague.  For

2  instance, they admitted that the highlighted portion on the left below comprises "a shape bent in the

3  form of a bow or curved in the form of a bow," i.e., "arcuate" yet inexplicably denied the identical

4  request with respect to the shape on the right.  (Ex. 12 at 103, 134.)



9      It is thus Plaintiffs' own inconsistencies in the application of this Court's claim constructions

10  that establish the indefiniteness of "flexure member" and "arcuate."

11      **G.    There Is No Dispute That Claims 1, 8-9, 12-13, 16, 20, and 55 of the '037 Patent Are Entitled to a Priority Date of March 5, 1996**

12      Abbott and BSC do not dispute that claims 1, 8-9, 12-13, 16, 20, and 55 of the '037 patent are

13  entitled to a priority date of March 5, 1996.

14  **IV.    CONCLUSION**

15      For the reasons explained above, Plaintiffs' motion for summary judgment should be denied

16  in full, except Abbott and BSC do not contest that claims 1, 8-9, 12-13, 16, 20, and 55 of the '037 are

17  entitled to a priority date of March 5, 1996.

20  Dated: August 20, 2008

21  FINNEGAN, HENDERSON, FARABOW,               FISH & RICHARDSON PC
22    GARRETT & DUNNER, L.L.P.

23  By:_____/s/_____      By:_____/s/_____
24                Michael A. Morin                          Frank E. Scherkenbach