**REDACTED**

1   **FOLEY & LARDNER LLP**
ONE MARITIME PLAZA, 6TH FLOOR
SAN FRANCISCO, CA 94111-3409
2   TEL: (415) 434-4484; FAX: (415) 434-4507
NANCY J. GEENEN, BAR NO. 135968
ngeenen@foley.com

3   **FOLEY & LARDNER LLP**
777 EAST WISCONSIN AVENUE, SUITE 3800
4   MILWAUKEE, WI 53202-5306
TEL: (414) 271-2400; FAX: (414) 297-4900
5   RICHARD S. FLORSHEIM, *PRO HAC VICE*
rflorsheim@foley.com

6   ATTORNEYS FOR PLAINTIFFS, COUNTERCLAIM
DEFENDANTS, AND DEFENDANTS TO
COMPLAINT-IN-INTERVENTION, MEDTRONIC
7   VASCULAR, INC., MEDTRONIC USA, INC., MEDTRONIC,
INC., AND MEDTRONIC VASCULAR GALWAY, LTD.

8   **KATTEN MUCHIN ROSENMAN LLP**
525 WEST MONROE STREET
9   CHICAGO, IL 60661-3693
TEL: (312) 902-5200; FAX: (312) 902-1061
TIMOTHY J. VEZEAU, *PRO HAC VICE*
10  timothy.vezeau@kattenlaw.com

11  **KEKER & VAN NEST LLP**
710 SANSOME STREET
SAN FRANCISCO, CA 94111
12  TEL: (415) 391-5400; FAX: (415) 397-7188
ROBERT A. VAN NEST, BAR NO. 84065
rvannest@kvn.com

13  ATTORNEYS FOR PLAINTIFF, COUNTERCLAIM
DEFENDANT, AND DEFENDANT TO COMPLAINT-IN-
14  INTERVENTION, EVYSIO MEDICAL DEVICES ULC

15              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
16               SAN FRANCISCO DIVISION

17  MEDTRONIC VASCULAR, INC.,          Case No. 06-01066-PJH
    MEDTRONIC USA, INC., MEDTRONIC,
    INC., MEDTRONIC VASCULAR GALWAY,   **PLAINTIFFS' RESPONSE TO ABBOTT**
18  LTD., and EVYSIO MEDICAL DEVICES   **AND BSC'S MOTION FOR SUMMARY**
    ULC,                               **JUDGMENT OF INVALIDITY**
19
            Plaintiffs, Counterclaim
20          Defendants, and Defendants to
            Complaint-in-Intervention,   **CONTAINS INFORMATION**
21                                       **DESIGNATED "OUTSIDE COUNSEL**
       v.                                **EYES ONLY"**
22
    ABBOTT CARDIOVASCULAR SYSTEMS,
23  INC., ABBOTT LABORATORIES, and       **Hearing Date: September 24, 2008**
    ABBOTT VASCULAR, INC.,               **Time: 9:00 a.m.**
24                                        **Location: Courtroom 3, 17th Floor**
            Defendants and Counterclaim
25          Plaintiffs,                   **Honorable Phyllis J. Hamilton**
       and
26
    BOSTON SCIENTIFIC CORPORATION,
27
            Plaintiff-Intervenor.
28

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

SUMMARY OF THE ARGUMENT AND RELEVANT FACTS ................................ 1

ARGUMENT ............................................................................................................ 5

I.     SUMMARY JUDGMENT ON THE ISSUE OF OBVIOUSNESS IS INAPPROPRIATE WHERE, AS HERE, DEFENDANTS CANNOT OFFER CLEAR AND CONVINCING SUPPORT FOR THEIR MOTION. ................................ 5

     A.    Summary Judgment Cannot Be Granted on the Issue of Obviousness Where There Are Disputed Issues of Material Fact.................................... 8

     B.    Contrary to the Defendants' Approach, the Obviousness Inquiry Is Even More Fact Intensive after *KSR*. .................................................. 8

     C.    The Defendants Cannot Provide Clear and Convincing Evidence in Support of Their Obviousness Arguments............................................. 12

          1.    Defendants cite no evidence to support the assertion that it would have been obvious to substitute a non-sinusoidal or U-shaped flexure member for an S-shaped connector. ................................. 12

          2.    Defendants cite no evidence to demonstrate that it would have been obvious to modify Wijay to include a U-shape. ............................... 13

          3.    The Defendants did not introduce any relevant evidence to show that it would have been obvious to interpose the flexure member between a pair of straight strut portions...................................... 14

          4.    The Defendants do not provide evidence that it would have been obvious to modify Wijay to include an "orthogonal" U-shape............... 15

     D.    Evidence the Defendants Fail to Cite Shows that the Inventions Claimed in Patents-in-Suit Were Not Obvious. ................................................... 15

          1.    Abbott did not think adding a non-sinusoidal connector was obvious.................................................................................... 16

          2.    Abbott's stent development shows that a U-shape is not obvious........... 17

          3.    Abbott has consistently touted the advantages of the Vision design and U-shaped flexure member in its advertising. .................................... 20

     E.    The Evidence Shows that the Art "Taught Away" from the Use of Non-Sinusoidal, or U-Shaped, or Orthogonal U-shaped Flexure Members in a Peak-to-Valley Stent. ...................................................................... 20

     F.    Secondary Considerations Favor Plaintiffs and Create an Issue of Material Fact Precluding Summary Judgment. .................................................... 21

          1.    The commercial success of the Vision stent supports the non-obviousness of the patents-in-suit....................................................... 21

2.    Long felt need favors the Plaintiffs.............................................. 23

3.    The unexpected results of the patented invention create an issue of fact.......................................................................................... 24

4.    The alleged near simultaneous invention does not support the Defendants' claim. ...................................................................... 26

II.    THE DEFENDANTS DID NOT CARRY THEIR BURDEN OF SHOWING THAT THE PATENTS-IN-SUIT ARE ANTICIPATED. ................................. 26

A.    Defendants Concede that Wijay Does Not Anticipate Claims 16, 40, 43, 45-48, 52-53, and 57 of the '037 Patent and Claim 16 of the '255 Patent. .......... 26

B.    Wijay Cannot Anticipate the '037 Patent Because it Has a Sinusoidal Connector. ................................................................................... 27

1.    The claims of the '037 patent require a non-sinusoidal flexure member. ...................................................................................... 27

2.    Wijay does not have a non-sinusoidal connector...................................... 28

3.    Wijay does not teach a non-sinusoidal connector.................................... 29

C.    Wijay Cannot Anticipate the '255 Patent. ......................................... 30

1.    "Each longitudinal portion" in Wijay does not have a flexure member "interposed between a pair of straight strut portions." .............. 30

2.    Wijay does not have a U-shaped flexure member. ................................... 30

III.    DEFENDANTS CANNOT PROVE INVALIDITY BY REASON OF INDEFINITENESS...................................................................................... 31

A.    The Court's Order Construing Claims Repeatedly Uses and Discusses "U-shaped" with no Statements of Confusion or Apprehension. ............................. 32

B.    The Patents-In-Suit Clearly Define "U-shaped"....................................... 32

C.    Defendants' Proffered Indefiniteness Evidence Is Irrelevant and Never Mentions the Intrinsic Evidence. ....................................................... 33

CONCLUSION............................................................................................... 35

MILW_7514280.4

**FEDERAL CASES**

*Advanced Display Sys. v. Kent State Univ.,*
    212 F.3d 1272 (Fed. Cir. 2000)........................................................16

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.,*
    466 F.3d 1000 (Fed. Cir. 2006)....................................................31-32

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
    314 F.3d 1313 (Fed. Cir. 2003).......................................................35

*Andrew Corp. v. Gabriel Elecs., Inc.,*
    847 F.2d 819 (Fed. Cir. 1988)....................................................33, 35

*ATD Corp. v. Lydall, Inc.,*
    159 F.3d 534 (Fed. Cir. 1998).........................................................24

*Centricut, L.L.C. v. Esab Group, Inc.,*
    390 F.3d 1361 (Fed. Cir. 2004).......................................................12

*Cooper v. Ford Motor Co.,*
    748 F.2d 677 (Fed. Cir. 1984).........................................................21

*Crown Operations Int'l, Ltd. v. Solutia, Inc.,*
    289 F.3d 1367 (Fed. Cir. 2002).........................................................8

*Exxon Research & Eng'g Co. v. United States,*
    265 F.3d 1371 (Fed. Cir. 2001)....................................................32, 35

*Gambro Lundia AB, v. Baxter Healthcare Corp.,*
    110 F.3d 1573 (Fed. Cir. 1997)....................................................21-23

*Gillette Co. v. S.C. Johnson & Son, Inc.,*
    919 F.2d 720 (Fed. Cir. 1990).........................................................23

*Glaxo Group, Ltd. v. Apotex, Inc.,*
    376 F.3d 1339 (Fed. Cir. 2004).......................................................28

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)........................................................................9

*Hodosh v. Block Drug Co.,*
    786 F.2d 1136 (Fed. Cir. 1986).........................................................8

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.,*
    401 F.3d 1367 (Fed. Cir. 2005)....................................................33-35

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,*
    887 F.2d 1050 (Fed. Cir. 1989).......................................................29

iv

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.,*
    430 F.3d 1377 (Fed. Cir. 2005)......................................................................27-28

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)...........................................................................22

*KSR Int'l Co. v. Teleflex, Inc.,*
    127 S. Ct. 1727 (2007)...............................................................................*Passim*

*Miles Labs., Inc. v. Shandon, Inc.,*
    997 F.2d 870 (Fed. Cir. 1993)............................................................................32

*Personalized Media Commc'ns v. Int'l Trade Comm'n,*
    161 F.3d 696 (Fed. Cir. 1998)......................................................................31, 33

*Quad Envtl. Techs. Corp. v. Union Sanitary Dist.,*
    946 F.2d 870 (Fed. Cir. 1991)..............................................................................8

*Solomon v. Kimberly-Clark Corp.,*
    216 F.3d 1372 (Fed. Cir. 2000)..........................................................................31

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.,*
    192 F.3d 1353 (Fed. Cir. 1999)..........................................................................21

*Teleflex, Inc. v. KSR Int'l Co.,*
    119 Fed. Appx. 282 (Fed. Cir. 2005)..................................................................25

*Teleflex Inc. v. KSR Int'l Co.,*
    298 F. Supp. 2d 581 (E.D. Mich. 2003)..............................................................25

**FEDERAL STATUTES**

35 U.S.C. § 112, ¶ 2.................................................................................31-33, 35

**RULES**

Fed. R. Civ. P. 36(b) ...........................................................................................34

**INTRODUCTION**

Abbott Cardiovascular Systems, Inc., Abbott Laboratories, Abbott Vascular, Inc. and Boston Scientific Corporation (collectively, "Defendants") have moved for summary judgment that the asserted claims of the patents-in-suit are obvious as a matter of law.  But, as explained below, Defendants' clever arguments ignore many "real world" facts that demonstrate the non-obviousness of the claimed inventions.  These real world facts preclude summary judgment on the issue of obviousness.

The Defendants also moved for summary judgment that certain of the asserted claims are anticipated and indefinite.  As explained in the Plaintiffs' Memorandum in Support of Motion for Summary Judgment, Defendants' anticipation position regarding the '037 patent depends on a claim interpretation – that <u>non</u>-sinusoidal really means sinusoidal – that not only defies common sense, but is also inconsistent with the prosecution history of the '037 patent.  The Defendants' anticipation argument for the '255 patent is no better, as it also requires the Court to interpret the term "interposed" in a way that is inconsistent with the intrinsic record.

The Defendants' indefiniteness position depends on the nonsensical argument that people skilled in the art do not understand the meaning of the term "U-shaped."  This argument is inconsistent with the position the Defendants took during claim construction, where they indicated that the term "U-shaped" did not require any interpretation.  The Defendants' position also reflects a fundamental misunderstanding of the law.  Disagreement does not equal indefiniteness.  If the term "U-shaped" is <u>capable</u> of construction – and all of the parties agree it is – then it <u>cannot</u> be indefinite, even if those skilled in the art disagree about whether a <u>particular</u> shape meets that definition of "U-shaped."

**SUMMARY OF THE ARGUMENT AND RELEVANT FACTS**

In the early 1990s – in the real world, not the artificial world constructed by attorney argument – real doctors were performing real procedures on real patients, and struggling with the promising but limited technology available to them.  Two of those doctors, Dr. Ian Penn and Dr. Donald Ricci, were on the front lines of interventional cardiology at that time.  They were the ones that had to look into the faces of the patients' families if something went wrong.

1

1    Interventional cardiology was still a relatively new discipline.  Much newer was the

2    concept of coronary stenting:  doctors, guided only by limited fluoroscopic images, implanting a

3    tiny metal device into the blood vessels of a beating heart, a device that would remain there

4    forever, acting as permanent "scaffold" to hold open some portion of a coronary artery so that

5    blood could flow through it more easily.  (Penn. Decl. ¶ 4; Penn Rep. ¶ 6; Second Rothman Rep.

6    ¶ 24; Penn Dep. 23:17-24:14, Aug. 20-21, 2007, Jelenchick Ex. 28.)  When Dr. Penn first heard

7    about the idea of stenting in 1987 or 1988, he contacted Dr. Richard Schatz, who was working on

8    the development of what would become the first commercially available coronary stent, the

9    Palmaz-Schatz stent, which had not yet been implanted in an actual person.  (Penn Decl. ¶ 5;

10   Penn Dep. 23:17-24:14, Aug. 20-21, 2007, Jelenchick Ex. 28.)  Between 1988 and 1989, Dr.

11   Penn worked closely with Dr. Schatz both in a research and clinical capacity, doing animal and

12   human implantation of these early stents in peripheral and coronary arteries.  (*Id.*)

13   Dr. Penn later trained other doctors who would be involved in testing these stents.  One

14   person he trained (in 1989 or 1990) was Dr. Donald Ricci, who was by then already a noted

15   interventional cardiologist in his own right.  (Penn. Decl. ¶ 6.)  Dr. Ricci trained at Stanford in

16   the heart transplant program, and was an expert in angioplasty.  (Ricci Dep. 15:13-18, Aug. 16-

17   17, 2007, Jelenchick Ex. 29; Ricci Dep. Ex. 1 2, Jelenchick Ex. 30.)

18   Drs. Penn and Ricci kept in touch, and would discuss their shared frustrations at the

19   limitations imposed by the stents then available to them.  (Penn Decl. ¶ 7.)  By 1994, they

20   decided to collaborate on the development of an improved stent technology.  (*Id.*)  Ultimately,

21   during a period of approximately six months, between late 1995 and mid 1996, the doctors

22   invented many new stents.  (*Id.* at ¶ 9.)  Their efforts led to the commercial release of the divYsio

23   stents, invented by Drs. Penn and Ricci and sold by a company called Biocompatibles.  (*Id.*)

24   Penn and Ricci's design efforts have also led to at least nine U.S. patents, including the two

25   patents-in-suit, which were later licensed to the Medtronic Plaintiffs.  (*Id.* at ¶ 10; Ricci 30(b)(6)

26   Dep. 173:11-174:6, 176:5-177:8, May 8, 2008, Jelenchick Ex. 31.)

27   In terms of stents, defendants Abbott and Abbott Vascular were nowhere in the early

28   1990s.  Abbott did not have a vascular business, much less a stent program.  (Abbott History,

2

MILW_7514280.4

1  Jelenchick Ex. 32.)  Though it maligns the doctors now, Abbott's first foray into stenting came

2  by way of Drs. Penn and Ricci.

8      Abbott and Abbott Vascular continued their expansion into the vascular business in

9  April, 2006, by the acquisition of Guidant's vascular business, including Advanced

10  Cardiovascular Systems.[1]  ACS, as it was often called, had commercially released the "Multi-

11  link" stent in the United States in 1997, and had developed many later generations of that stent.

12  Though the Defendants now attempt to paint a different picture, the engineers at ACS were not

13  leading the field of stent design, nor was everyone else following in lock-step behind them.

14      Between 1995 and 1997, at the time of the Penn and Ricci inventions, stent designers

15  were going in many different directions.  (Second Rothman Rep. ¶¶ 45, 47, 68-131 and Exs. 1-3,

16  7-8, 22-25, 62-63.)  They were experimenting with tubular designs, coiled designs, modular

17  designs, rink-and-link designs, and ratcheting designs, among others.  *Id.*  Interrelated and often

18  conflicting design ideals created a design puzzle that stent designers were attempting to solve in

19  many different ways.  (*Id.*)  Stent designers attempted to design the "ideal stent" by balancing the

20  dozen or more conflicting characteristics of a successful stent.  ("Build-a-Stent" at AB0597552,

21  Jelenchick Ex. 3; *see also* Ta Dep. 88:11-19, Jelenchick Ex. 22.)  The number of shapes and

22  configurations that could be used to create a stent is quite literally infinite:  as varied as the

23  imagination of any stent designer.  (*See* Roubin Dep. 122:13-124:17; Jelenchick Ex. 33.)

24      Drs. Penn and Ricci tried a unique approach to their stent design.  Their patented design

25  uses undulating circumferential rings, which are connected together by "peak-to-valley"

26      _____

[1] Abbott acquired Guidant's vascular business, with Guidant's cardiac rhythm
27  management business going to BSC.  (Messal Decl. ¶¶ 3-4; Dkt. # 132.)  Advanced
Cardiovascular Systems is now known as Abbott Cardiovascular Systems.  (Dkt. # 181.)

28

PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
CASE NO. 06-01066-PJH

MILW_7514280.4

1   longitudinal connectors that include curved, non-sinusoidal (and in some instances U-shaped)

2   flexure members.  (*See* '037 and '255 patents; Malaney Exs. 1-2.)  Though the Defendants now

3   argue vociferously that these designs would have been obvious, the fact of the matter is that no

4   one, prior to Drs. Penn and Ricci, thought to pursue such a design.  ACS, in its 1997 Multi-link

5   stent and in all of the stents it released in each subsequent year until 2001, included only straight

6   longitudinal connectors.  (Technical Guide at AB0521121; Jelenchick Ex. 4.)  And the Wijay

7   reference on which the Defendants place so much weight shows a <u>sinusoidal</u> connector – not a

8   <u>non</u>-sinusoidal one.  (Wijay '940 patent; Malaney Ex. 12.)

9        These fundamental differences were recognized by the United States Patent and

10   Trademark Office.  The patents-in-suit were prosecuted before two different patent examiners.

11   (Linck Rep. ¶ 27.)  Most tellingly, those real world, experienced patent examiners – who had

12   handled the examination of over 300 stent patents combined before the issuance of the '037 and

13   '255 patents – had the same Wijay, Fischell, and Israel patents in front of them that the

14   Defendants now rely on.  (*Id.*; Malaney Exs. 14-18.)  They considered those patents on multiple

15   occasions, and discussed them with the applicants during interviews.  (*Id.*)  Both of these

16   experienced examiners, separately, determined the claimed inventions were not anticipated or

17   obvious.

18        The real world development of the ACS designs leading up to the Vision stent provides

19   strong evidence of non-obviousness.  As noted above, the first Multi-Link was introduced in the

20   United States in 1997.  It had a peak-to-valley design with straight longitudinal connectors.

21   According to the Defendants' hindsight reasoning before this Court, it would have been obvious

22   to modify that design to use connectors with curved or U-shaped flexure members.  Yet, that is

23   not what ACS did.  ACS introduced several generations of "Multi-link" stents:  Multi-link Duet

24   (1998), Multi-link Tristar (1999), Multi-link Tetra (2000), Multi-link Penta (2001), Multi-Link

25   Zeta (2002), and Multi-link Vision (2003).  (Technical Guide at AB0521121; Jelenchick Ex. 4.)[2]

26   ———————————
    [2] ACS also released a "Mini Vision" – which, though smaller, has the same basic design

27   as the Vision.  (PMA Letter at AB0733439, Jelenchick Ex. 5.)  Released in the U.S. in 2008,
    Abbott's "Xience V," and BSC's "Promus" also have the same design, but with the addition of a

28   drug coating.  (Abbott Press Release 7/2/2008; Jelenchick Ex. 35.)

1    Despite its asserted obviousness (years earlier), the 2001 Penta design was the first to use any

2    type of curved connectors. (*Id.*)  And it was not until the 2003 Vision design, that ACS adopted

3    the allegedly obvious design, including non-sinusoidal connectors in a peak-to-valley stent.  (*Id.*)

4    This real world evidence shows the Penn and Ricci design was not obvious.  Put simply, if this

5    design represented such an obvious improvement, why did it take the many experienced

6    engineers at ACS more than five years to recognize it?

7        Nor did ACS tell the world that the infringing Vision stent design was obvious.  Far from

8    it.  Highlighting the same feature it now claims is obvious, a U-shaped flexure member, ACS

9    told the world that the Vision stent design was "novel."  (Competitive Comparison at

10   AB0521708; Jelenchick Ex. 6.)  It repeatedly touted its U-shaped flexure member in its

11   advertising (calling it the "Flexalink™ technology").  (Vision Brochure at AB0727517-18;

12   Jelenchick Ex. 34; Pacitti 61:1-63:10, Jelenchick Ex. 26.)  Though the Defendants contend <u>now</u>

13   that including this "Flexalink" in a peak-to-valley stent would have been obvious, the real world

14   evidence, including what ACS <u>did</u> and <u>said</u> years earlier, shows that it was anything but.

15                                   **ARGUMENT**

16

17   **I.    SUMMARY JUDGMENT ON THE ISSUE OF OBVIOUSNESS IS
         INAPPROPRIATE WHERE, AS HERE, DEFENDANTS CANNOT OFFER
18       CLEAR AND CONVINCING SUPPORT FOR THEIR MOTION.**

19       The Supreme Court's decision in *KSR* made it plain that an obviousness determination

20   requires a consideration of "real world" facts.  *See KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727

21   (2007).  Yet, the Defendants' brief completely ignores real world facts, opting instead for a

22   overly simplistic and manifestly unrealistic analysis of obviousness.[3]  The Defendants attempt to

23   ───────────────
     [3] Defendants also appear to try to prove obviousness by citing irrelevant material about
24   the PTO in a transparent attempt to undermine the presumption of validity – a tactic courts and
     even their own expert reject.  (Killworth Dep. 98:2-13,109:13-111:9; Jelenchick Ex. 43.)
25   Further, Defendants (as in their claim construction brief) inject irrelevant allegations of
     inequitable conduct, not the subject of any motion. (Defs. Mem. in Supp. S.J. 7-9.)  These
26   allegations are nothing more than a smokescreen to conceal the fact that all of the prior art
     Defendants now rely on was placed before and considered by the examiners at the PTO.
27   (Carmichael Rep. Ex. 14 at MDT_1038244, Ex. 13 at MDT_1038204-05, Ex. 12 at
     MDT_1038175-77, Ex. 20 at MDT_1038230.)
28

MILW_7514280.4

1   locate anything resembling each claim element in the prior art, and then argue – <u>without any</u>

2   <u>evidence whatsoever</u> – that it would have been obvious to combine these elements to achieve the

3   patented invention.  This sort of hindsight approach is not permitted.  And for good reason:  a

4   hindsight reconstruction of the prior art (starting from the invention and working backwards to

5   find any similarities in the prior art) ignores real world evidence that can be highly probative of

6   the issue of obviousness.  As shown in this brief, the real world evidence belies the Defendants'

7   hindsight position and prevents summary judgment of obviousness.

8           The Defendants' principal argument is that the patented invention is merely a predictable

9   combination of prior art elements, each used in accordance with their established functions.  This

10  argument fails as a matter of law, as demonstrated below, not only because the Defendants do

11  not cite any actual <u>evidence</u> to support their position, but also because their argument is

12  inconsistent with the actual, real world evidence, which shows that:

13      1.   As explained by Abbott's own witnesses, stent design is
             unpredictable.  (*See, e.g.*, Gomez Dep. 166:6-18, Jelenchick Ex.
14           21; Ta Dep. 65:21-66:5, Jelenchick Ex. 22.)

15      2.   As explained by Abbott's own witnesses, stent designers could not
             predict whether a stent would be more flexible, even if it had a
16           more flexible connector.  (*See id.*)

17      3.   Though Abbott's expert testified that it was a matter of "scientific
             fact" that an S-shaped flexure member would be more flexible than
18           a U-shaped connector formed from "half an S," Abbott's own
             testing showed no difference in the flexibility of stents having such
19           connectors.  (*Compare* Taylor Dep. 199:25-201:9, Jelenchick Ex.
             8, *with* Medinol Gomez Dep. 136:6-18, Jelenchick Ex. 15.)
20

21      4.   Though Abbott's expert testified that he would expect a stent with
             a curved connector to be more flexible in its deployed (*i.e.*,
22           expanded) state than a stent with a straight connector, Abbott's
             own testing showed that not to be the case.  (*Compare* Taylor Dep.
23           195:20-199:24, Jelenchick Ex. 8, *with* Gomez Dep. Ex. 18 at
             AB0551016, Jelenchick Ex. 24.)

24          The Defendants also argue (again without affirmative evidence) that it would have been

25  obvious to create a peak-to-valley, non-sinusoidal and arcuate (or in some cases U-shaped)

26  flexure member separated from a circumferential.  But the real world evidence establishes that

27  this combination was not obvious to some of the most talented scientists in the field (including

28  those at Abbott):

                                                6

5.  Although very talented physicians and scientists were working to develop new stents, there is no prior art before Drs. Penn and Ricci's invention that used a peak-to-valley design with a non-sinusoidal and arcuate (or U-shaped) flexure member separated from a circumferential by a straight strut portion. (Second Rothman Rep. ¶¶ 231, 233, 242-44, 247, 251, 277.)

6.  ACS itself introduced six different peak-to-valley stent designs from 1994 to 2003 – none of which used a non-sinusoidal or U-shaped flexure member. (Technical Guide at AB0521121; Jelenchick Ex. 4.) ACS introduced its infringing Vision design more than 6 years after Penn and Ricci's invention. (*Id.*)

7.  Since Abbott introduced its Vision stent in 2003 – which uses a U-shaped flexure member – it has not introduced another stent design. (*See* Abbott Press Release, July 2, 2008, Jelenchick Ex. 35.)

8.  Prior to the introduction of Vision, both Abbott and BSC experimented with stent designs having U-shaped flexure members, but both abandoned these designs, and Abbott specifically rejected the design as unsatisfactory. (Brown Dep. 165:1-166:14, 166:22-169:23, 170:1-14, 175:8-15, 178:7, 178:19-179:13, 180:10-181:18, Malaney Ex. 22; Limon Dep. 30:7-10, 34:11-36:7, 47:8-17, 48:23-49:12; Malaney Ex. 24.)

9.  During the 2002 development of the Vision stent (separate and apart from the development of all the earlier Multi-link iterations), ACS developed and experimented with 69 configurations (including stents having an S-shaped flexure member) before it began working on the U-shaped connector that Defendants now claims was obvious years earlier. (Medinol Gomez Dep. 136:6-18, Jelenchick Ex. 15; Gomez Ex. 5, Jelenchick Ex. 16; Vision Design Review at AB0582251-65, Jelenchick Ex. 17.)

10. Contemporaneous medical literature taught away from using Penn and Ricci's claimed U-shaped flexure member, because of the potential for rheologic (*i.e.*, blood related) problems and twisting. (Ku Rep. ¶ 20 and Exs. 5, 40; Ku Dep. 72:13-73:8, Jelenchick Ex. 38; Eberhart Rep. ¶¶ 11-18.)

In addition, secondary considerations (such as commercial success, long-felt need and unexpected results) show the non-obviousness of the claimed invention and create factual issues that preclude summary judgment:

11.

12. After Abbott introduced the Vision stent, it specifically touted the advantages of the U-shaped flexure member that it now claims was so obvious. (Competitive Comparison at AB0521708, Jelenchick Ex. 6; Vision Brochure at AB0727518, Jelenchick Ex. 34; Vision Launch Guide at AB0521246, Jelenchick Ex. 19; Product Release Guide at AB0521772, Jelenchick Ex. 25.)

7

13.    Abbott filed a patent application on the design of its Vision stent and touted the specific advantages of orthogonal U-shaped flexure member used in the design.  (U.S. Patent No. 6,629,994 col.7, ll.30-50, Jelenchick 42.)

These and other real world facts, discussed below, show the flaws in the Defendants' position and preclude summary judgment of obviousness.

**A.    Summary Judgment Cannot Be Granted on the Issue of Obviousness Where There Are Disputed Issues of Material Fact.**

It is very difficult to prove invalidity at all, let alone on summary judgment.  *See Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991) (reversing grant of summary judgment of obviousness).  First, in light of the statutory presumption of validity, Defendants have the burden to prove their claims of invalidity due to obviousness by clear and convincing evidence based on undisputed facts.  *Id.*  Further, as in any case on summary judgment, all factual inferences are drawn in favor of the non-movant (here the Plaintiffs).  When addressing an obviousness issue in particular, factual disputes can arise with respect to any of the underlying factual inquires required in the obviousness analysis.  *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) ("Obviousness is a legal conclusion based on underlying facts of four general types, all of which must be considered by the trier of fact.").  An obviousness analysis also often involves the conflicting testimony of experts. *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1142 (Fed. Cir. 1986) (conflicting expert opinions precluded summary judgment on obviousness).  Any genuine issues of material fact preclude summary judgment.  *Id.*  In sum, where material facts are disputed, and testimonial, documentary, and expert evidence are needed for their resolution, summary adjudication is not indicated.  *Id.*

**B.    Contrary to the Defendants' Approach, the Obviousness Inquiry Is Even More Fact Intensive after *KSR*.**

A thorough review of the Supreme Court's *KSR* decision reveals the Court's insistence that <u>more facts</u> – including contextual, "real world" facts from the time of the invention – be included in a court's obviousness analysis, not fewer.  *See KSR*, 127 S. Ct. 1727.

At the outset, the Court confirmed that the "test" for obviousness, and the role of

8

1  secondary considerations of non-obviousness, derives from *Graham v. John Deere Co.*, 383 U.S.

2  1 (1966), which stated:

3
> Under § 103, the scope and content of the prior art are to be
> determined; differences between the prior art and the claims at
4  > issue are to be ascertained; and the level of ordinary skill in the
> pertinent art resolved. Against this background the obviousness or
5  > nonobviousness of the subject matter is determined. Such
> secondary considerations as commercial success, long felt but
6  > unsolved needs, failure of others, etc., might be utilized to give
> light to the circumstances surrounding the origin of the subject
7  > matter sought to be patented.

8  *KSR*, 127 S. Ct. at 1734. Next, *KSR* describes the first part of the obviousness analysis:

9
> If a person of ordinary skill can implement a predictable variation,
> § 103 likely bars its patentability. For the same reason, if a
10 > technique has been used to improve one device, and a person of
> ordinary skill in the art would recognize that it would improve
11 > similar devices in the same way, using the technique is obvious
> unless its actual application is beyond his or her skill. *Sakraida*
12 > and *Anderson's-Black Rock* are illustrative—a court must ask
> whether the improvement is more than the predictable use of prior
13 > art elements according to their established functions.

14
*Id.* at 1740.[4] *KSR* further states, "Following these principles may be more difficult in other cases
15
than it is here because the claimed subject matter may involve more than the simple substitution
16
of one known element for another or the mere application of a known technique to a piece of
17
prior art ready for the improvement." *Id.*
18
     *KSR* then provides a second part of the obviousness analysis:
19
20 > Often, it will be necessary for a court to look to interrelated
> teachings of multiple patents; the effects of demands known to the
> design community or present in the marketplace; and the
21 > background knowledge possessed by a person having ordinary skill
> in the art, all in order to determine whether there was an apparent
22 > reason to combine the known elements in the fashion claimed by
> the patent at issue.
23

24  _____

25  [4] *KSR* also teaches that whether the result of the claimed change is "predictable" is a key
consideration in combinations whose outcome is unpredictable. Even more so, as an invention
which advocates a combination that the prior art *teaches away* from (that is, recommends
26  against) is prima facie *not* obvious. *See KSR*, 127 S. Ct. at 1739-40 (explaining that "when prior
art teaches away from combining certain known elements, discovery of a successful way of
27  combining them is more likely to be non-obvious").

28

MILW_7514280.4

1  *Id.* at 1740-41. *KSR* then states a third part of the analysis: "As our precedents make clear,

2  however, the analysis need not seek out precise teachings directed to the specific subject matter

3  of the challenged claim, for a court can take account of the inferences and creative steps that a

4  person of ordinary skill in the art would employ." *Id.* at 1741. As a fourth part, *KSR* states, "In

5  many fields it may be that there is little discussion of obvious techniques or combinations, and it

6  often may be the case that market demand, rather than scientific literature, will drive design

7  trends." *Id.* On the issue of whether something was "obvious to try," *KSR* states, "When there is

8  a design need or market pressure to solve a problem and there are a finite number of identified,

9  predictable solutions, a person of ordinary skill has good reason to pursue the known options

10 within his or her technical grasp. If this leads to the anticipated success, it is likely the product

11 not of innovation but of ordinary skill and common sense. In that instance the fact that a

12 combination was obvious to try might show that it was obvious under § 103." *Id.* at 1742. More

13 globally, regarding the use of "hindsight," the Court states: "A factfinder should be aware, of

14 course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon

15 *ex post* reasoning." *Id.*

16      These statements by the Supreme Court show that at least the following factors relevant

17 to this case should be evaluated in considering obviousness:

18      *(1)   whether the invention is merely a combination of prior art elements;*

19           Here, the invention is not a combination patent because the prior art does not
20           disclose non-sinusoidal and arcuate flexure members separated from an adjoining
            circumferential element. Defendants have certainly not established the contrary.

21      *(2)   whether each of the combined prior art elements have established functions;*

22           Here, Defendants provide no evidence that all of the elements of the invention
            function in a predictable way, much less that their function was "established."

23      *(3)   whether each of the prior art elements are being used in accordance with their
            established functions;*

24           Just as there is no evidence that all the elements of the invention had established
25           functions, Defendants likewise provide no evidence that all of the elements are
            used or operate according to those functions.

26      *(4)   whether the use of this particular combination of prior art elements according to
            their known functions was <u>predictable</u>;*

27           Here, the only evidence – including testimony and testing done by the defendants'
28           own stent designers – shows that stent design is not predictable, and that the
            claimed invention is a counterintuitive design that defied conventional wisdom

10

MILW_7514280.4

regarding placing a stent with such flexure members in a human body.

(5)   *whether there was a design need or market pressure to solve the problem solved by the inventions at issue;*

Here, despite tremendous market pressure to design the "ideal stent," no one prior to Drs. Penn and Ricci thought of pursuing a peak-to-valley design with a non-sinusoidal flexure member. Defendants only answer involves ignoring the prosecution history and slicing flexure members in random pieces.

(6)   *whether there was a finite number of identified, predictable solutions (solutions with "anticipated success") to that design need or market pressure;*

Stent designers were heading in many different directions; there were an infinite number of possible workable stent designs. There is no evidence that the success of the patented design was or would have been anticipated – were that the case one would have expected the Defendants to pursue it earlier, and they did not.

(7)   *whether, if there were a finite number of identified, predictable solutions to such a design need or market pressure to solve a problem, such solutions were within the technical grasp of a person of ordinary skill in the art;*

Here, even if the Defendants could show that the claimed invention was a combination of elements with established functions, the evidence shows that those skilled in the art, such as Abbott's Tim Limon, could not make the claimed invention work and subsequently abandoned the idea as inadequate.

(8)   *the inferences that a person of ordinary skill in the art would employ;*

Here, again Defendants provide only argument, and the only evidence shows that those skilled in the art – such as the scientists at BSC, Abbott and IsoStent – did not think the claimed invention was obvious – or even a good idea.

(9)   *whether the scientific literature had an effect on driving design trends or "taught away;"*

Here, the scientific literature taught away from using a design that might create rheologic or twisting problems.

(10)   *whether there is a "teaching, suggestion, or motivation to combine" prior art;*

Here, the Defendants offer no affirmative evidence to show a teaching, suggestion or motivation to combine Wijay with the Fischell or Israel patents.

(11)   *whether any secondary considerations of non-obviousness are present that might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented, such as commercial success, long felt but unsolved needs, failure of others, unexpected results, etc.;*

Here, the evidence of record shows that the claimed invention was a huge commercial success, the Defendants touted the shape of the flexure member as one of the reasons for its success, those in the medical community sought without success to create the "ideal stent" before the doctors conceived of their invention, and Abbott's and BSC's scientists tried but failed for many years to create a medically acceptable stent having a non-sinusoidal flexure member.

(12)   *whether any conclusions drawn are the result of impermissible hindsight.*

Here, Defendants offer arguments employing hindsight that contradicts the real world facts.

All of these factors support the non-obviousness of the patents-in-suit. Yet, the

11

1   Defendants – who must carry the clear and convincing burden of proof, with all inferences taken

2   in favor of the Plaintiffs – do not even identify most of these factors, let alone analyze them.

3       **C.    The Defendants Cannot Provide Clear and Convincing Evidence in Support**
        **of Their Obviousness Arguments.**

4

5       The Defendants' brief substitutes <u>assertion</u> for <u>proof</u>.  Their obviousness "analysis" runs

6   a scant five pages – with a new obviousness argument on each page.  On those pages, they

7   repeatedly <u>assert</u> that "it would have been obvious" to modify the prior art to achieve the

8   patented invention.  Parroting the case law as if it were proof, they also repeatedly <u>assert</u> that

9   such a modification would merely involve the "predictable use of prior art elements according to

10  their established functions."

11      Glaringly absent, however, is any <u>proof</u> that these statements are true.  Without

12  exception, the Defendants' assertions are followed either by no citation to the record, by a

13  citation to *KSR* or by a citation to a prior art patent.[5]  The Defendants do not cite to testimony,

14  and they do not cite to any expert opinion to support these bald assertions.  *See Centricut, L.L.C.*

15  *v. Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) ("'typically' expert testimony will be

16  necessary in cases involving complex technology.").[6]

17          **1.    Defendants cite no evidence to support the assertion that it would**
                **have been obvious to substitute a non-sinusoidal or U-shaped flexure**

18              **member for an S-shaped connector.**

19      On pages 22-23, the Defendants assert that "it would have been obvious to substitute a

20  non-sinusoidal flexure member for a sinusoidal one."  To support this assertion, the Defendants

21  point to the sinusoidal connector in the Wijay patent and the non-sinusoidal connector in the

22  _____

23      [5] The absence of evidentiary citations is equally glaring the "background" section –
    littered with statements about alleged design development, what was well-known, what was

24  needed, etc., without citation to any evidentiary support, or worse, by citation to material that
    does not actually support the statement it follows.  (*See* Defs.' Mem. in Supp. S.J. pp. 2-7.)

25      [6] Defendants further seek to improperly skew any analysis by addressing the alleged
    obviousness of each feature separately.  This is improper, since any obviousness analysis must

26  consider the invention <u>as a whole</u>.  *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100,
    1108 (Fed. Cir. 1987).  Plaintiffs attempt to address the arguments as outlined by the Defendants

27  below should not be taken as an implied acceptance of this methodology.

28

MILW_7514280.4

1   Israel patent. They then <u>assert</u> "it certainly would have been obvious to modify the two-turn

2   Wijay connector of Figures 2 and 2A to be 'non-sinusoidal.'" (Defs.' Mem. in Supp. S.J. 23).

3   <u>They do not cite any evidence to support this statement.</u> Nor do they point to any testimony or

4   other evidence that this would be obvious to one of skill in the art. The Defendants also assert on

5   page 23 that this substitution "would have involved nothing more than the 'predictable use of

6   prior art elements according to their established functions.'" (*Id.*) Again, the Defendants cite no

7   supporting evidence. In the absence of <u>any</u> supporting evidence, the Defendants have failed to

8   carry their burden of proof.

9               **2.     Defendants cite no evidence to demonstrate that it would have been
                         obvious to modify Wijay to include a U-shape.**

10          The Defendants next argue that it would have been obvious to modify Wijay to include a

11   U-shape. (*Id.* at 23-24.) This three-paragraph argument suffers the same defects as above.

12          The Defendants cite two pieces of evidence that they say supports this conclusion. First,

13   they cite snippets of testimony by an expert <u>in a prior, unrelated litigation</u> that "the introduction

14   of curvilinear segments into any stent improved the flexibility." (*Id.* at 24.) The statement, of

15   course, says nothing whatsoever about <u>U-shapes</u>. Indeed. Dr. Roubin said nothing about whether

16   it would have been obvious to modify an S-shape connector into a U-shaped connector. (Roubin

17   Dep. 70:5-71:7; McCauley Ex. 30.) Moreover, despite Defendants' selective citation and

18   suggestion to the contrary, Dr. Roubin testified quite clearly that the possible number of

19   acceptable stent designs "infinite." (*See* Roubin Dep. 122:13-124:17; Jelenchick Ex. 33.)

20          The Defendants also cite Dr. Eberhart's statement that a U-shaped flexure member was

21   known to provide flexibility to a beam. (Defs.' Mem. in Supp. S.J. 24.) They conclude from this

22   that "it would have been obvious to tweak the Wijay connector to include a curve that looked

23   even more 'U-shaped,' as expressly taught in Fischell '442 and Israel '303." (*Id.*) Once again,

24   the Defendants do not cite any evidence to support this proposed "tweak." No testimony; no

25   opinion; no document saying such a tweak would have been obvious. Indeed, the Defendants'

26   expert testified that it was a "scientific fact" that an S-shaped flexure member would be more

27   flexible than a similarly dimensioned U-shaped flexure member. (Taylor Dep. 199:25-201:1;

28

MILW_7514280.4

1  Jelenchick Ex. 8.)  Thus, according to the Defendants' own evidence, the "tweak" that the

2  Defendants propose to Wijay would actually make Wijay *less flexible*.  There is no evidence in

3  the record as to why one of skill in the art would want to make such a counterintuitive change.

4          **3.**     **The Defendants did not introduce any relevant evidence to show that**

5                     **it would have been obvious to interpose the flexure member between a**
                   **pair of straight strut portions.**

6       The Defendants argue that it would have been obvious to modify Wijay to interpose the

7  flexure member between a pair of straight strut portions.  (Defs.' Mem. in Supp. S.J. 24-25.)

8       Of course this is only part of the story.  The obviousness determination focuses on

9  whether "the invention as a whole" – not specific limitations – would have been obvious.

10  *Hartness*, 819 F.2d at 1108.  The Defendants improperly focus on whether it would have been

11  obvious to interpose a flexure member, without considering the other limitations of the claim –

12  such as the arcuate, U-shape curving in a non-radial direction of the stent of claim 11 of the '255

13  patent or the non-sinusoidal and arcuate flexure member of claim 22 of the '037 patent.  Thus,

14  Defendants distort the obviousness analysis by limiting the inquiry to a single limitation.

15       Even so, the Defendants' evidence falls far short of showing by clear and convincing

16  evidence that this limitation is obvious.  The Defendants rely most heavily on a statement by

17  evYsio's attorney when he was asking for a reexamination of a completely different patent,

18  having completely different inventors and claims.  (McCauley Ex. 31.)  Any statements about the

19  obviousness of that patent has no relevance to the patents at issue in this case.

20       Further, the evYsio attorney expressly stated in the reexamination proceeding that his

21  statements were based on an assumed filing date of June 16, 2000 (or later) (see *id* at 25) – more

22  than three years after the filing date of the patents-in-suit were filed and nearly three years after

23  the specifications of the patents-in-suit were published for all to see in September of 1997.

24  (Jelenchick Exs. 36, 37.)  Even if, with the benefit of 20/20 hindsight after looking at Drs. Penn

25  and Ricci's published patent applications, straight strut members were a "design choice" in 2001,

26  that says nothing about whether they were a design choice before Drs. Penn and Ricci made their

27  inventions in 1996.  This evidence, in short, is irrelevant.

28       The Defendants only remaining argument is to point to the Israel and Fischell prior art

1   and argue that the combination would be obvious.  Defendants cite no testimony or opinion

2   evidence that such a combination would have been obvious.  Attorney argument is not evidence.

3        It is also not persuasive.  The Israel '303 patent is a peak-to-peak stent having a squared

4   connector.  There is no evidence that it would have been obvious to one of skill in the art to take

5   that connector, curve some portions of it (even though the rest of the Israel stent is also squared),

6   and place it in a peak-to-valley stent.  The Fischell '442 patent does not disclose either a non-

7   sinusoidal flexure member or a peak-to-valley stent.  There is no evidence that one of skill in the

8   art would make these changes to Fischell '442 or otherwise modify Fischell '442 to achieve the

9   inventions of claims 22 and 11.  Likewise, the Globerman '161 patent does not disclose either a

10  non-sinusoidal flexure member or a peak-to-valley stent.  The connectors on this design are

11  intentionally off-set.  (Globerman '161 patent, Figs. 26-27; McCauley Ex. 26.)

    **4.**    **The Defendants do not provide evidence that it would have been obvious to modify Wijay to include an "orthogonal" U-shape.**

12

13  The Defendants argue that the claims that call for an orthogonal U-shape would have

14  been obvious.  Again, however, the Defendants rely on nothing but attorney argument.  Instead,

15  they dress the argument up in rhetoric by referring to the U-shape as "serendipitous" and "hastily

16  disclosed" – without, as is their wont, citing any supporting evidence.

17  The Defendants' only substantive argument is that it would have been obvious to modify

18  Wijay by adding part of the flexure member in the Fischell '442 patent.  But there is nothing to

19  support this assertion.  Without any evidence – much less clear and convincing evidence – the

20  Defendants' argument that these claims are obvious cannot succeed.

21      **D.**    **Evidence the Defendants Fail to Cite Shows that the Inventions Claimed in Patents-in-Suit Were Not Obvious.**

22

23  As noted above, the "real world" facts belie the Defendants' overly simplistic approach to

24  obviousness.  The real world shows that the doctors and other scientists attempting to improve

25  stent technology tried many diverse stent designs.  Stent developers were not marching in lock

26  step toward the perfect stent.  They were all going in different directions, working on different

27  designs.  Yet no one before Drs. Penn and Ricci created a peak-to-valley stent having a non-

28  sinusoidal flexure member separated from the circumferential by a straight strut portion – no one

1   before the doctors created their peak-to-valley stent having a U-shaped flexure member.

2   **1.    Abbott did not think adding a non-sinusoidal connector was obvious.**

3   During this time period, Abbott's predecessors (ACS and Guidant) sold the Multi-link

4   stent – a peak-to-valley stent with a straight connector. (Technical Guide at AB0521121;

5   Jelenchick Ex. 4.) Abbott says now that it would have been obvious to add a curve in place of

6   that connector. They argue further that it would have been obvious to make that curve U-shaped.

7   Yet, Abbott itself did not find this obvious. Abbott introduced its first Multi-link with a

8   straight connector in 1997. (*Id.*) It introduced a second version, called Duet, in 1998. (*Id.*) This

9   version had thicker metal struts, because the first version was too hard to see under fluoroscopy.

10  (Svensson Dep. 16:22-17:18; Jelenchick Ex. 9.) The thicker struts made the stent less flexible.

11  Pacitti Dep. 149:19-24, Jelenchick Ex. 26; Vision Technical Guide at AB0521121, Jelenchick

12  Ex. 4.) But Abbott did not add a curved flexure member to accommodate the thicker struts –

13  even though they now say this would have been obvious.

14  Abbott experimented with using curved connectors for a about a month during this time

15  period. But it <u>could not get the idea to work and subsequently abandoned its work on curved</u>

16  <u>connectors</u>. (Malaney Exs. 24, 25.) Abbott's failed efforts to create a satisfactory stent using

17  curved connectors is itself evidence of the non-obviousness of the patented invention. *See*

18  *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285 (Fed. Cir. 2000) ("[E]vidence of

19  failed attempts by others could be determinative on the issue of obviousness."). Instead of

20  adding curved or non-sinusoidal connectors, Abbott removed some of the connecting struts in the

21  Duet to try to achieve more flexibility. (Pacitti Dep. 149:19-24, Jelenchick Ex. 26.)

22  Abbott introduced another version, called TriStar, in 1999. (Technical Guide at

23  AB0521121; Jelenchick Ex. 4.) Again, Abbott did not curve the connectors, despite its alleged

24  obviousness. (*Id.*)

25  Abbott introduced its fourth version, called Tetra, in 2000. *Id.* In this version, Abbott re-

26  introduced the connecting struts that it removed in the Duet design. This would make the design

27  less flexible. Today Abbott argues that the "obvious" solution would have been to make the

28  remaining connectors curved to increase the flexibility of the stent. Yet, Abbott did not do that.

16

1   Instead, Abbott modified the longitudinals by making then thicker in some places than in others.

2   (Limon Dep. 61:15-62:6; Jelenchick Ex. 23.)

3          Finally, in 2001, Abbott introduced its Penta stent.  The Penta was designed in late 1999

4   and 2000 by a team that continued the focus on improving flexibility.  (Ainsworth Dep. Exs. 2 at

5   AB0607190 and 3 at AB0623375-402; Jelenchick Exs. 10 and 11.)  Yet, even at that late date,

6   and even starting with a peak-to-valley stent, they did not move directly to the invention Abbott

7   now claims was "obvious" years earlier.  In a process that took place over many months, and

8   involving many hours of work by a large design team, they approached flexibility from five

9   different directions: "helical patterns, sub-crowns, flexible links, variable widths, and variable

10  crowns."  (Ainsworth Dep. 90:15-21, Jelenchick Ex. 7; Ainsworth Exs. 3, 4, Jelenchick Exs. 11

11  and 12; Cheng Dep. 108:13-109:10, Jelenchick Ex. 13.)  At least 56 different designs were

12  created, tested and analyzed before the Penta design was selected.  One of these designs had a

13  non-sinusoidal flexure member – though it was promptly rejected.  (Cheng Dep. 116:11-16,

14  Jelenchick Ex. 13; Cheng Ex. 5 at AB0604645, Jelenchick Ex. 14.)  The Penta design, the first

15  Abbott design to include curved connectors, included connectors that were <u>not</u> non-sinusoidal or

16  U-shaped.  (Technical Guide at AB0521121; Jelenchick Ex. 4.)  The real world of stent design,

17  full of smart people trying to solve complex problems in an iterative process of ideas and blind

18  alleys, unpredictable outcomes and with a myriad of design choices, shows the claimed invention

19  was not at all obvious.

20         **2.**       **Abbott's stent development shows that a U-shape is not obvious.**

21         Abbott's sixth generation stent finally added a U-shaped peak-to-valley connector.  But

22  even then Abbott arrived at the U-shape only after experimenting with numerous other designs.

23  Indeed, the record shows that Abbott experimented with 69 configurations (including stents

24  having S-shapes) before it began working on the U-shaped connector that Abbott now claims

25  was obvious.  (Medinol Gomez Dep. 136:6-18, Jelenchick Ex. 15; Gomez Ex. 5, Jelenchick Ex.

26  16; Vision Design Review at AB0582251-65, Jelenchick Ex. 17.)

27         Design 68 was a design that looks much like the Vision stent, except that it used an S-

28  shaped connector.  (Gomez Ex. 5 at AB0517593; Jelenchick Ex. 16.)  Abbott then replaced the

17

1   S-shaped connector with a U-shaped connector.  (*Id.*)  Surprisingly, though Abbott's expert

2   testified that it was a matter of "scientific fact" that an S-shaped flexure member would be more

3   flexible than a U-shaped connector formed from "half an S" (Taylor Dep. 199:25-201:1;

4   Jelenchick Ex. 8), Abbott's own testing showed <u>no difference in flexibility</u> between stents having

5   such connectors.  (Medinol Gomez Dep. 136:19-137:9; Limon Ex. 6; Jelenchick Exs. 15, 20.)

6          This result was contrary to Abbott's own internal teaching.  Abbott's own February 2003

7   stent design manual preached that "the longer the path, the more flexible the stent" (Vision

8   Technical Features at AB0533977; Jelenchick Ex. 18) – meaning, among other things, that a

9   flexure member with a longer curved length would provide more flexibility.  But the U-shape

10  was unexpectedly as flexible as the S-shaped connector.  This result was significant enough that

11  the Vision designers reported it in the product's launch guide.  (Vision Launch Guide at

12  AB0521195, 197, and 241; Jelenchick Ex. 19.)

13         Although the result was counterintuitive, it was in keeping with the unpredictable nature

14  of stent design.  Indeed, Andreina Gomez, one of the designers of the accused Vision stent,

15  testified that stent design is unpredictable:

16

17

18

19

20

21

22

23

24

25  (Gomez Dep. 166:6-18 (emphasis added); Jelenchick Ex. 21; *see also id.* 91:21-

26  96:18; 166:19-167:4; 177:10-180:22; 196:9-197:7.)

27         The Vision designers also testified that making a connector more flexible did not

28

PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
CASE NO. 06-01066-PJH

MILW_7514280.4

1  | necessarily result in a more flexible stent:

8  | (Ta Dep. 65:21-66:5; Jelenchick Ex. 22.)

9  |      The patented invention is a perfect example of the unpredictable nature of stent design: according to Abbott's experts' "scientific fact," a U-shaped connector should be less flexible than an S-shaped connector.  But when the connector is used as part of a stent system, Abbott's internal testing showed that the resulting stent designs had no difference in flexibility.

     Likewise, Abbott's expert testified that a curved connector would be more flexible than a straight connector after the stent is deployed – *i.e.*, expanded in the artery.  He said that this too, was a scientific fact.  (Taylor Dep. 199:25-201:1; Jelenchick Ex. 8.)  Yet, the Vision designers learned that a curved connector was only more flexible during delivery – they did not find any difference during deployment.  (Gomez Dep. Ex. 18 at AB0551016; Jelenchick Ex. 24.)

     Consistent with this, the defendants' own Vision designers repeatedly testified that they could not tell whether a stent modification would result in a more flexible stent by looking at the design.  (Gomez Dep. 92:22-24, 95:21-24, 91:21-96:18, 166:19-167:4, 177:10-180:22, 196:9-197:7, Jelenchick Ex. 21; Ta Dep. 92:17-23, Jelenchick Ex. 22.)  They testified consistently and without contradiction that they would need to build and test any new stent design to determine whether the resulting stent was more flexible.  (Gomez Dep. 89:1-94:2, 95:2-96:18, 159:2-160:11, 166:6-167:4, 177:10-178:10, Jelenchick Ex. 21; Ta Dep. 65:17-66:5, 92:3-16, 94:5-8, 95:25-97:8, Jelenchick Decl. Ex. 22.)  Despite Abbott's arguments in this case, the "real world" evidence is that stent design is an unpredictable art.  Those skilled in the art would not have had a reasonable expectation that adding a non-sinusoidal and arcuate flexure member would result in a more flexible or more deliverable stent.

19

MILW_7514280.4

1

      **3.**     **Abbott has consistently touted the advantages of the Vision design and U-shaped flexure member in its advertising.**

2

     While Abbott argues to this Court that the addition of a U-shaped connector would have

3

been obvious in 1996, its own advertising when it introduced the Vision stent in 2003 is just the

4

opposite. Abbott said its design was "novel." (Competitive Comparison at AB0521708;

5

Jelenchick Ex. 6.) It called its new longitudinal the "Flexalink™". (Vision Brochure at

6

AB0727518; Jelenchick Ex. 34.) It distinguished the U-shaped Flexalink from the S-shaped link

7

in the Penta stent. (Vision Launch Guide at AB0521246; Jelenchick Ex. 19.) According to

8

Abbott, the "benefit of this new shape is that it allows a tight crimp on the delivery system,

9

resulting in extremely low crossing profiles." (*Id.*) Abbott also told physicians and the medical

10

community in its advertising that the Flexalink provided "enhanced flexibility." (Vision

11

Brochure at AB0727518; Jelenchick Ex. 34.) It also touted the fact that this new shape

12

"maintain[s] an optimal balance between metal-to-artery ratio and scaffolding." (Product

13

Release Guide at AB0521772; Jelenchick Ex. 25.)

14

     These statements to the marketplace stand in stark contrast to the Defendants' arguments

15

before this Court that the addition of a U-shaped connector would have been obvious. These

16

conflicting statements by Abbott at a minimum raise a question of fact concerning the

17

obviousness of the claimed invention.

18

      **E.**     **The Evidence Shows that the Art "Taught Away" from the Use of Non-Sinusoidal, or U-Shaped, or Orthogonal U-shaped Flexure Members in a**

19

              **Peak-to-Valley Stent.**

20

     Defendants' "proof" of "obviousness" totally ignores the fact that stents are made to be

21

placed in a beating human heart's coronary arteries, where they will interact with the artery walls

22

and arterial blood flow for as long as the patient lives. The Plaintiffs have submitted expert

23

testimony that those skilled in the art in 1996 would have had serious reservations about making

24

the combination that the Defendants now say is obvious, because of fears about how those stent

25

designs would operate inside an actual, living person. Specifically, Dr. Robert Eberhart, a

26

biomedical engineering professor from the University of Texas in Arlington with experience in

27

stent design, identified that one of skill in the art would have been concerned that a non-

28

PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
CASE NO. 06-01066-PJH

MILW_7514280.4

1   sinusoidal or U-shaped flexure member might create an asymmetric stent structure that might

2   twist during expansion.  (Second Eberhart Rep. ¶¶ 16-17; Supp. Eberhart Rep. ¶ 2.)  His testing

3   shows that such a concern would have been well founded.  (Second Eberhart Rep. ¶¶ 61, 65-68;

4   Supp. Eberhart Rep. ¶¶ 14-16, 18-20.)  Twist is undesirable for a number of reasons, one being

5   that the stent might not then conform to the wall of the blood vessel.  (Second Eberhart Rep. ¶

6   68; Second Rothman Rep. ¶¶ 292, 297.)

7          Dr. David Ku, a medical doctor and mechanical engineering professor from Georgia

8   Tech, opined that one skilled in the art would have been concerned about adding structure to the

9   longitudinal connector that would be at a right angle to blood flow, such as a U-shaped flexure

10  member.  (Ku Rep. ¶¶ 1, 19, 27-29, 73; Ku Dep. 5:10-17, Jelenchick Ex. 38.)  He noted that the

11  literature at the time taught away from such a design; it was thought to increase the potentially

12  fatal risk of thrombosis (blood clots) and restenosis (reclosing of the artery).  (Ku Rep. ¶¶ 20-26.)

13         The Plaintiffs' expert testimony of this "teaching away" and the unexpected nature of the

14  success of the Penn/Ricci designs is completely unrebutted.  Indeed, the Defendants did not even

15  provide an expert opinion that addresses the Plaintiffs' expert opinions of Drs. Eberhart and Ku.

16  Accordingly, the uncontradicted evidence of record supports the finding that these concerns

17  would have led one of skill in the art <u>away</u> from making the modifications that the Defendants

18  now say are obvious.  This unrebutted evidence precludes a finding of obviousness on summary

19  judgment.  *See Cooper v. Ford Motor Co.*, 748 F.2d 677, 679-80 (Fed. Cir. 1984).

20   **F.   Secondary Considerations Favor Plaintiffs and Create an Issue of Material Fact Precluding Summary Judgment.**

21          **1.   The commercial success of the Vision stent supports the non-obviousness of the patents-in-suit.**

22

23  Commercial success is one of the secondary considerations that support a finding of non-

24  obviousness.  *Gambro Lundia AB, v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir.

25  1997).  Commercial success is routinely proven by way of sales of the infringing products.  *See,*

26  *e.g., Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1361 (Fed. Cir. 1999) (holding

27  evidence of sales of two million devices per month incorporating patented technology supported

28  non-obviousness finding, and stating that "sales figures alone are also evidence of commercial

21

1   success"); *Gambro*, 110 F.3d at 1579 (holding patent was not invalid as obvious and relying on

2   commercial success of competitive design).  Here, there is no dispute:  the accused products are

3   commercially successful.  (Pacitti Dep. 55:23-56:3; Jelenchick Ex. 26.)

4        Defendants weakly argue (by way of a bald assertion) that their commercially successful

5   products do not infringe.  (Defs.' Mem. in Supp. S.J. 27.)  Notably, Defendants did not move for

6   summary judgment on infringement or otherwise claim that there no material dispute of fact

7   regarding infringement.  Indeed, there is ample evidence of infringement, certainly enough to

8   create a material issue of fact regarding commercial success.  (*See, e.g.*, First Rothman Rep.

9   ¶¶ 52-185, Penn Rep. ¶¶ 25-72, and accompanying exhibits.)

10       The Defendants also claim that it will be difficult for Plaintiffs to prove that the

11  commercial success of the infringing products is due to the patented invention.  (Defs'. Mem. in

12  Supp. S.J. 27.)  But this argument reflects nothing more than an incomplete understanding as to

13  the applicable burdens.  Where a patentee can demonstrate the commercial success of a product

14  embodying the claimed invention, it is <u>presumed</u> that the commercial success is due to the

15  patented invention.  *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir.

16  1997).  Thus, because commercial success is admitted upon proof of infringement, <u>Defendants</u>

17  will have the burden at trial to prove that there is no nexus between the admitted commercial

18  success of their infringing products and the patented invention.

19       Here, Defendants have not even attempted to offer any actual, admissible evidence on

20  this issue – claiming only that their <u>earlier</u> Multi-link products were also successful.  (Defs'.

21  Mem. in Supp. S.J. 27.)  Of course, one aspect of the patented invention not present in any of the

22  Defendants' earlier products is the claimed "non-sinusoidal and arcuate" "U-shape" or "arcuate

23  U-shaped" flexure member in a longitudinal connecting a peak in one circumferential to a valley

24  in another.  (Vision Technical Guide at AB0521121, 139; Jelenchick Ex. 4.)  And whatever they

25  may tell the Court now, Abbott Defendants obviously believed that this feature was important to

26  the success of their Vision and Xience products since they:  (1) named it the "Flexalink," (2)

27  sought a trademark for that name, and (3) then made it a <u>centerpiece of their marketing efforts</u>.

28  (Vision Brochure at AB0727517-18; Jelenchick Ex. 34.)

22

1    Abbott Defendants told the world, in their marketing literature, that the Vision had a

2    "novel design" and that the "Flexalink™ technology" was <u>the number one reason why the</u>

3    <u>Vision design was better</u>.  (*Id.* at AB0727517; *see also* Competitive Comparison at AB0521708,

4    Jelenchick Ex. 6.)  The Flexalink was also identified as a "key to the flexibility of the ML

5    VISION™."  (Guidant's Local Rule 56.1 Counterstatement to Medinol's Rule 56.1 Statement of

6    Undisputed Facts at AB0778368; Jelenchick Ex. 39.)  The undisputed fact that Abbott touted the

7    commercially successful Vision design and its "Flexalink" feature and recognized it as an

8    important advance is objective evidence of non-obviousness.  *Gambro*, 110 F.3d at 1579.  As the

9    *Gambro* court explained:  "The prominence of the patented technology [in the infringer's]

10   advertising creates an inference that links the [patentee's] invention to [the commercial]

11   success."  *Id.*  As the law recognizes, when it comes to obviousness, Abbott cannot be permitted

12   to tell its customers one thing, and this Court another.

13    In addition to this advertising evidence, Plaintiffs' experts will testify that there is a

14   strong nexus between the infringing design and the commercial success of the Vision product.

15   (Weinstein Rep. ¶¶ 36-39; Sheffield Rep. ¶¶ 26-27, 33-36.)  The accused stents embody the Penn

16   & Ricci claimed inventions.  (First Rothman Rep. ¶¶ 52-185; Penn Rep. ¶¶ 25-72.)  Accordingly,

17   the jury will be entitled to conclude that the commercial success of the accused products is

18   related to the patented invention.  This strong evidence of commercial success certainly

19   precludes summary judgment in favor of the Defendants on the issue of obviousness.

20          **2.      Long felt need favors the Plaintiffs.**

21    Citing no actual precedent or legal authority, Defendants make two claims, both of which

22   would lead the Court into error.  First, they claim that long felt need cannot be established if

23   every element of a combination patent was already known in the prior art.  As they put it, there

24   cannot be any long felt need "for any of these features."  That is not the test.  The question in a

25   secondary consideration analysis is whether there was a long felt need or failure of others with

26   respect to the patented invention <u>as a whole</u> – not as to any particular feature of the invention.

27   *See Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990) (The court held

28   that "[f]ocusing on the obviousness of substitutions and differences, instead of on the invention

23

1    as a whole, is a <u>legally improper</u> way to simplify the often difficult determination of

2    obviousness") (emphasis added).  There is ample evidence both of long felt need and the failure

3    of others with regard to the invention as a whole.  (*See, e.g.*, Second Rothman Rep. ¶¶ 338-340;

4    Ainsworth Dep. Ex. 2 at AB0607181-82, 187-189, 205, Jelenchick Ex. 10; Ainsworth Dep. Ex. 3

5    at AB0623375-401, Jelenchick Ex. 11; Gomez Dep. Ex. 3 at AB0546155-68, Jelenchick Ex. 27;

6    Gomez Dep. Ex. 18 at AB0550999, Jelenchick Ex. 24; Limon Notebook, Malaney Ex. 25.)

7         As for the second, easily refuted claim, Defendants claim (again with citation to no

8    precedent or legal authority) that there can be no long felt need where the Plaintiffs do not have

9    present plans to market the patented invention.  There is no such rule of law.  Often, as here, a

10   long felt need is demonstrated by the commercial success of the infringing product.  *ATD Corp.*

11   *v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed. Cir. 1998).  And it can be no surprise that Medtronic has

12   no present plan to attempt to sell <u>the exact same product the Defendants are already selling</u>.[7]  In

13   short, the Defendants' sales of infringing products support a finding of long felt need sufficient

14   to defeat summary judgment.  *See Monarch*, 139 F.3d at 883-84.  Plaintiffs present plans (relied

15   on by Defendants) prove nothing.

16                    **3.    The unexpected results of the patented invention create an issue of**

17                    **fact.**

18        Defendants completely misrepresent the state of the law regarding the secondary

19   consideration of unexpected and surprising results.  Defendants incorrectly equate whether (1)

20   "an improvement is more than the predictable use of prior art elements according to their

21   established functions," or (2) there is "a design need or market pressure to solve a problem and . .

22   . a finite number of identified, predictable solutions" making an improvement "obvious to try,"

23   with the secondary considerations of non-obviousness.  (Defs.' Mem. in Supp. S.J. 28-30.)  This

24   is wrong.

25           [7] Defendants cite Jeff Allen testimony on this issue; though he was not the 30(b)(6)
     witness on that topic of business considerations regarding the sales of the patented technology
26   (as the transcript reflects), and responded only that Medtronic had not considered incorporating
     the licensed "tubular" stent design technology into their current wire stents – an unsurprising
27   conclusion.

28

1    Even a cursory reading demonstrates that the Supreme Court's discussion in *KSR* about

2  "predictable use" and "obvious to try" are separate from the Supreme Court's discussion of

3  secondary considerations. *See KSR*, 127 S. Ct. at 1739, 1740-41, 1742. There is nothing to

4  suggest that the Supreme Court intended to conflate the inquiries. In fact, there is no discussion

5  whatsoever regarding the secondary consideration of unexpected and surprising results in the

6  Supreme Court's decision. Leading up to the Supreme Court's decision, the only secondary

7  consideration at issue in the case was commercial success. *See Teleflex, Inc. v. KSR Int'l Co.,*

8  119 Fed. Appx. 282 (Fed. Cir. 2005); *Teleflex Inc. v. KSR Int'l Co.*, 298 F. Supp. 2d 581, 595-96

9  (E.D. Mich. 2003). Thus, Defendants cannot credibly contend that the Supreme Court's

10  discussion about the predictable use of prior art elements or the obvious to try inquiry have

11  anything to do with the secondary consideration of unexpected and surprising results. Rather,

12  because a patent is presumed valid, and because the predictable use and obvious to try inquiries

13  articulated in *KSR* are part of underlying factual inquiry to be considered in determining

14  obviousness, it is the Defendants' burden to show that the claimed invention was merely the

15  predictable use of prior art elements according to their established function or one of a finite

16  number of identified, predictable solutions that are obvious to try. *KSR*, 127 S. Ct. at 1742. At

17  the summary judgment stage, Defendants must not only offer proof, but also demonstrate that

18  there are no genuine issues of fact (with all inferences drawn in favor of the Plaintiffs). For the

19  reasons discussed above, Defendants have fallen far short of the requisite showing.

20    Indeed, the "evidentiary" citations in this section are particularly glaring in their failure to

21  provide any actual evidence on the points for which they are cited. The section starts with

22  citation to Penn testimony that is not even related to the cited point (McCauley Ex. 41 (Defs'.

23  Mem. 28)), and a quote from Professor Rothman in another matter, concerning how cardiologists

24  viewed stents as compared to other technologies used in human circulation (McCauley Ex. 33

25  (Defs.' Mem. 28)), which also proves nothing. Likewise, Defendants rely heavily on selective

26  citation to snippets of inadmissible testimony from Dr. Roubin, taken wholly out of context and

27  relating to a different stent design. (McCauley Ex. 30 (Defs.' Mem. 30).) As explained above,

28  Dr. Roubin's testimony had nothing to do with non-sinusoidal connectors or the patents-in-suit.

25

MILW_7514280.4

1   This testimony is simply irrelevant. Equally inappropriate is the citation to exhibits 13, 23 and

2   34 at page 29 of Defendants' brief. The cited portions of the Penn, Ricci, and Rothman

3   depositions simply do not support the Defendants' statement.

4       Putting their unsupported assertions and incorrect analysis aside – there is little left to the

5   unexpected and surprising results portion of Defendants' brief. Where their brief is thin,

6   however, the Plaintiffs' evidence is thick. As discussed above in §§ I.D and I.E, the evidence

7   shows that the patented inventions yielded unexpected and surprising results. This evidence

8   creates an issue of fact for trial.

9          **4.     The alleged near simultaneous invention does not support the Defendants' claim.**

10      The Defendants contend that the alleged near simultaneous invention of similar designs

11  by others shows the obviousness of the invention. In fact, it shows no such thing. While the

12  Defendants make much of this evidence, they fail to tell the Court that these designs were

13  promptly rejected or abandoned. (*See* transcripts cited at Malaney Exs. 19-22, 24, 28.) Thus, far

14  from showing the obviousness of the invention, the fact that these other designers rejected the

15  claimed invention shows that the invention was in fact not obvious. *Cf. Monarch*, 139 F.3d at

16  884 (where other designers had abandoned the invention, "it is difficult to see how a solution

17  solves long-felt need if its developer does not recognize that it does so."). Thus, the "non prior

18  art" – which should not be considered in any event, (Pls.' Mem. in Supp. S.J. 22-25) – cannot

19  support Defendants' position.

20  **II.    THE DEFENDANTS DID NOT CARRY THEIR BURDEN OF SHOWING THAT THE PATENTS-IN-SUIT ARE ANTICIPATED.**

21

22      **A.     Defendants Concede that Wijay Does Not Anticipate Claims 16, 40, 43, 45-48, 52-53, and 57 of the '037 Patent and Claim 16 of the '255 Patent.**

23

24      There is no dispute that the Wijay '940 patent does not anticipate claims 16, 40, 43, 45-

25  48, 52-53, and 57 of the '037 patent and claim 16 of the '255 patent. Defendants concede this.

26  (Defs.' Mem. in Supp. S.J. 9-21.)

27

28

MILW_7514280.4

**B.    Wijay Cannot Anticipate the '037 Patent Because it Has a Sinusoidal Connector.**

      **1.    The claims of the '037 patent require a non-sinusoidal flexure member.**

Every asserted claim of the '037 patent requires a non-sinusoidal flexure member. The claim language specifically states that the flexure member must be "in two dimensions . . . non-sinusoidal." ('037 patent col.14 ll.50-52, col.15 l.66-col.16 l.3, col.17 l.15-19; McCauley Ex. 27.) Such claim language explicitly excludes any sinusoidal or S-shaped flexure member, a fact that both the examiner and the applicants obviously believed. As Wijay discloses only a sinusoidal flexure member, it cannot possibly anticipate.

This is confirmed by the prosecution history. During the prosecution of the '037 patent, the applicants distinguished the claims from the prior art, which expressly included Wijay, on the basis that it failed to disclose a non-sinusoidal flexure member. Wijay was not buried under a pile of other pieces of prior art. Instead, as explained in Plaintiffs' Memorandum on page 14, it was squarely in front of the examiner _four_ separate times and considered _ad nauseam_. (Carmichael Rep. Ex. 14 at MDT_1038244, Ex. 13 at MDT_1038204-05, Ex. 12 at MDT_1038175-77, Ex. 20 at MDT_1038230.) It was identified in an Information Disclosure Statement, pointed out in a response to an Office Action, and discussed in an interview with the examiner not once, but twice. (_Id._) In each instance, Wijay was distinguished precisely because it did <u>not</u> disclose a non-sinusoidal flexure member. (_See also_ Pls.' Mem. in Supp. S. J. at 14; explaining how Defendants' position is inconsistent with the prosecution history.)

Despite the unequivocal prosecution history and ignoring the examiner's conclusion that Wijay did <u>not</u> disclose a non-sinusoidal flexure member, Defendants now contend that Wijay does disclose a non-sinusoidal flexure member. But Defendants give no plausible explanation as to how their position can be reconciled with the intrinsic evidence in the prosecution history.

Rather, Defendants merely cite to _IPXL Holdings, L.L.C. v. Amazon.com, Inc._, 430 F.3d 1377, 1381 (Fed. Cir. 2005), and state that it is possible for a patent to be anticipated by a reference that was previously before the examiner. _IPXL Holdings_ is not controlling (or even relevant) in this case. Unlike the prior art reference in _IPXL Holdings_, Wijay was evaluated and

27

1   considered multiple times.  Moreover, just because the defendant in *IPXL Holdings* carried its

2   burden there, it does not mean that Defendants can meet their "especially difficult burden" in this

3   case. *See Glaxo Group, Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004) (citing *Al-Site*

4   *Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999)).

### 2.   Wijay does not have a non-sinusoidal connector.

6   Wijay's S-shaped flexure member cannot be carved up into pieces to read on the '037

7   patent's non-sinusoidal claim limitation.  There is simply no authority for slicing up the S-shaped

8   flexure member of Wijay.

9   As discussed above and in Plaintiffs' brief, the prosecution history makes clear that the

10   Wijay '940 patent discloses only a sinusoidal flexure member.  (Pls.' Mem. in Supp. S.J. 14.)

11   The Defendants' contrary interpretation would completely read the "non-sinusoidal" limitation

12   out of the claims.  <u>Every</u> S-shape contains some sort of non-sinusoidal part.  Thus, if Defendants'

13   approach was adopted, <u>every</u> flexure member would be "non-sinusoidal."

14   Moreover, the evidence that Defendants cite to in support of their theory is not

15   persuasive.  Defendants point to language found in claims 2 and 23 of the '037 patent, two

16   claims not asserted in this litigation or alleged to be anticipated by Wijay.  (Defs.' Mem. in Supp.

17   S.J. 18, 35.)  Defendants contend that the "multiple flexure members within the same

18   longitudinal portion" required by claims 2 and 23 necessarily means that the flexure member can

19   be cut up into pieces to meet this claim limitation.  This is wrong.  While there can be multiple

20   flexure members within the same longitudinal portion (*e.g.* Figures 12e, 12f, 12g), there is no

21   support for the proposition that each individual flexure member can be sliced into parts to meet

22   the non-sinusoidal claim limitation.

23   Additionally, in support of their argument, Defendants rely on select statements made in

24   the specification that S-shaped connectors in Figures 8-10 are a "pair of joined curved sections."

25   While the specification does refer to an S-shaped or <u>sinusoidal</u> flexure member as comprised of a

26   pair of joined curved sections, this is not relevant to what a <u>non-sinusoidal</u> flexure member is.

27   Despite Defendants' argument to the contrary, the applicants <u>never</u> said that a non-sinusoidal

28   flexure member could be created by disregarding parts of a sinusoidal flexure member.

MILW_7514280.4

1    Furthermore, Defendants' reliance is misplaced regarding the applicants' statement that

2    the non-sinusoidal claims of the '037 patent were supported by Figure 8.  While the applicants

3    did assert that claims containing the non-sinusoidal limitation were supported by Figure 8, the

4    applicants were not offering an interpretation of the claim language, but merely arguing about a

5    priority determination.  In any event this statement was simply made in error; it was intended to

6    have been filed in connection with a different patent application that was being prosecuted by the

7    same patent attorney at the same time before the same examiner.  (Bauer Dep. 152:17-153:21,

8    154:11-156:15, Jelenchick Ex. 40; Carmichael Rep. 24-26, Exs. 24-28.)  Regardless, this

9    statement cannot override the clear claim language limiting the claims to non-sinusoidal flexure

10   members.  *See Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054 (Fed. Cir. 1989)

11   (explaining that the claims themselves control rather than the erroneous statements of an attorney

12   made during the course of prosecution).

13       Moreover, the specification makes clear that Figure 8 is not limited to having sinusoidal

14   flexure members.  Rather, Figure 8 can also contain the non-sinusoidal embodiments illustrated

15   in Figure 12.  ('037 patent col.11 ll.62-65 ("Those of skill in the art will recognize that it is

16   possible to combine various of the alternate embodiments illustrated in FIGS. 2-10 and 12 to

17   derive further designs which are still within the spirit and scope of the present invention.").)

18   This is a distinction that both the applicants and examiner made.  In fact, in response to the

19   applicants' assertion regarding Figure 8, the examiner issued a Notice of Allowability and

20   explicitly stated in his reasons for allowance that the claimed invention was "clearly

21   distinguished" from the prior art because the prior art "has failed to disclose . . . a non-sinusoidal

22   flexure member."  (Carmichael Rep. Ex. 25 at MDT_1038292.)  This intrinsic evidence is

23   controlling here.

24       **3.    Wijay does not teach a non-sinusoidal connector.**

25       As an alternative to their slicing and dicing theory, Defendants argue that the Wijay

26   Figures 2 and 2A "cross-ties" teach a non-sinusoidal connector.  While pointing to these

27   crossties that have a "plurality of bends" (Wijay '940 patent col.5 ll.37-41; Malaney Ex. 12),

28   Defendants then cite to another portion of the Wijay specification that references a

29

fundamentally different, alternative stent design (Figures 19 and 20) for the proposition that crossties can have a single, non-sinusoidal bend.  (Defs.' Mem. in Supp. S.J. 17-18.)  As explained fully in Plaintiffs' brief on pages 17-18, there is no merit to this anticipation argument either:  Wijay does not teach the use of a non-sinusoidal flexure member in a stent made up of undulating circumferential rings connected by peak-to-valley longitudinal connectors.[8]

### C.   Wijay Cannot Anticipate the '255 Patent.

#### 1.   "Each longitudinal portion" in Wijay does not have a flexure member "interposed between a pair of straight strut portions."

Each asserted claim of the '255 patent requires that "each of said ... longitudinal portions" have a flexure member "interposed between a pair of straight strut portions which are disposed parallel to the longitudinal axis of the stent."  The claim language is clear that both of the two straight strut portions must be part of the same longitudinal as the flexure member.  As explained in Plaintiffs' Memorandum at pages 19-20, Wijay does not disclose a stent that meets this claim limitation, and thus, it cannot anticipate.

#### 2.   Wijay does not have a U-shaped flexure member.

Wijay does not have a U-shaped flexure member.  The only way to get a U-shape from Wijay's sinusoidal flexure member is to carve the S-shape into pieces.  As explained above and in Plaintiffs' motion, this argument – that all S-shapes include U-shapes – fails.

Because the Wijay '940 patent does not disclose a U-shape, what and how Dr. Rothman and Dr. Penn characterize "U-shaped" is irrelevant.  Similarly, statements about the Wijay '940 patent made by Mr. Bauer in an unrelated *ex parte* reexamination request to the Patent Office for an unrelated patent are immaterial.  As explained above, these statements were analyzing different claim language – U-shaped turn back portions – and were made on the assumption that the unrelated patent had a priority date of at least the year 2000, nearly four years after the effective filing date of the '255 patent.  These arguments should be ignored.[9]

---

[8] Because the independent claims of the '037 patent are not anticipated, it is likewise true that the asserted dependent claims are not anticipated.  *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1148-49 (Fed. Cir. 2005).

[9] Because independent claim 11 is not anticipated, dependent claims 12-13, 15, and 16

III.    **DEFENDANTS CANNOT PROVE INVALIDITY BY REASON OF INDEFINITENESS**

Defendants never contended during claim construction that "U-shaped" was indefinite. (Abbott Answering Claim Constr. Br.; Dkt. # 195; Defs.' Prelim. Claim Constr.; Malaney Ex. 9.) Instead, Defendants argued "U-shaped" should be given its "ordinary meaning." (Defs.' Prelim. Claim Constr. at 3; Malaney Ex. 9.)

Defendants now belatedly argue that claims 11-13, 15, and 16 of the '255 Patent and claim 17 of the '037 Patent are invalid because claim term "U-shaped" is indefinite. (*See* Defs.' Mem. in Supp. S.J. at 31.) Defendants' sole support for this newly minted indefiniteness argument is extrinsic evidence derived from this litigation. (*Id.* at 31-34.) Defendants' arguments fail, as a matter of law, for at least three reasons. First, as a matter of controlling Federal Circuit law, claim terms amenable to construction cannot be indefinite. *See, e.g., Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006). Since the Court repeatedly referenced and discussed the term "U-shaped" in its order construing claims without noting any definitional problems, Defendants cannot now show that "U-shaped" is indefinite. (*See* Order Constr. Claims at 12, 29; Dkt. # 283; Malaney Ex. 4.)

Second, resort to extrinsic evidence is improper "when the intrinsic evidence unambiguously defines the disputed claim language." *Personalized Media Commc'ns v. Int'l Trade Comm'n*, 161 F.3d 696, 706 (Fed. Cir. 1998). Because the intrinsic evidence reveals no ambiguity with regards to "U-shaped," and because all evidence cited by Defendants is extrinsic, Defendants cannot prove that "U-shaped" is somehow indefinite.

Third, an inquiry as to whether claims meet the requirements of 35 U.S.C. § 112, ¶ 2 critically focuses on the claims and specifications of the patents in question. *E.g., Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1378 (Fed. Cir. 2000). Incredibly, Defendants never once mention the specification of either patent-in-suit in their summary judgment argument that "U-shaped" is indefinite. Defendants cannot, as a matter of law, carry their burden of proving

are not anticipated. *Nystrom*, 424 F.3d at 1148-49.

31

1    indefiniteness by clear and convincing evidence.

2    **A.   The Court's Order Construing Claims Repeatedly Uses and Discusses "U-shaped" with no Statements of Confusion or Apprehension.**

3    If a claim term is "amenable to construction, 'even though the task may be formidable

4    and the conclusion may be one over which reasonable persons will disagree,' the claim [term] is

5    not indefinite." *Aero Prods.*, 466 F.3d at 1016 (quoting *Exxon Research & Eng'g Co. v. United*

6    *States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001)). As established in Plaintiffs' brief, although "U-

7    shaped" was not specifically construed, it was referred to repeatedly during construction of other

8    terms. (*See* Pls.' Mem. in Supp. S.J. 6-7; *e.g.*, Order Constr. Claims 12, 29, Malaney Ex. 4.)

9    Consequently, because the Court obviously encountered no confusion or ambiguity regarding

10   "U-shaped," Defendants are precluded as a matter of law from showing "U-shaped" is indefinite.

11   **B.   The Patents-In-Suit Clearly Define "U-shaped"**

12   Pursuant to 35 U.S.C. § 112, ¶ 2, a patent specification must conclude with one or more

13   claims "particularly pointing out and distinctly claiming the subject matter which the applicant

14   regards as his invention." 35 U.S.C. § 112, ¶ 2. Specifically, "[i]f the claims read in light of the

15   specification reasonably apprise those skilled in the art of the scope of the invention, § 112 [¶ 2]

16   demands no more." *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

17   Although "U-shaped" is not specifically defined, the specification of the

18   patents-in-suit describes the bottom portion of Figure 12g as a "U-joint:"

19   As this demonstrates, a "U-joint" or "U-shape" not surprisingly resembles the

20   letter "U." Accordingly, there is ample support in the intrinsic record (as well as the extrinsic

21   record[10]) for the simple claim term "U-shaped." In light of this, there can be no dispute that a

22   person of skill in the art – or anyone for that matter – understands what "U-shaped" means when

23   read in light of the specifications of the patents-in-suit. That is all that § 112, ¶ 2 requires. *Miles*

24

25        [10] Although resort to extrinsic evidence is not needed because the intrinsic record unambiguously defines "U-shaped", witnesses on both side of this case have encountered no

26   problem with attributing a meaning to "U-shaped." (*See, e.g.*, Taylor Rep. I 106 (""U-shaped' means having the general shape of the letter 'U'"); Svensson 30(b)(6) Dep. 44:6-13, Jelenchick

27   Ex. 9; Ta Dep. 82:9-25, Jelenchick Ex. 22; Second Rothman Rep. ¶¶ 156, 351.)

28

MILW_7514280.4

*Labs.*, 997 F.2d at 875. As such, the asserted claims containing "U-shaped" meet the requirements of § 112, ¶ 2.

### C. Defendants' Proffered Indefiniteness Evidence Is Irrelevant and Never Mentions the Intrinsic Evidence.

Defendants' "U-shaped" indefiniteness arguments all suffer from a fatal flaw – they are directed to the Plaintiffs' application of "U-shaped." (*See, e.g.*, Defs.' Mem. in Supp. S.J. 31-35 ("As asserted by Plaintiffs, 'U-shaped' Is Indefinite") (emphasis added)). Notably, the parties are in general agreement that "U-shaped" means shaped like the letter "U." (*See, e.g.*, Taylor Rep. I 106; Second Rothman Rep. ¶¶ 156, 351.) Predictably, the parties disagree as to how this settled definition applies to the accused products and prior art. As such, Defendants' purported indefiniteness arguments are relevant, if at all, not to indefiniteness but to infringement. *See, e.g.*, *Andrew Corp. v. Gabriel Elecs., Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (holding "imprecise claim limitation[s]" that serve reasonably to describe the claimed subject matter "[do] not impart invalidity to the claims, but [are] to be considered in determination of infringement"). Accordingly, Defendants' objections to Plaintiffs' application of the settled definition of "U-shaped" are completely irrelevant to §112, ¶ 2 invalidity.

Even if Defendants' disagreements with Plaintiffs' application of "U-shaped" were germane to indefiniteness, the evidence cited to support Defendants' contentions bear no relation to § 112, ¶ 2. "Determining whether a claim is definite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification.'" *Personalized Media Commc'ns*, 161 F.3d at 705 (emphasis added). The relevant temporal context is the time of the patent application. *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1371 (Fed. Cir. 2005).

In spite of the clear Federal Circuit precedent requiring an analysis of claims in light of the specification, Defendants never discuss or cite to the intrinsic record of the patents-in-suit. Instead, Defendants rely on three types of extrinsic evidence: (1) Plaintiffs' objections and denials to selected Abbott Requests for Admissions (Defs.' Mem. in Supp. S.J. 31-32); (2) an unrelated reexamination request filed on December 22, 2004 for U.S. Patent No. 6,547,817 (*Id.*

33

1   at 32); and (3) assorted deposition quotes from Plaintiffs' experts regarding shapes of various

2   patents and products. (*Id.* at 33-35.) Defendants' evidence suffers from the same flaw – none of

3   it relates to the claims, figures, specification or prosecution history of either patent-in-suit.

4       First, Defendants' reliance on Plaintiffs' responses to selected Abbott requests for

5   admissions is wholly misplaced. In these responses, Plaintiffs objected to and then denied

6   requests directed to various shapes. These denials are <u>not</u> admissions of anything. *See Fed. R.*

7   Civ. P. 36(b). Moreover, these denials, if relevant at all, relate only to the <u>application</u> of the term

8   "U-shaped," not the <u>definition</u> of that term. These responses are irrelevant to the issue of

9   indefiniteness. The Defendants' position reflects a complete misunderstanding of the

10  indefiniteness standard: it is "[t]he perspective of a person of ordinary skill in the art at the time

11  of the patent application [that] governs the definiteness analysis." *Howmedica*, 401 F.3d at 1371.

12  The issue is not whether a person, years later, perusing a parties' position in litigation[11] regarding

13  other patents, could understand the claim terms. As such, these discovery responses are

14  completely irrelevant to a definiteness determination, and cannot support Defendants' position.

15      Likewise, Defendants mistakenly rely on excerpts of an *ex parte* reexamination request

16  filed in 2004 for a completely different patent with totally unrelated inventors. (Defs.' Mem. in

17  Supp. S.J. at 32.) Defendants never address why a reexamination request for a different patent

18  _____

19  [11] Defendants seem to assume, throughout their indefiniteness arguments, that litigants' disagreement regarding the meaning of claim terms is somehow indicative of indefiniteness.

20  Considering all patent infringement litigants disagree as to the meaning of every disputed claim term during claim construction, this cannot establish indefiniteness:

21      It may of course occur that persons experienced in a technologic field will
22      have divergent opinions as to the meaning of a term, particularly as
        narrow distinctions are drawn by the parties or warranted by the
23      technology. Patent disputes often raise close questions requiring
        refinement of technical definitions in light of particular facts. The judge
24      will then be obliged to decide between contending positions; a role
        familiar to judges. But the fact that the parties disagree about claim scope
25      does not of itself render the claim invalid.

26  *Verve, L.L.C. v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002); *see also, North Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993) ("[W]hile the parties in

27  the midst of a dispute have disagreed concerning the meaning of the claims, the claims are not so lacking in clarity as to be invalid [as indefinite.]").

28

MILW_7514280.4

1    filed in 2004 is relevant to a determination focused many years earlier. They do not because they

2    cannot – the law is clear that it is the time of filing that is critical. *Howmedica*, 401 F.3d at 1372.

3            Lastly, Defendants citation of deposition testimony from Plaintiffs' experts regarding

4    figures and structures unrelated to the patents-in-suit is completely irrelevant to indefiniteness.

5    (Defs.' Mem. in Supp. S.J. 33-35.) During expert depositions, Defendants repeatedly questioned

6    Plaintiffs' experts as to whether portions of stent elements excerpted from various pieces of prior

7    art and products were "U-shaped." The Defendants' argument again betrays a fundamental

8    misunderstanding of the law of indefiniteness. The testimony in question does not relate to the

9    <u>definition</u> of the term "U-shaped" – all witnesses agree on the definition of that term, and it

10   cannot therefore be indefinite. Rather, the testimony cited by the Defendants relates to the

11   <u>application</u> of the properly defined term to the structure. That there is a <u>factual</u> dispute about this

12   issue does not render the claim indefinite – indeed, that is often the case when the finder of fact

13   is asked to decide disputed issues relating to infringement or anticipation. (*See* n.11 above.)

14           Defendants' burden of proving indefiniteness is a heavy one. *See, e.g., Amgen Inc. v.*

15   *Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) ("The standard of

16   indefiniteness is somewhat high; a claim is not indefinite merely because its scope is not

17   ascertainable from the face of the claims.") Indeed, the Federal Circuit has upheld claim terms

18   unquestionably more ambiguous than "U-shaped." *See Exxon*, 265 F.3d at 1374 (deciding "to

19   increase substantially," "for a period sufficient," and "substantial absence" all sufficiently

20   definite); *Verve*, 311 F.3d at 1120 (holding "substantially constant wall thickness" not

21   indefinite); *Andrew Corp.*, 847 F.2d at 822 (finding "substantially equal" and "closely

22   approximate" do not render claims invalid). Accordingly, there can be no dispute that the

23   specific, structural, "U-shaped" claim limitation that the parties agree meaning shaped like the

24   letter "U" meets the requirements of §112, ¶2.

## CONCLUSION

Defendants' Motion for Summary Judgment should be denied in its entirety.

25

26

27

28

PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT
CASE NO. 06-01066-PJH

MILW_7514280.4

DATE:  August 20, 2008                    FOLEY & LARDNER LLP

                                          By:  s/ Cynthia J. Franecki
                                               Cynthia J. Franecki

                                          Attorneys for Plaintiffs Medtronic
                                          Vascular, Inc., Medtronic USA, Inc.,
                                          Medtronic, Inc., and Medtronic Vascular
                                          Galway, Ltd.

DATE:  August 20, 2008                    KATTEN MUCHIN ROSENMAN LLP

                                          By:  s/ Timothy J. Vezeau
                                               Timothy J. Vezeau

                                          Attorneys for Plaintiff evYsio Medical
                                          Devices ULC

36