1    FINNEGAN, HENDERSON, FARABOW,               FISH & RICHARDSON PC
        GARRETT & DUNNER, L.L.P.                  225 Franklin Street
2    3300 Hillview Avenue                         Boston, Massachusetts  02110-2804
     Palo Alto, California  94304                 Tel: (617) 542-5070; Fax: (617) 542-8906
3    Tel:  (650) 849-6600; Fax:  (650) 849-6666   Frank E. Scherkenbach (Bar No. 142549)
     Robert F. McCauley III (Bar No. 162056)      scherkenbach@fr.com
4    robert.mccauley@finnegan.com                 Kurt L. Glitzenstein (*pro hac vice*)
                                                  kurt.glitzenstein@fr.com
5    FINNEGAN, HENDERSON, FARABOW,               Elizabeth A. Brown (#193540)
        GARRETT & DUNNER, L.L.P.                  Elizabeth.brown@fr.com
6    901 New York Avenue, NW                      Adam J. Kessel (*pro hac vice*)
     Washington, DC  20001                        Kessel@fr.com
7    Tel:  (202) 408-4000; Fax: (202) 408-4400
     Gerald F. Ivey (pro hac vice)                Attorneys for Intervenor-Plaintiff
8    gerald.ivey@finnegan.com                     Boston Scientific Corporation
     Michael A. Morin (pro hac vice)
9    michael.morin@finnegan.com
     James R. Barney (pro hac vice)
10   james.barney@finnegan.com

11   Attorneys for Defendants
     Abbott Cardiovascular Systems Inc.,
12   Abbott Laboratories, and Abbott Vascular, Inc.

13
                        UNITED STATES DISTRICT COURT
14                    NORTHERN DISTRICT OF CALIFORNIA
                          SAN FRANCISCO DIVISION
15
     MEDTRONIC VASCULAR, INC.                     CASE NO. 06-01066-PJH (EMC)
16   MEDTRONIC USA, INC., MEDTRONIC, INC.,
     MEDTRONIC VASCULAR GALWAY, LTD.,            **ABBOTT AND BSC'S REPLY IN**
17   and EVYSIO MEDICAL DEVICES, ULC             **SUPPORT OF THEIR MOTION FOR**
                                                  **SUMMARY JUDGMENT OF**
18                  Plaintiffs/Counterclaim-      **INVALIDITY**
                    Defendants
19
            v.                                    [REDACTED FOR PUBLIC VIEWING]
20
     ABBOTT CARDIOVASCULAR SYSTEMS
21   INC., ABBOTT LABORATORIES, and
     ABBOTT VASCULAR, INC.
22                                                **Date:     September 24, 2008**
                                                  **Time:     9:00 a.m.**
23                  Defendants/Counterclaim-      **Place:    Courtroom 3**
                    Plaintiffs                    **Judge:    Honorable Phyllis J. Hamilton**
24
            and
25
     BOSTON SCIENTIFIC CORPORATION
26
                    Intervenor-Plaintiff
27

28

1

**TABLE OF CONTENTS**

2    I.   INTRODUCTION ...................................................................................................1

3    II.  ARGUMENT .........................................................................................................2

4          A.   There Are No Genuine Factual Disputes Precluding Summary Judgment That
                Wijay Anticipates Most of the Asserted Claims.........................................2
5
6               1.   Wijay Anticipates Claims 11, 13, 15, and 16 of the '255 Patent................2

7               2.   Wijay Anticipates Claims 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41,
                     55 and 56 of the '037 Patent ...........................................................3

8          B.   There Are No Genuine Factual Disputes Precluding Summary Judgment That
                the Remaining Claims Are Obvious in View of Wijay, Either Alone or in
9               Combination With Fischell '442 or Israel '303 .....................................7

10              1.   *KSR* Did Not Render the Obviousness Analysis "More Fact Intensive"
                     or Less Amenable to Resolution on Summary Judgment...........................7
11
12              2.   Most of Plaintiffs' Arguments Are Moot Because They Ignore That
                     Wijay and Israel Already Have Non-Sinusoidal, Curved Connectors........8

13              3.   There Are No Disputed Facts Precluding a Finding That Non-
                     Sinusoidal, U-Shaped, and "Orthogonal" U-Shaped Flexure Members
14                   Had an Established Function in 1996, Which Is the Same Function
                     Used in the Claimed Designs ...........................................................9
15
16              4.   Because Non-Sinusoidal, U-Shaped, and "Orthogonal" U-Shaped
                     Flexure Members Were Known in 1996 and Had an Established
17                   Function, the Use of Those Features for Their Established Function
                     Would Have Been Obvious as a Matter of Law .......................................11

18              5.   Plaintiffs Do Not Dispute That the Dependent Claims Are Obvious
                     Modifications of the Independent Claims.................................................15
19
20              6.   Plaintiffs' Secondary Considerations Fail to Create a Genuine Issue of
                     Material Fact Precluding Summary Judgment...........................................16

21         C.   The "U-Shaped" Limitation Is Indefinite Because Validity Requires a Definite
                Scope, Not Just a Definition ............................................................18
22
23   III. CONCLUSION....................................................................................................20

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

**CASES**

4

*Aero Products Int'l, Inc. v. Intex Recreation Corp.*,
5
    466 F.3d 1000 (Fed. Cir. 2006) ................................................................. 19

6
*Andrew Corp. v. Gabriel Electronics, Inc.*,
    847 F.2d 819 (Fed. Cir. 1988) ........................................................... 19, 20

7
*Comcast Cable Commc'ns Corp. v. Finistar Corp.*,
8
    No. C-06-04206, 2008 WL 2740324 (N.D. Cal. July 11, 2008) ........................ 16-17, 18

9
*Cordis Corp. v. Medtronic AVE, Inc.*,
    511 F.3d 1159 (Fed. Cir. 2008) ................................................................. 10

10
*Desper Prods., Inc. v. QSound Labs, Inc.*,
11
    157 F.3d 1325 (Fed. Cir. 1998) ................................................................... 5

12
*Friskit, Inc. v. RealNetworks, Inc.*,
    499 F. Supp. 2d 1145 (N.D. Cal. 2007) .............................................. 17, 18

13
*Halliburton Energy Servs., Inc. v. M-I LLC*,
14
    514 F.3d 1244 (Fed. Cir. 2008) ........................................................... 18, 20

15
*Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000) ..................................................................... 5

16
*Intellicall, Inc. v. Phonometrics, Inc.*,
17
    952 F.2d 1384 (Fed. Cir. 1992) ................................................................... 2

18
*Intervet America, Inc. v. Kee-vet Laboratories, Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989) ................................................................... 5

19
*J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*,
20
    106 F.3d 1563 (Fed. Cir. 1997) ................................................................. 16

21
*KSR Int'l Co. v. Teleflex, Inc.*,
    127 S. Ct. 1727 (2007) ................................................... 7, 8, 11, 12, 13

22
*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
23
    485 F.3d 1157 (Fed. Cir. 2007) ................................................................. 18

24
*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    481 F.3d 1371 (Fed. Cir. 2007) ................................................................. 11

25
*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*,
26
    139 F.3d 877 (Fed. Cir. 1998) ................................................................. 18

27
*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005) ................................................................... 2

28

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
 469 F.3d 978 (Fed. Cir. 2006) ................................................................................................. 4

*Pfizer, Inc. v. Apotex, Inc.*,
 480 F.3d 1348 (Fed. Cir. 2007) ....................................................................................... 11, 18

*PureChoice, Inc. v. Honeywell Int'l, Inc.*,
 No. 2:06-CV-244, 2008 WL 190317 (E.D. Tex. Jan. 22, 2008) ............................................ 4

*Rockwell Int'l Corp. v. U.S.*,
 37 Fed. Cl. 478 (Ct. Fed. Cl. 1997) ...................................................................................... 18

*Springs Window Fashions LP v. Novo Indus., L.P.*,
 323 F.3d 989 (Fed. Cir. 2003) ............................................................................................ 5, 6

*Tokyo Keiso Co., Ltd. v. SMC Corp.*,
 533 F. Supp. 2d. 1047 (C.D. Cal. 2007) ............................................................................... 18

*Tritek Techs., Inc. v. U.S.*,
 No. 02-255 C, 2004 WL 1299571 (Ct. Fed. Cl. June 4, 2004) .............................................. 8

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3     Anticipation is ripe for resolution on summary judgment.  For claims 11, 13, 15, and 16 of

4   the '255 patent, Plaintiffs' opposition rests entirely on two claim-construction issues: "interposed"

5   and "comprising."  If "interposed" has its ordinary meaning (as this Court has already ordered) and if

6   "comprising" has its typical, open-ended meaning, then there is no factual dispute that these '255

7   claims are anticipated by Wijay.  Similarly, for claims 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41,

8   55, and 56 of the '037 patent, Plaintiffs' sole dispute is whether Wijay discloses a "non-sinusoidal"

9   flexure member.  The evidence shows it does for two independent reasons: (1) it expressly discloses

10   a "one-bend" flexure member, which Plaintiffs do not dispute is non-sinusoidal; and (2) the flexure

11   members illustrated in Figures 2 and 2A of Wijay include a *part* that provides flexibility that is non-

12   sinusoidal.  Either basis provides sufficient grounds to grant summary judgment of anticipation.

13     Obviousness of the remaining claims is likewise ripe for resolution on summary judgment.

14   Plaintiffs attempt to create the specter of disputed material facts by amassing dozens of exhibits,

15   expert reports, and deposition excerpts, then asking this Court to deny summary judgment because

16   their evidence is "thick."  (Dkt. No. 448 at 26.)  The quantity of Plaintiffs' evidence is irrelevant,

17   however, because *none of it is material to the present motion*.

18     For example, whether it would have been obvious to replace straight connectors with curved

19   connectors in 1996 (a central focus of Plaintiffs' opposition) is legally irrelevant because Abbott and

20   BSC's obviousness position is based on the prior-art Wijay design, which already *has* curved

21   connectors.  Thus, the only issue is whether it would have been obvious to modify the curved

22   connectors of Wijay to achieve the trivial variants recited in the asserted claims, e.g., by tweaking the

23   sides to be more "orthogonal" as shown in the prior art Israel patent.

24     While Plaintiffs criticize Abbott and BSC's evidence as being "thinner" than Plaintiffs', that

25   is only because Abbott and BSC's positions are simple and straightforward.  Indeed, a single

26   reference—Wijay—anticipates most of the asserted claims and renders the remaining claims

27   obvious.  Any arguable differences are obvious based on the straightforward teachings of either

28   Israel or Fischell '442.  Summary judgment of invalidity is therefore appropriate.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.     ARGUMENT

### A.     There Are No Genuine Factual Disputes Precluding Summary Judgment That Wijay Anticipates Most of the Asserted Claims

#### 1.     Wijay Anticipates Claims 11, 13, 15, and 16 of the '255 Patent

Plaintiffs' effort to distinguish claims 11, 13, 15, and 16 of the '255 patent from Wijay turns entirely on two issues of claim construction.[1]  As such, the Court can and should reach both arguments on summary judgment.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed. Cir. 1992).

First, Plaintiffs argue that Abbott and BSC's position on "interposed" would "require[] the Court to interpret the term 'interposed' in a way that is inconsistent with the intrinsic record." (Dkt. No. 448 at 1.)  Yet Plaintiffs have never before suggested that any special or unusual construction is warranted for "interposed."  To the contrary, Plaintiffs stipulated—and the Court has *ordered*—that "interposed" has its ordinary meaning.  (Dkt. No. 283 at 19.)  As explained in detail in Abbott and BSC's Motion, according to the ordinary meaning of "interposed," Wijay has a flexure member interposed between two straight portions.  (Dkt. No. 408 at 12-14.)  Plaintiffs offer no response to this point in their opposition brief.  (Dkt. No. 448 at 30.)  It is thus uncontested that, according to the *ordinary* meaning of "interposed," Wijay has "interposed" flexure members as required by the as-construed asserted claims of the '255 patent.  Plaintiffs' only dispute is whether the ordinary meaning should apply.  But that is an issue of claim construction—a pure question of law—which has already been resolved and warrants summary judgment in Abbott and BSC's favor.  *Intellicall,* 952 F.2d at 1387.

The second claim construction issue concerns the common, open-ended patent term "comprises."  It is black-letter patent law that "comprises" means "includes."  *See Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005).  Plaintiffs argue, however, that "[t]he only way to get a U-shape from Wijay's sinusoidal flexure member is to carve

---

[1] Plaintiffs mistakenly contend that Abbott and BSC concede Wijay does not anticipate claim 16 of the '255 patent.  (Dkt. No. 448 at 26)  In fact, Abbott and BSC very clearly explained that Wijay anticipates claim 16 (Dkt. No. 408 at 16), which only adds the requirement of "a balloon catheter having an expandable portion." (Dkt. No. 402, Ex. 20 at col. 9:16-20.)

the S-shape into pieces." (Dkt. No. 448 at 30.)  By acknowledging that it is possible to "get a U-shape" from "Wijay's sinusoidal feature" (*id.*), Plaintiffs concede that Wijay "comprises" a U-shaped portion.  That is all that claim 11 requires—a flexure member that "*comprises* an arcuate U-shape." (Dkt. No. 402, Ex. 50 at col. 15:32-34.)  Indeed, Plaintiffs' own expert, Dr. Rothman, acknowledged this in his expert report:



(Ex. 56 at 80) (emphasis added).  This claim-construction dispute presents a pure question of law, which can and should be resolved in Abbott and BSC's favor.

On the proper claim construction, Plaintiffs do not dispute that Wijay has flexure members that "comprise" U-shaped portions that are "interposed" between two straight portions.  Accordingly, since Plaintiffs do not dispute any of the other required limitations, this Court should grant summary judgment that Wijay anticipates claims 11, 13, 15, and 16 of the '255 patent.

> **2.    Wijay Anticipates Claims 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41, 55 and 56 of the '037 Patent**

As explained in detail in Abbott and BSC's Motion (Dkt. No. 408 at 16-21), Wijay anticipates claims 1, 8, 9, 12, 13, 17, 20, 22, 29, 30, 33, 34, 41, 55, and 56 of the '037 patent.  In their response, Plaintiffs' sole argument to the contrary is that Wijay fails to disclose a "non-sinusoidal" flexure member.  (Dkt. No. 448 at 27-30.)  Plaintiffs are wrong, however, for two independent reasons, either of which warrants summary judgment in Abbott and BSC's favor.

*First*, Wijay expressly states that the crossties can have "**one** or more bends." (Dkt. No. 402, Ex. 20 at col. 8:53-57.)  A shape with only one bend is necessarily non-sinusoidal because a sinusoid must have two bends.  (*See* Dkt. No. 408 at 18.)  Plaintiffs do not dispute this fact in their opposition.

1    Instead, Plaintifffs repeat the fallacious and unsupported argument that the phrase "one or more

2    bends" in Wijay refers to Figures 19 and 20 alone.[2]   As explained in Abbott and BSC's Response to

3    Plaintiffs' Summary Judgment Motion, however, that disclosure in Wijay clearly refers to the

4    "various embodiments" of stents disclosed in Wijay, including the "multi-ring" designs of Figures 2

5    and 2A.  (Dkt. No. 441 at 4-6; *see also* Dkt. No. 402, Ex. 20, col. 8:53-57.)  This issue need not go to

6    a jury because the text of Wijay is absolutely clear on this point and Plaintiffs have presented no

7    credible evidence or argument to the contrary.  *See, e.g.*, *Optivus Tech., Inc. v. Ion Beam*

8    *Applications S.A.*, 469 F.3d 978, 990 (Fed. Cir. 2006).

9            *Second*, even setting aside Wijay's disclosure that the crossties can have "**one** or more

10   bends," the stents depicted in Figures 2 and 2A of Wijay include "non-sinusoidal" flexure members

11   according to the Court's claim construction, which requires that a flexure

12   member be "*part* of a longitudinal portion that provides flexibility."  As

13   explained fully in Abbott and BSC's Motion (Dkt. No. 408 at 16-17) and in

14   Abbott and BSC's Response to Plaintiffs' Motion (Dkt. No. 441 at 11-12), it is

15   undisputed that the portion of Wijay highlighted to the right in blue is (1) *part* of

16   a longitudinal portion that (2) provides flexibility—thus, it is a "flexure

17   member" under the Court's construction.  It is further undisputed that the blue portion is "non-

18   sinusoidal," i.e., not S-shaped.  Accordingly, the blue portion is a "non-sinusoidal flexure member."

19           A straightforward reading of the Court's construction compels this result, and the prosecution

20   history confirms it.  Specifically, Drs. Penn and Ricci told the PTO—and thus the public—that "the

21   independent claims may be read on Figure 8."  (Dkt. No. 402, Ex. 32 at AB0732816.)  In other

22   words, they argued that the "non-sinusoidal" claims are supported by the S-shaped flexure members

23

24   ───────────────

25       [2]  This illustrates why the Court should give little weight to the fact that Wijay was
     "considered" by the PTO.  There is no indication that the Examiner specifically considered the "one
26   or more bends" language in Wijay.  Moreover, because Drs. Penn and Ricci failed to properly
     document their private interviews with the Examiner, the public has no way of knowing whether the
27   "one or more bends" language was ever discussed during those interviews or what Drs. Penn and
     Ricci said about it.  *See PureChoice, Inc. v. Honeywell Int'l, Inc.*, No. 2:06-CV-244, 2008 WL
28   190317 (E.D. Tex. Jan. 22, 2008).  It is entirely possible, for instance, that they told the Examiner the
     same falsehood that they tell here, i.e., that "one or more bends" is limited to Figures 19 and 20.

of Figure 8.  Plaintiffs admit that this assertion was made in furtherance of an argument "about a priority determination" (Dkt. No. 448 at 29), and this fact should not be overlooked.  Namely, Drs. Penn and Ricci voluntarily made this statement to the PTO for a *self-serving reason*—to secure an earlier priority date for their allowed claims.  Their litigation-induced claim of "mistake" should therefore be viewed with great skepticism.  *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).

Contrary to Plaintiffs' argument, this case is not like *Intervet America, Inc. v. Kee-vet Laboratories, Inc.*, 887 F.2d 1050, 1053-54 (Fed. Cir. 1989), where the applicant made an erroneous statement that was undisputedly incorrect on its face and not relied upon by the Examiner.  Here, the statement in question is not undisputedly erroneous but, in fact, is fully consistent with the sworn testimony of Dr. Ricci and Plaintiffs' expert, Dr. Eberhart.  Accordingly, this case is more akin to *Hockerson-Halberstadt, Inc. v. Avia Group International, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000), where the Federal Circuit distinguished *Intervet* on the ground that "a reasonable competitor reading the . . . prosecution history would have no reason to believe that a mistake was made or that the inventor meant anything other than what he said."  *Accord Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1335 (Fed. Cir. 1998) (distinguishing *Intervet* on similar grounds).

Far from an undisputed mistake, Plaintiffs and their experts have endorsed the position originally taken by the applicants before the PTO.  Specifically, they have testified and asserted, time and time again, that it is proper to characterize a U-shaped *portion* of an S-shaped curve as a "flexure member:"



**Dr. Ricci under oath: "U-shaped flexure member." (Dkt. No. 402, Ex. 23 at 261.)**

**Plaintiffs' Expert Dr. Eberhart under oath: B is a "flexure member" (Dkt. No. 402, Ex. 46 at 255.)**



**Plaintiffs' Infringement Contentions against J&J: Blue portion of curved connector is a "flexure member," but "may comprise more or less of the overall longitudinal strut" (Dkt. No. 442, Ex. 10 at 8 n.5 and 24 (emphasis added).)**

1    (Dkt. No. 408 at 19-20, Dkt. No. 441 at 8-9.)

2           Plaintiffs' response ignores this evidence entirely.  Instead, Plaintiffs cling to two vague and

3    irrelevant comments in the prosecution history.  In the first—which is reported only in a cryptic, one-

4    sentence "summary" of an otherwise non-public interview with the Examiner—the applicants

5    allegedly argued that "the prior art of reference [which included Wijay, among other references] does

6    not disclose a flexure member being non-sinusoidal, arcuate and isolated to at least one adjacent

7    circumferential portion."  (Ex. 57 at AB0732744.)  As explained in Abbott and BSC's Response to

8    Plaintiffs' Motion, this statement refers to a combination of three features and does not equate to a

9    representation that Wijay specifically lacks a non-sinusoidal flexure member.  (Dkt. No. 441 at 10-

10   11.)  In any event, it certainly cannot erase the applicants' later, unequivocal statement that the "non-

11   sinusoidal" claims read on Figure 8.  *See Springs Window*, 323 F.3d at 995.

12          Second, using creative ellipses, Plaintiffs misstate the Examiner's reasons for allowance.

13   Specifically, Plaintiffs contend that the Examiner said: "The prior art 'has failed to disclose . . . a

14   <u>non-sinusoidal</u> flexure member.'"  (Dkt. No. 448 at 29) (ellipses and emphasis added by Plaintiffs).

15   What the Examiner *actually* said, however, was that none of the art contained *all* of the features of

16   the claims in combination (i.e., that he was allowing the claims):

17                  The prior art of reference has failed to discloses [*sic*] an unexpanded
                    stent comprising a series of undulating circumferential portions
18                  defining peaks and valleys, a plurality of longitudinal portion [*sic*]
                    connecting said series of undulating longitudinal circumferential
19                  portions, wherein at least one longitudinal portion connects a peak in a
                    first circumferential portion with a valley in a second circumferential
20                  portion adjacent to the first circumferential portion and wherein each
                    longitudinal portion has a non-sinusoidal flexure member interposed
21                  between a pair of straight strut portions which are disposed parallel to
                    the longitudinal axis of the stent.
22
23   (Ex. 57 at AB0732803.)  Plaintiffs could just as easily have used their creative ellipses to claim that

     the Examiner allowed the claims because "The prior art has failed to disclose . . . <u>an unexpanded</u>
24
     <u>stent</u>," which would be equally false.
25
            In short, there are two independent bases on which this Court should invalidate claims 1, 8, 9,
26
27   12, 13, 17, 20, 22, 29, 30, 33, 34, 41, 55, and 56 of the '037 patent as anticipated by Wijay.  First,

28   Wijay expressly discloses a non-sinusoidal flexure member because it states that the crossties in

Figures 2 and 2A can have "**one** or more bends" (Dkt. No. 402, Ex. 20 at col. 8:55-57), and it is

undisputed that a "one-bend" flexure member is non-sinusoidal.  Second, the stents depicted in

Figures 2 and 2A each include non-sinusoidal flexure members according to the plain application of

this Court's claim construction, the prosecution history, and multiple admissions by Plaintiffs and

their experts.  Because Plaintiffs do not dispute any other limitation in these asserted claims, this

Court should grant summary judgment that they are anticipated by Wijay.

> **B.     There Are No Genuine Factual Disputes Precluding Summary Judgment That the Remaining Claims Are Obvious in View of Wijay, Either Alone or in Combination With Fischell '442 or Israel '303**

>> **1.     *KSR* Did Not Render the Obviousness Analysis "More Fact Intensive" or Less Amenable to Resolution on Summary Judgment**

Plaintiffs are incorrect that "the obviousness inquiry is even more fact intensive after *KSR*."

(Dkt. No. 448 at 8.)  Not surprisingly, they fail to cite a single post-*KSR* decision to support this

erroneous assertion.  *KSR*, after all, involved a determination of obviousness on summary judgment.

The Supreme Court made clear that summary judgment of obviousness is appropriate in cases such

as this, where the obviousness of the claims is apparent in view of the prior art:

> To the extent the court understood the *Graham* approach to exclude the possibility of summary judgment when an expert provides a conclusory affidavit addressing the question of obviousness, it misunderstood the role expert testimony plays in the analysis.  In considering summary judgment on that question the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact.  That is not the end of the issue, however.  The ultimate judgment of obviousness is a legal determination.  **Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.**

*KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1745-46 (2007) (internal citations omitted) (emphasis

added).

Ignoring this portion of *KSR*, Plaintiffs instead recite a passage from *KSR* to the effect that

courts must sometimes look to multiple factors "all in order to determine whether there was an

apparent reason to combine the known elements in the fashion claimed by the patent at issue."  (Dkt.

No. 448 at 9, quoting *KSR*, 127 S. Ct. at 1740-41.)  Yet that analysis is only necessary in cases—

ABBOTT AND BSC'S REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
Case No. C-06-01066 PJH (EMC)

1    unlike that presented in *KSR* and unlike the case here—where the claimed subject matter involves

2    "more than the simple substitution of one known element for another or the mere application of a

3    known technique to a piece of prior art ready for the improvement."  *Id.*

4        Here, the claimed subject matter involves, at most, the simple substitution of one known

5    design element for another having the identical function.  This is precisely the type of case the

6    Supreme Court held in *KSR* is amenable to summary judgment because, ultimately, obviousness is a

7    question of law.

8        ### 2.    Most of Plaintiffs' Arguments Are Moot Because They Ignore That Wijay and Israel Already Have Non-Sinusoidal, Curved Connectors

9

10       Plaintiffs devote much of their opposition trying to convince the Court that nobody in 1996

     would have conceived of substituting curved connectors for straight connectors in a ring-and-link

11

12   design because such a design change would have allegedly been considered unpredictable and

13   "counterintuitive."  (Dkt. No. 448 at 4-8, 16-17.)  They likewise contend that no one in 1996 would

14   have thought to use "non-sinusoidal" or "U-shaped" connectors in place of S-shaped connectors, for

15   these same reasons.  (*Id.* at 13-14, 16-21.)  All of these assertions are legally irrelevant, however,

16   because Abbott and BSC's obviousness analysis is based on Wijay, either alone or in combination

17   with Israel, and both of these prior-art references include non-sinusoidal, U-shaped connectors.

18   (Dkt. No. 402, Ex. 20, Figs. 2-2A; *id*, Ex. 19, Figs. 1-4, 7-8.)  In short, even accepting Plaintiffs'

19   flawed premise that the use of curved, non-sinusoidal connectors in 1996 was inventive, that leap

20   had already been made by Wijay and Israel.

21       Because non-sinusoidal and U-shaped connectors are already included in Wijay and Israel,

22   any argument that no one would have thought of these elements in 1996 must be rejected.  Simply

23   put, the references themselves rebut this assertion conclusively.[3]  It is indisputable that those skilled

24
     _____

25       [3] Plaintiffs frequently complain that Abbott and BSC have produced no "evidence" to support
     their obviousness analysis.  That is untrue.  Not only have Abbott and BSC pointed to a wealth of
26   evidence including the sworn testimony of Plaintiffs' own witnesses and experts, the prior-art
     references themselves are evidence *per se*.  Indeed, they are the best type of evidence because they
27   are unbiased and contemporaneous with the claimed invention.  *See Tritek Techs., Inc. v. U.S.*, No.
     02-255 C, 2004 WL 1299571, at *12 (Ct. Fed. Cl. June 4, 2004) (describing the prior art as
28   "impartial" and "unbiased").

ABBOTT AND BSC'S REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
Case No. C-06-01066 PJH (EMC)

1   in the art *did* think of using curved connectors, including "non-sinusoidal" and "U-shaped"

2   connectors, before March of 1996.  Indeed, the very assertion that no one in 1996 would have

3   thought to use "non-sinusoidal" or "U-shaped" connectors flatly ignores that, as early as December

4   1995, Dr. Penn was *personally involved* in clinical trials of the NIR stent (an embodiment of Israel

5   '303), which included non-sinusoidal, U-shaped connectors.  (Dkt. No. 408 at 5, Dkt. No. 402, Ex.

6   24.)  Indeed, Dr. Ricci's contemporaneous notes reflect that that the use of such curved connectors

7   was a ███████████████████████████

8   ██████████████████████████████████████

9   ██████████████████████████████████████

10  ██████████████████████████████████████

11  ██████████████████████████████████████

12  (Ex. 60 at L001039.)

13          **3.      There Are No Disputed Facts Precluding a Finding That Non-Sinusoidal,
                      U-Shaped, and "Orthogonal" U-Shaped Flexure Members Had an
14                    Established Function in 1996, Which Is the Same Function Used in the
                      Claimed Designs**

15          Plaintiffs do not dispute that Israel discloses orthogonal, U-shaped flexure members.  Nor do

16  they dispute that Israel *explains the function* of these orthogonal, U-

17  shaped flexure members in unmistakable terms:



18
19          During bending, the loops 14-20 to the right of point A
            change shape in order to compensate for the
20          differences in length between the inside and outside
            curves.  For example, loops 18*i* and 20*i* near the inside
21          of the curve are closer together than loops 18*o* and 20*o*
            on the outside of the curve, which expand.

22  (Dkt. No. 402, Ex. 19, col. 3:37-41.)  Thus, Israel explains that the

23  expected function of an orthogonal, U-shaped connector in a ring-and-link design is to extend and

24  compress as the stent rounds a curve to provide flexibility.

25          In addition, contrary to Plaintiffs' assertion, Israel discloses a curved connector (shown at

26  right).  Thus, it is not necessary to debate whether Israel teaches rounding

27  of the shoulders of the blue connectors shown above because Israel



28  plainly discloses curved connectors.  (*Id.*, Fig. 8.)

It is undisputed that Dr. Penn, himself, recognized the established function of U-shaped connectors when he described how the NIR stent worked in an article summarizing his clinical trials from December 1995 to March 1996:

 

**Figure 2. A,** Crimped stent is flexible by virtue of differential elongation of vertical loops (note the difference in opening of the vertical loop inside [1] and outside [2] the curve). **B,** Stent expanded in a curve shows conformity to curvature by the same differential elongation (note the difference in length of the loop inside [1] and outside [2] the curve).

Dr. Ricci likewise recognized and documented the established function of U-shaped connectors, which he described as being a ████████████████████ (Ex. 60 at L001039; Ex. 58 at 100-01.)  Dr. Ricci has subsequently admitted that the NIR stent includes U-shaped flexure members.  (Ex. 59 at 22-23.)  *See also Cordis Corp. v. Medtronic AVE, Inc.*, 511 F.3d 1159, 1172-73 (Fed. Cir. 2008) (holding that the NIR stent has "U-shaped" connectors).

None of this is surprising given the simplicity of the geometric shapes involved here.  Indeed, Plaintiffs' own expert, Dr. Eberhart, admitted that a person of ordinary skill in the art in 1996 would have known that "[t]he U-shaped flexure member is one of the simplest structures that can be used to introduce flexibility into a beam." (Dkt. No. 402, Ex. 48 at ¶ 22; Dkt. No. 402, Ex. 46 at 236.)

Plaintiffs' only response to this overwhelming evidence is to assert that "Defendants cite no supporting evidence" on this issue and, therefore, have "failed to carry their burden of proof."  (Dkt. No. 448 at 13.)  Yet Plaintiffs have it exactly backwards.  What is recited above is *evidence* that U-shaped connectors, including "orthogonal" U-shapes, were known and had an established function in 1996.  This evidence comes directly from the prior art and from Plaintiffs' own witnesses and contemporaneous documents.  Plaintiffs, in contrast, have offered *nothing* in rebuttal except for attorney argument and irrelevant facts.

First, Plaintiffs assert that it is a "'scientific fact' that an S-shaped flexure member would be more flexible than a similarly dimensioned U-shaped flexure member." (Dkt. No. 448 at 13.)  Even

1   accepting that premise as true, that does not change the fact that Israel discloses orthogonal, U-

2   shaped flexure members and explains their function in clear, unmistakable terms.  Therefore, this

3   argument cannot create a disputed issue of *material* fact.  *See Liebel-Flarsheim Co. v. Medrad, Inc.*,

4   481 F.3d 1371, 1381 (Fed. Cir. 2007).

5          Second, Plaintiffs point to the testimony of Abbott engineers Ta and Gomez, who declined to

6   speculate, in hypothetical terms, as to whether replacing an unspecified straight connector with an

7   unspecified "shaped" connector in an unspecified stent design would necessary enhance flexibility.

8   (Dkt. No. 448 at 18-19.)  Again, even accepting as true that unspecified "shaped" connectors do not

9   *necessarily* enhance flexibility in every stent design (e.g., because they might interfere with other

10  aspects of the design), that does not change the fact that Israel discloses, as a *general* principal, that

11  orthogonal, U-shaped connectors can be used to enhance flexibility by providing extension and

12  compression as the stent rounds a bend.  *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed.

13  Cir. 2007) ("[T]he expectation of success need only be reasonable, not absolute.").  Accordingly, the

14  testimony of Ta and Gomez does not create a disputed issue of *material* fact.

15         In the end, Plaintiffs simply cannot deny that the function of curved connectors—including

16  U-shaped connectors and "orthogonal," U-shaped connectors—was known in 1996.

17                **4.    Because Non-Sinusoidal, U-Shaped, and "Orthogonal" U-Shaped Flexure**
                         **Members Were Known in 1996 and Had an Established Function, the Use**
18                       **of Those Features for Their Established Function Would Have Been**
                         **Obvious as a Matter of Law**
19

20         *KSR* instructs that patents are obvious if they merely make "predictable use of prior art

21  elements according to their established functions."  *KSR*, 127 S. Ct. at 1740.  As explained above,

22  "non-sinusoidal," "U-shaped," and "orthogonal" U-shaped flexure members were well known in the

23  art in 1996 and had an established function.  This is confirmed by the teachings of Wijay and Israel,

24  by the contemporaneous documentation and sworn testimony of Drs. Penn and Ricci, and by the

25  testimony of Plaintiffs' own experts in this case, all of which stands unrebutted.

26         The starting point of the obvious analysis is Wijay.  As explained above, Wijay expressly

27  discloses the use of non-sinusoidal (i.e., "one-bend") flexure members in an in-phase, ring-and-link

28  design.  For this reason, Wijay clearly anticipates most of the asserted claims in this case.  The

1   obviousness inquiry is thus quite narrow (contrary to Plaintiffs' opposition brief, which makes it

2   seem as if obviousness is the central question on every claim).  With respect to the independent

3   claims, Abbott and BSC's obviousness arguments can be broken into three parts.  First, with respect

4   to claim 43, would it have been obvious to modify the "one-bend" flexure members in Wijay to have

5   sides that run "substantially orthogonal" to the longitudinal axis?  Second, to the extent Wijay is

6   deemed *not* to expressly disclose a "one-bend" flexure member, would a non-sinusoidal flexure

7   member have been obvious in view of Israel?  Finally, to the extent "interposed" is given the

8   unorthodox definition asserted by Plaintiffs rather than its *ordinary* meaning as ordered by the Court,

9   would this feature have been obvious from either Israel or Fischell '442?  On each of these points,

10  Plaintiffs have failed to raise a genuine issue of material fact precluding summary judgment.

11          As explained in Abbott and BSC's Motion (Dkt. No. 408 at 26), it would have been obvious

12  to a person of ordinary skill in the art in 1996 to tweak the sides of the one-bend flexure member of

13  Wijay to run more "orthogonal" to the longitudinal axis, as expressly taught in Israel.  Specifically,

14  there is no dispute that Israel discloses "orthogonal" U-shaped flexure members.  (Dkt. No. 402, Ex.

15  19, Fig. 1; *see also* Dkt. No. 402, Ex. 35 at 131.)  And, as explained above, there is no genuine

16  dispute that Israel discloses the *function* of these orthogonal, U-shaped members, namely extension

17  and compression as the stent rounds a bend.  (Dkt. No. 402, Ex. 19, col. 3:37-41.)  Thus, independent

18  claim 43 requires nothing more than the substitution of one known design element (the orthogonal

19  U's of Israel) for another (the one-bend flexure members of Wijay).  As the Supreme Court has now

20  made clear in *KSR*, such a simple substitution of known elements for the same function is not

21  patentable.  *KSR*, 127 S. Ct. at 1740.

22          Plaintiffs contend that Abbott and BSC "do not provide evidence" on this point and "rely on

23  nothing but attorney argument."  (Dkt. No. 448 at 15.)  Again, though, it is Plaintiffs who have failed

24  to come forward with relevant evidence sufficient to raise a genuine issue of material fact.  Israel's

25  disclosure of orthogonal, U-shaped flexure members is *evidence* that this feature was known in 1996.

26  Likewise, the discussion in Israel of how these flexure members operate is *evidence* that orthogonal,

27  U-shaped flexure members had an established function in 1996.  *These facts stand unrebutted*.

28          Plaintiffs' only substantive response to the "orthogonal" issue is to assert—via the declaration

1    of Dr. Ku—that "one skilled in the art would have been concerned about adding structure to the

2    longitudinal connector that would be at a right angle to blood flow, such as a U-shaped flexure

3    member." (Dkt. No. 448 at 21.) This conclusory assertion ignores, however, that those skilled in the

4    art *were*, in fact, designing stents with curved connectors that ran perpendicular to blood flow, e.g.,

5    Wijay, Israel, and Fischell.[4] (Dkt. No. 402, Exs. 19, 20, 21.) In other words, the very feature that

6    Dr. Ku posits would have been a concern to stent designers had, in fact, already been embraced by

7    stent designers. *KSR* makes clear that summary judgment cannot be avoided simply by having "an

8    expert provide[] a conclusory affidavit addressing the question of obviousness." *KSR*, 127 S. Ct. at

9    1745. Since Plaintiffs have offered nothing more, summary judgment is appropriate that claims 43,

10   45-48, 53, and 57 are obvious based on Wijay in view of Israel.

11          The "non-sinusoidal" limitation of claims 1 and 22 follows a similar analysis. Again, Wijay

12   *expressly* discloses this limitation for two independent reasons: (1) the flexure members in Wijay can

13   have "**one** or more bends," and (2) the flexure members in Figures 2 and 2A necessarily include a

14   "non-sinusoidal" *portion* that provides flexibility. But even if Wijay is deemed not to expressly

15   disclose a "non-sinusoidal" flexure member, this feature certainly would have been obvious in view

16   of Israel. As explained above, Israel expressly discloses non-sinusoidal flexure members and

17   explains their function, i.e., extension and compression. This is unrebutted *evidence*, not attorney

18   argument. It is likewise undisputed that the patents-in-suit assign no importance to "non-sinusoidal"

19   shapes versus sinusoidal shapes and, indeed, express a preference for sinusoidal connectors. (Dkt.

20   No. 408 at 22-23.) As explained in the specification:

21              The specific shape of the flexure means disposed in the longitudinal
22              strut **is not particularly restricted** provided that it confers lateral
                flexibility to the unexpanded stent by allowing diametrically opposed
                pairs of the longitudinal struts to undergo substantially complementary
23              extension and compression.

24   _____

25          [4] Indeed, it is noteworthy that the patents-in-suit say *nothing* about this alleged "concern" of
     orienting connectors perpendicular to blood flow. The reason for that is clear; the argument was
26   developed years after the fact, in the midst of this litigation, in an attempt to create a disputed issue
     of material fact. Dr. Ku admitted there is no evidence that ████████████████████████████████
27   ████████████████████████████████████████████████ (*See, e.g.,* Ex. 61 at 87-93; *see also id.* at
     12-13, 178-79, 184-85.) Indeed, Dr. Ku fails to identify any reports of blood flow issues with the
28   products incorporating U-shaped connectors (e.g., the NIR stent) and does not explain how BSC was
     able to sell millions of NIR stents in light of this supposed design problem.

1    (Dkt. No. 402, Ex. 27, col. 3:57-62 (emphasis added).)  Thus, it is the function of the curved

2    connector that is important, not its exact shape.  And it is undisputed that Israel discloses a non-

3    sinusoidal connector *and explains its function* (i.e., extension and compression).  As explained

4    above, Dr. Penn observed this same function in his work with the NIR stent beginning in December

5    1995 (*see* Section II.B.3), and Dr. Ricci recorded in his notes that this principle was ███████████

6    ███████████  at that time (Ex. 60).

7         All of this constitutes *evidence* (regardless of whether Plaintiffs care to acknowledge it) that

8    "non-sinusoidal" connectors were known in 1996 and had an established function of enhancing

9    flexibility by allowing extension and compression of the connectors during delivery.  (*See* Section

10   II.B.3, *supra*.)  The law does not require any more than this.

11        Plaintiffs' only substantive response to this evidence is to cite Dr. Taylor's testimony that, all

12   else being equal, an S-shaped connector is more flexible than a similarly dimensioned U-shaped

13   connector.  (Dkt. No. 448 at 13-14.)  That does not change the fact that Israel discloses non-

14   sinusoidal flexure members and explains their function.  The fact that other flexible shapes might

15   also have been known in 1996 is legally irrelevant.[5]

16        Finally, with respect to the requirement in claim 22 of the '037 patent and claim 11 of the

17   '255 patent of an "interposed" flexure member, this requirement is met under the *ordinary* meaning

18   of "interposed," as explained above.  Even under the unorthodox definition proposed by Plaintiffs,

19   however, the evidence shows that this limitation amounts to nothing more than an obvious design

20   choice.  (Dkt. No. 402, Ex. 31 at 32.)

21        As explained in Abbott and BSC's Motion, Evysio admitted in the Fischell Reexamination

22   Request that it would have been a mere "design choice" to interpose a curved connector directly

23   ───────────────────

24        [5] The evidence shows that stent designers do not necessarily choose the most flexible
     connector when designing a stent.  (*See, e.g*., Dkt. No. 402, Ex. 20, col. 8:55-57 ("The crossties can

25   be a more rigid, straight design or a more flexible design incorporating one or more bends.").)
     Instead, stent designers choose a connector shape that allows the desired balance of properties (e.g.,

26   deliverability, radial strength, crimped profile, etc.) for a given stent design.  In 1996, non-sinusoidal
     and "U-shaped" connectors were among the arsenal of connector shapes that were known to stent

27   designers.  (*See, e.g.*, Dkt. No. 402, Ex. 19.)  Their function was well known, and the choice to use
     one shape versus another would have been merely a matter of design choice.  (*See, e.g.*, Dkt. No.

28   402, Ex. 20, col. 8:55-57; Dkt. No. 402, Ex. 27, col. 3:57-62.)

ABBOTT AND BSC'S REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
Case No. C-06-01066 PJH (EMC)

1  between two straight portions.  (Dkt. No. 408 at 24-25.)  Plaintiffs now contend this admission is

2  "irrelevant" because it was made during Evysio's attempt to invalidate an unrelated patent.

3  Regardless of which patent was at issue, however, the fact remains that Evysio admitted to the PTO

4  that a person of ordinary skill in the art, reading Wijay, would consider it a "design choice" to

5  interpose the flexure member directly between two straight, strut portions.

6         As a fallback, Plaintiffs argue that the Fischell Reexamination Request was premised on a

7  different priority date than the one at issue here.  Plaintiffs contend that what Evysio *really* meant to

8  say in the Fischell Reexamination Request was that the "interposed" feature was obvious based on a

9  *combination* of Wijay and the published Penn and Ricci applications.  (Dkt. No. 448 at 14.)  That is

10  revisionist history.  In fact, the Reexamination Request never even mentions the Penn and Ricci

11  applications.  Instead, Evysio told the PTO that a person of ordinary skill in the art looking at Wijay

12  *alone* would understand that the flexure member could be interposed directly between two straight

13  sections.  This is dispositive of the issue and is confirmed by Israel and Fischell '442, which likewise

14  disclose the "interposed" feature.  (Dkt. No. 402, Ex. 19, Fig. 1; Dkt. No. 402, Ex. 20, Figs. 2-2A.)

15         **5.    Plaintiffs Do Not Dispute That the Dependent Claims Are Obvious**
                   **Modifications of the Independent Claims**

16

17         With the exception of claim 17 of the '037 patent, which requires a "U-shaped" flexure

18  member, Plaintiffs do not dispute that the dependent claims would have been obvious modifications

19  to the designs claimed in the independent claims.  For example, Plaintiffs do not dispute that it would

20  have been obvious in 1996 to create flexure members with "a width less than a width of said

21  undulating circumferential portions when measured on an outer surface of the tubular wall," as

22  required by dependent claims 16, 40, and 52 of the '037 patent and claim 12 of the '255 patent.

23  (Dkt. No. 408 at 25.)  Likewise, Plaintiffs do not dispute that it would have been obvious to add a

24  medicinal coating, as recited in '037 claims 8, 29, and 45 and '255 claim 15.  (*Id.* at 16, 20-21.)

25         As for claim 17, which requires a "U-shaped" flexure member, this feature is undisputably

26  disclosed by Israel and the NIR stent and would have been obvious for the reasons explained above.

27  (*See* Section II.B.4 *supra*.)  Accordingly, if any of the independent claims of the '037 and '255

28  patent are held invalid as anticipated or obvious, the corresponding dependent claims should also be

ABBOTT AND BSC'S REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
Case No. C-06-01066 PJH (EMC)

held invalid as anticipated or obvious.

### 6.   Plaintiffs' Secondary Considerations Fail to Create a Genuine Issue of Material Fact Precluding Summary Judgment

Plaintiffs contend that certain "real world" evidence shows that no one in 1996 would have thought to modify Wijay in accordance with the teachings of Israel or Fischell.  Almost all of this evidence, however, is legally irrelevant to the obviousness inquiry.  For example, Plaintiffs devote many pages to ACS's stent development program, apparently trying to make the point that curved connectors *in general* were not obvious to stent designers in 1996.  Aside from being false,[6] that assertion is irrelevant.  The obviousness analysis in this Motion relies on Wijay and Israel, which already include curved, non-sinusoidal connectors.  Plaintiffs' alleged "real world" evidence cannot erase those curved connectors.  Instead, the four corners of Wijay and Israel must be accepted as being within the knowledge of a person of ordinary skill in the art in 1996, and the only relevant question is whether the specific, trivial variants recited in the asserted claims would have been obvious to such a person in view of those references.  Plaintiffs present virtually no secondary evidence on *that* question.

Plaintiffs' commercial success argument fails because it presumes—without evidence—that the accused products practice the patents.  Plaintiffs have the burden of establishing infringement if they wish to rely on Abbott's sales as proof of commercial success.  *See J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).  In other words, the presumption upon which Plaintiffs seek to rely is applicable *only* if they can show a nexus between the successful product and the allegedly novel features of the patented invention, which they have not done and cannot do.  *See Comcast Cable Commc'ns Corp. v. Finistar Corp.*, No. C-06-04206, 2008 WL

---

[6] Plaintiffs fail to mention one very important fact.  Namely, ACS's Multi-Link designs are *open-cell* designs, which derive their flexibility primarily from the numerous unconstrained peaks in the rings.  (Dkt. No. 408 at 3.)  This allows the rings, themselves, to bend and deform during delivery, providing flexibility as the stent takes a bend.  (Dkt. No. 402, Ex. 41 at 118, Ex. 14 at 53; Ex. 62 at 93.)  Because of this, the need for curved connectors in open-cell designs is not as great as in closed-cell designs (such as those disclosed in the patents-in-suit), and different design tradeoffs come into play.  Thus, the design tradeoffs and considerations that went into transitioning from straight to curved connectors in the Multi-Link design are irrelevant to whether it would have been obvious to modify Wijay in light of Israel, *both of which already have curved connectors.*

1   2740324, *8 (N.D. Cal. July 11, 2008) (granting summary judgment of obviousness and dismissing

2   patentee's attempted reliance on the accused product's success where patentee failed to make "any

3   proper showing that the success of [the accused] system was attributable to the teachings of the

4   [asserted] patent."). A mere allegation of "prima facie" infringement is not sufficient. *Friskit, Inc. v.*

5   *RealNetworks, Inc.*, 499 F. Supp. 2d 1145, 1154 (N.D. Cal. 2007) (granting summary judgment of

6   obviousness despite commercial success of the accused product and despite patentee's allegation of

7   "prima facie" infringement).

8        As a fallback, Plaintiffs cite to the conclusory opinion of their expert, Dr. Rothman, that there

9   was allegedly a "long felt need" for the claimed invention in 1996 and that others had failed to arrive

10  at the same idea of connecting undulating rings with curved, non-sinusoidal, peak-to-valley

11  connectors. The latter point is demonstrably false. Wijay, for instance, disclosed such a design in

12  October 1995 (Dkt. No. 402, Ex. 20, Figs. 2-2A and col. 8:55-57), and Mr. Brown at SciMed

13  likewise conceived of such a design in November 1995 (Dkt. No. 402, Ex. 3). As for the conclusory

14  assertion of "long felt need," Dr. Rothman relies primarily on *ACS's* development activities, which,

15  as explained above, are irrelevant because they involved an open-cell stent design, unlike that

16  disclosed in the patents-in-suit. (*See* n.6, *supra*.) Moreover, there is no evidence to support Dr.

17  Rothman's opinion that "Drs. Penn and Ricci were the first to meet the long-felt need of the art for a

18  stent that was flexible and had sufficient scaffolding strength by virtue of their stent design." (Dkt.

19  No. 402, Ex. 39 at ¶ 339.) This assertion is easily rebutted by the fact that Medtronic, itself, has no

20  plans to adopt the claimed design, apparently satisfied that its open-cell, out-of-phase design is

21  sufficiently flexible and strong. (Dkt. No. 402, Ex. 14 at 31-32.)

22        Plaintiffs present no relevant evidence of unexpected results. Instead, much of the cited

23  evidence relates to *ACS's* stent development, which, again, is irrelevant to an obviousness analysis

24  based on Wijay and Israel. (*See* n.6, *supra*.) Plaintiffs also ignore (and thus do not dispute) the

25  testimony of their own inventors and experts that the stent itself is "one of our simplest technologies"

26  (Dkt. No. 402, Ex. 33 at 229-30); that the use of curved connectors was ███████████████████

27  ████████ (Ex. 60); that it is "elementary" that flex members add flexibility to straight struts (Dkt. No.

28  402, Ex. 46 at 56); and that "U-shaped" flexure members were known in 1996 to be "one of the

1    simplest structures" for increasing flexibility in a straight beam (Dkt. No. 402, Ex. 48 at ¶ 22).  The

2    behavior of such a "simple" and "elementary" feature would have been predictable to those skilled in

3    the art in 1996, even if some routine experimentation was required.  *Pfizer*, 480 F.3d at 1364

4    ("[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art

5    so long as there was a reasonable probability of success.").

6           Plaintiffs also ignore that other stent designers contemporaneously conceived of the same

7    designs, asserting that such "non prior art" cannot support Abbott and BSC's position.  (Dkt. No. 448

8    at 26.)  Abbott and BSC, however, are not offering this evidence as "prior art" but, rather, as

9    evidence of near-simultaneous conception, which the Federal Circuit has specifically endorsed.  *See*

10   *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 883-84 (Fed. Cir. 1998); *see*

11   *also Rockwell Int'l Corp. v. U.S.*, 37 Fed. Cl. 478, 500 (Ct. Fed. Cl. 1997) ("Evidence that several

12   persons working in the same art each independently arrive at the same solution to the operative

13   problems at roughly the same time mitigates strongly toward a finding that the solution was obvious.

14   An independent conception need not be prior art.") (citations omitted), *vacated-in-part on other*

15   *grounds,* 147 F.3d 1358 (Fed. Cir. 1998).

16          In the end, secondary considerations "do not control the obviousness inquiry," which is a

17   question of law.  *Tokyo Keiso Co., Ltd. v. SMC Corp.*, 533 F. Supp. 2d. 1047, 1059-60 (C.D. Cal.

18   2007) (granting summary judgment of obviousness despite disputed secondary considerations);

19   *Friskit*, 499 F. Supp. 2d at 1153-54 (same); *Comcast*, 2008 WL 2740324 at *8 (same).  Thus, where

20   the primary evidence of obviousness is strong, summary judgment may be granted even if the

21   patentee has presented "substantial evidence" of secondary factors.  *See Leapfrog Enters., Inc. v.*

22   *Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (upholding summary judgment where

23   "substantial evidence of commercial success, praise, and long-felt need" were "inadequate to

24   overcome a final conclusion that [the asserted claim] would have been obvious.").

25          **C.    The "U-Shaped" Limitation Is Indefinite Because Validity Requires a Definite**
               **Scope, Not Just a Definition**

26

27          Patent claim terms must be reasonably definite so the public can know whether an activity

28   infringes.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Case 4:06-cv-01066-PJH   Document 492   Filed 09/03/08   Page 23 of 24

1    Indefiniteness is a two-part inquiry: (1) the Court must be able to define a term *and* (2) the term (as

2    defined) must sufficiently identify what is claimed:  "Even if a claim term's definition can be

3    reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate

4    the definition into meaningfully precise claim scope."  *Id.* at 1251.  Here, Plaintiffs focus only on the

5    first half of the analysis—whether the term can be defined—and ignore the question of whether that

6    definition is "meaningfully precise," i.e., "sufficiently definite to inform the public of the bounds of

7    the protected invention."  *Id.* at 1249.[7]

8            As set forth in the opening brief, the disagreement here *among Plaintiffs and their own*

9    *experts* conclusively establishes that "U-shaped" is fatally imprecise.  Plaintiffs attempt to sweep

10   aside this disagreement by claiming that, "predictably, the *parties* disagree as to how this settled

11   definition applies." (Dkt. No. 448 at 33, emphasis added.)  Yet this is not a disagreement between the

12   parties.  It is the Plaintiffs failing even to get their <u>own</u> story straight.  Abbott and BSC cited

13   testimony in their motion by Dr. Rothman, Dr. Penn, Dr. Eberhart, and Dr. Ricci (all Plaintiffs'

14   experts), as well as Plaintiffs' own Responses to Requests for Admission, to show that Plaintiffs and

15   their own experts have been fundamentally inconsistent in defining the boundaries of what is "U-

16   shaped." (Dkt. No. 408 at 32-34.)  Plaintiffs' opposition does not rebut this testimony, provide a

17   theory to harmonize these divergent opinions, or otherwise explain the boundaries of this term.[8]  It is

18   this failure of Plaintiffs and their own experts to articulate "meaningfully precise" bounds for the

19   claim that demonstrates the indefiniteness of the term "U-shaped" as a matter of law.[9]

20
     _____

21
            [7] Plaintiffs' reliance on *Aero Products Int'l, Inc. v. Intex Recreation Corp.*, 466 F.3d 1000
22   (Fed. Cir. 2006) is likewise misplaced.  *Aero Products* addressed only the first part of the
     definiteness inquiry—whether the term could be construed.  It did not reach the second requirement
23   in *Halliburton*, and the issue presented here, namely, whether the term provides "meaningfully
     precise claim scope."  514 F.3d at 1251.
24
            [8] Plaintiffs' contention that Abbott and BSC's argument rests upon the application of a
25   contemporaneous understanding of "U-shaped" is unsupported.  Plaintiffs' experts did not testify that
     the meaning of the term had changed over time or that they were applying a contemporaneous
26   definition, and Plaintiffs have not proffered any reason why the meaning of the term "U-shaped" has
     changed in the last decade.  Common sense establishes that it has not.
27
            [9] Plaintiffs cite *Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819 (Fed. Cir. 1988) for
28   the proposition that their experts' inconsistent definitions of "U-shaped" relate to infringement and
     not indefiniteness. (Dkt. No. 448 at 33.)  In *Andrew Corp.*, however, claim terms such as "close
                                                                                            (continued . . .)

                                             19

(continued . . .)

1        The public is entitled to know the scope of Plaintiffs' claims; and where, as here, Plaintiffs

2   themselves are incapable of describing those bounds in "meaningfully precise" terms, the claims are

3   indefinite. *Halliburton*, 514 F.3d at 1251.

4   **III.     CONCLUSION**

5        For the reasons explained in Abbott and BSC's Motion and above, Abbott and BSC's Motion

6   for Summary Judgment of Invalidity should be granted.

7

8   Dated: September 3, 2008

9   FINNEGAN, HENDERSON, FARABOW,        FISH & RICHARDSON PC
        GARRETT & DUNNER, L.L.P.

10

11   By:_____/s/_____    By:_____/s/_____

12               James R. Barney              Frank E. Scherkenbach

13

14

15

16

17

18

19

20

21

22

23

24

25

---

   (…continued)

26   proximity" were held not indefinite because the language was "as precise as the subject matter

27   permits." (847 F.2d at 822.) Here, in contrast, the evidence shows that "U-shaped" is indefinite
      because it is unclear whether the corners must be round (Dkt. No. 408 at 34), whether the sides must
      be parallel (*id*. at 32-34), and whether the ends of the "U" can be flared (*id*. at 34). Because any of

28   these points could have been defined with more precise language, *Andrew Corp.* does not apply.